DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 05-30102-MAP
_____

ANTHONY GARVIN,
PLAINTIFF

V.

HAMPDEN COUNTY SHERIFF'S DEPARTMENT, ET AL.,
DEFENDANTS
_____

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

Now come the defendants in the above-captioned matter, and they move

for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the

grounds that there are no material facts in dispute and Defendants are entitled to

judgment as a matter of law for the

reasons set forth in Defendants' Memorandum In Support of Motion for Summary

Judgment, which is filed herewith.

For the Defendants by their Attorneys

___s\Kevin D. Withers_____
Edward J. McDonough, Jr., BBO# 331590
Kevin D. Withers, BBO# 531660
Katherine A. Day, BBO# 657765
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

Certificate of Service

___s\Kevin D. Withers\___ certifies that copies of the foregoing document were
served on all parties by fax/mail on July 31, 2007.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 05-30102-MAP
_____

ANTHONY GARVIN,
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT,
SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS,
COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS,
DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON,
LT. (FIRST NAME UNKNOWN) KORMAN,
LT. JUAN RAMOS,
LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW,
OFFICER VICTOR KELLY, AND
THE UNKNOWN OFFICER IN THE TOWER,
DEFENDANTS
_____

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT.**

The defendants hereby submit this memorandum of law in support of their

motion for summary judgment.

### SUMMARY OF PLAINTIFF'S CLAIMS

It appears from the plaintiff's complaint that this inmate litigation presents

two principal claims: (1) that the defendants failed to provide adequate security,

as a result of which the plaintiff, Anthony Garvin, was the victim of an assault

and battery by another prisoner (Timothy Zanetti) on June 2, 2003; and (2) that

the defendants are somehow liable for testimony given against Garvin in a

criminal case by a prisoner (Omar Marrero) who was Garvin's cell mate for a

short time in September, 2003 while they were incarcerated at the Hampden

County Correctional Center in Ludlow, MA ("HCCC").  *See* Complaint, ¶¶ 6-9 (App. p. 2).  The defendants deny Garvin's allegations and submit that he cannot support a cause of action under any federal or state law.

The Court should enter summary judgment on Garvin's claims.  With respect to the tort claims, the defendants are absolutely immune from damages that allegedly arise from their discretionary acts and policy making decisions or from an intentional assault by a third party, s*ee* Mass. G.L. c. 258 §§10(b) and 10(j), and there is no evidence of gross negligence to overcome the bar to Plaintiff's claims posed by §10(i) with respect to another inmate's escape from his cell.  To the extent that Garvin has attempted to plead various civil rights claims, those claims should be dismissed because Garvin has not proffered evidence of each element of the claim and the allegations of negligence do not as a matter of law amount to a civil rights claim.

To the same extent, the defendants have no liability for the allegedly false testimony and invasion of privacy by Garvin's former cell mate.

### SUMMARY JUDGMENT STANDARD

UnderRule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993).  A fact is material if, based upon the substantive law at issue, it might affect the outcome of the case.  *See Anderson*, 477 U.S. at 248; *Mack v. Great Atl. and Pac. Tea Co.,*

*Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989).

**ARGUMENT**

### I.  PLAINTIFF CANNOT RECOVER ON HIS CLAIMS RELATING TO THE ASSAULT BY A FELLOW DETAINEE.

Garvin claims that as a result of the assault by Zanetti, he "suffered injuries of a deep cut on his lower lip, which left a perminate [sic] scar, two bumps to the back of his head and trauma to his eye." App. 3 (Complaint ¶ 22.) He alleges that he "continuously requested medical treatment which was repeatedly denied to him by unit staff." App. 3 (Complaint ¶ 23.) Significantly, Garvin does not claim that any of his injuries were inflicted by or at the direction of the defendants; his claim in Count I is based upon his belief that the defendants violated his civil rights by housing him in Administrative Segregation as a Protective Custody status inmate, were negligent in preventing the assault by Zanetti, and denied him proper medical care after the assault.

### A.  THERE IS NO EVIDENCE TO WARRANT A FINDING THAT DEFENDANTS VIOLATED PLAINTIFF'S CIVIL RIGHTS BY DENYING MEDICAL CARE.

As a pre-trial detainee at the time of the assault, Garvin's claim that he was denied medical treatment invokes the due process protections of the Fourteenth Amendment. *See Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 111 S.Ct. 2266 (1991). Pre-trial detainees are

3

entitled to "rights . . . at least as great as the Eight Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). "The Eighth Amendment . . . imposes a duty to attend to a prisoner's 'serious medical needs.' Government officials violate the Constitution if they exhibit 'deliberate indifference' to such needs." *Gaudreault*, 923 F.2d at 208 (internal citations omitted). Deliberate indifference may be demonstrated by prison officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976).

Here, it is undisputed that Garvin was injured by Zanetti during the assault; however, Garvin's injuries did not rise to the level of a "serious medical need," and, even if they did, the defendants' response in obtaining timely medical care was appropriate. "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault*, 923 F.2d at 208. There is no evidence that mandated treatment was not given to the Plaintiff. In *Gaudreault*, the Court found that the plaintiff's multiple bruises to his face and body, abrasion on his upper back, corneal abrasion, deviated septum, and transient nerve damage were not "serious medical needs" because it was not obvious that a doctor's attention to them was necessary. *Id*. at 208 ("While Gaudreault's injuries may have been 'obvious' in the sense that his bruises and abrasions were visible, the medical record demonstrates that he did not display any *needs* so patent as to make lay persons . . . remiss in failing to

arrange for immediate medical attention."). In this case, Garvin's injuries consisted of a lacerated lip, bumps to his head, and "trauma" to his eye. Like the plaintiff in *Gaudreault*, Garvin's bruises and bleeding lip may have been visible to the defendants, but they simply to not rise to the level of "serious medical needs" so as to trigger Constitutional protection.

Additionally, Garvin's allegation that the defendants failed to provide him with proper medical treatment is unfounded. "The First Circuit has instructed that the 'seriousness' of an inmate's needs may . . . be determined by reference to the effect of the delay of treatment. Under this test, a medical need is considered 'serious' when the delay in treating it causes 'unnecessary and wanton infliction of pain' or 'a life-long handicap or permanent loss.'" *Rand v. Simonds*, 422 F.Supp.2d 318, 330 (D.N.H. 2006) (internal citations and quotations omitted). First, Garvin was seen by medical personnel shortly after the incident. See App. 59 (Medical Record). In fact, Garvin included as Exhibit D of his Complaint the Incident Report Form sworn to under the pains and penalties of perjury by both Defendant Muldrow and Defendant Korman, which states that "[b]oth inmates were seen by medical" shortly after the assault occurred. Garvin's claim that he was not treated for several days is completely inconsistent with the record. In addition to being seen on the day of the attack, he was seen again two days later, referred to a medical doctor for an eye exam and then seen by the eye doctor on June 10, 2003. No significant problem was found, nor was any further treatment prescribed. Moreover, even if the defendants had delayed or failed in providing Garvin with medical treatment, which they did not, there is nothing in the record

that indicates, nor does Garvin even claim, that such delay exacerbated his injuries in the slightest.  Certainly, he has produced no medical evidence of such exacerbation.

Despite Plaintiff's claims that Defendants ignored his requests for treatment, there is no evidence that he had "serious medical needs" or that defendants exhibited "deliberate indifference" to such needs.  Accordingly, there is nothing to support Garvin's claim that the defendants violated his civil rights by denying him proper medical treatment.

**B.    THERE IS NO EVIDENCE THAT DEFENDANTS VIOLATED PLAINTIFF'S CIVIL RIGHTS BY FAILING TO PROTECT HIM FROM ASSUALT BY ANOTHER INMATE.**

In Count I, Garvin claims that the defendants violated his civil rights and, with "indifference and negligence" towards his safety, failed to protect him from an assault by another inmate.  The United States Supreme Court answered the question of whether prison officials may be held liable for violence against inmates by fellow inmates in *Farmer v. Brennan*, 511 U.S. 825 (1994). Specifically, although the Court held that there is a governmental obligation to "protect prisoners from violence at the hands of other prisoners, . . . [*i*]*t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety*." *Id*. at 833-34 (internal quotations omitted) (emphasis added).  A prisoner who is assaulted by a fellow prisoner must meet two conditions in order for the prison officials to be liable.  *Id*. at 834.  First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id*.

6

And, second, the inmate must show that the prison officials acted with "'deliberate indifference' to his health or safety." *Id.*

Admittedly, the first requirement does not present a difficult hurdle for Garvin to meet. As the discovery previously provided by the defendants shows, they were concerned that Garvin might be a target for retaliation by fellow gang members of the man Garvin killed from the time Garvin first came to HCCC. That was the very reason that he was placed in administrative segregation upon his arrival. Thus, the issue in this case is not whether the defendants knew or had reason to believe Garvin needed some special protection, but whether they were deliberately indifferent to his safety. It is this second requirement that Garvin fails to meet.

It is well settled that "deliberate indifference entails something more than mere negligence." *Farmer*, 511 U.S. at 835; *see also Suprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005) ("Deliberate indifference . . . is a mental state akin to criminal recklessness."); *Calderon-Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002); *Burrell v. Hampshire County*, 307 F.2d 1, (1st Cir. 2002) ("Th[e] state of mind [of deliberate indifference] is more blameworthy than negligence."); *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999) ("[Deliberate indifference], requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness."). The "deliberate" part of "deliberate indifference" has been held to require "that a prison official subjectively 'must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Burrell*, 307 F.d at 8 (*citing Farmer*, 511 U.S. at 837). Additionally, and a critical factor in this case, the "indifference" part of "deliberate indifference" means that, even if the prison officials are aware of the risk, "*they cannot be deliberately indifferent if they responded reasonably to the risk, even if*

7

*the harm ultimately was not avoided.*" *Id.* (emphasis added). Thus, because "[a] prison official's duty under the Eight Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions," *Farmer*, 511 U.S. at 844 (internal citations and quotations omitted), "*a reasonable response clearly defeats the claim of constitutional violation*," *Burrell*, 307 F.2d at 8 (emphasis added). *See also*, *e.g.*, *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997) ("reasonable measures taken to avert known risks will insulate a prison official from Eighth Amendment liability, even if those measures prove unsuccessful"); *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (defendants did use measures, although unsuccessful, to thwart threat to plaintiff).

A brief review of the facts of this case establishes that the defendants were not deliberately indifferent to Garvin's safety. Upon entering HCCC, Garvin was classified as Protective Custody status based upon the defendants' concern that fellow gang members of the man who Garvin was accused (and ultimately convicted) of shooting might attempt to retaliate against Garvin in reprisal for the victim's death. Garvin had no objections to his classification as Protective Custody. On June 2, 2003, Defendant Muldrow escorted Garvin to a sub-day room for recreation. App. 35. Shortly thereafter, while Defendant Muldrow was escorting another inmate to the showers, that inmate's cell mate, Zanetti, rushed out of his cell past Defendant Muldrow, and ran into the sub-day room where Garvin was recreating. App. 13. Although defendants Muldrow and Kelly immediately acted to restrain Zanetti, he was able to punch Garvin several times before they could do so. App. 13. As a result of the assault by Zanetti, Garvin suffered a laceration to his lip, a lump over his eye, and some bruises to the back of his head, and was seen that day by medical personnel. Additionally, Garvin

was seen not long thereafter by an eye doctor after he complained of throbbing of his eye. *See* App. 59-59D.

The facts of this case demonstrate that the defendants were most certainly not deliberately indifferent to Garvin's safety. When the defendants became concerned that Garvin might be a target for retaliation, he was classified as Protective Custody status and housed in the Administrative Segregation Unit. He was given use of the sub-day room by himself for recreation. There is no evidence that Zanetti had escaped or tried to escape from his cell previously or that Defendants had any particular reason to believe Zanetti posed a threat to Plaintiff. When, unfortunately, he was assaulted by a fellow detainee, the correctional officers on duty immediately acted to restrain his attacker.[1] The defendants' actions constitute a reasonable response to their concerns for Garvin's safety and preclude a finding of deliberate indifference for his safety.

In discovery, Plaintiff has suggested that Defendants Cadigan and Weldon violated Plaintiff's rights because they did not comply with his request to be transferred to another facility. This claim also fails.

As discussed in more detail below, housing and classification are decisions which are left to the broad discretion of prison officials. Moreover, inmates have no right or reasonable expectation in choosing the location of their incarceration, because "prison inmates have the protections of procedural due process only if there is an existing liberty or property interest at stake" *See Torres v. Comm'r of Corr.*, 427 Mass. 611, 617 (1998) No such liberty interest exists in the place of a prisoner's incarceration. *See Abdullah v. Sec'y of Pub. Safety*, 42

---

[1]Indeed, the defendants would not have been deliberately indifferent even if they failed to break up the fight if they reasonably believed that their intervention would threaten their own safety. *See Williams v. Willits*, 853 F.2d 585 (8th Cir. 1988).

Mass.App.Ct. 387, 390 (1997) (transfers do not fall within due process protections because they do not impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life).

Prison officials have broad discretion to transfer and to place inmates confined within the state correctional system. *See Jackson v. Comm'r of Corr.*, 388 Mass. 700, 703 (1983). "The Commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another . . . ." G.L. c. 127 §§ 97. Because prison officials retain by law the discretion to transfer a prisoner "for whatever reason or for no reason at all," <u>*Meachum v. Fano,*</u> 427 U.S. 215, 228 (1976), a prisoner can have no reasonable expectation to remain in, or be granted a transfer to, a particular prison. *See Hastings v. Comm'r of Corr.*, 424 Mass. 46, 52-53, 674 N.E.2d 221, 225 (1997) ("A prisoner cannot harbor a reasonable expectation of remaining at a particular prison, or in a particular custodial setting, so long as prison officials retain discretion to transfer him for whatever reason or no reason at all."). Thus, having failed to identify any recognizable legal interest in a transfer to another facility, Garvin's claim that defendant Weldon's and Cadigan's denial of his request violated his civil rights is without merit.

### C.     PLAINTIFF CANNOT RECOVER ON HIS CLAIMS AGAINST THE DEFENDANTS BASED ON NEGLIGENCE.

Tort claims against the Commonwealth of Massachusetts, its subdivisions and its employees are subject to the provisions of the Massachusetts Tort Claims Act, Mass. General Laws, chapter 258, section 1, et seq. Insofar as the Plaintiff

asserts claims based on theories of negligence, those claims must comport with

the Tort Claims Act's provisions.

          1.    <u>The individual defendants are immune from liability based on negligence                         committed in the course and scope of their employment</u>.

      Section 2 of chapter 258 provides, in part, that

         Public employers shall be liable for injury … caused by the negligent or wrongful         act or omission of any public employee while acting within the scope of his office        or employment, in the same manner and to the same extent as a private individual        under like circumstances, …. The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject        matter against the public employer or, the public employee or his estate whose        negligent or wrongful act or omission gave rise to such claim, and *no such public employee or the estate of such public employee shall be liable for any injury ...        caused by his negligent or wrongful act or omission while acting within the        course and scope of his office or employment*. (emphasis added)

Each of the individual named defendants in this case is a public employee within

the meaning of Mass. General Laws chapter 258. Section 1 of that statute defines

"public employer" as

        the Commonwealth and any county, city, town, educational collaborative, or        district, …, and any department, office, commission, committee, council, board,        division, bureau, institution, agency or authority thereof …, or any other       independent body politic and corporate.

Section 1 of that statute defines "public employee" as

        elected or appointed, officers or employees of any public employer, whether        serving full or part-time, temporary or permanent, compensated or        uncompensated, ….

Since the end of county government, the Hampden County Correctional Center

has been owned by the Commonwealth of Massachusetts. As the elected Sheriff

of Hampden County, the defendant Sheriff Michael J. Ashe, Jr. is in charge of

operations at the facility and he and the other individual defendants are all

employees of the Commonwealth.  Accordingly, there is no substantial dispute

that the Commonwealth is a "public employer" and the individual defendants are

"public employees" under the Massachusetts Tort Claims Act, Chapter 258.

There is also no dispute that the claims against the individual defendants are for

actions committed in the course and scope of their duties.  As public employees,

the individual defendants are immune from tort liability.  Accordingly, summary

judgment should be granted to each of the individual defendants with respect to

the Plaintiff's tort claims in this case.

> 2. Plaintiff's claims that Defendants were negligent with respect to the decisions they made concerning classification or housing are barred by the discretionary function exclusion of the Mass. Tort Claims Act.

Garvin asserts that the defendants were negligent with regard to his safety

by failing to protect him from the assault by Zanetti.  Garvin's claim appears to be

based, in part, upon his contention that the defendants were negligent in his or his

assailant's classification status and housing assignment.   To the extent that

Garvin's claim could be construed to invoke the Massachusetts Tort Claims Act,

G.L. c. 258, for Count I, such a claim is without merit.  Although Massachusetts

has waived in limited respects its sovereign immunity,[2] the legislature, however,

---

[2]General Laws c. 258 §2, the Massachusetts Tort Claims Act, provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in

was careful *not to waive* the Commonwealth's immunity in certain respects, which are at issue here. In particular, under the Massachusetts Tort Claims Act, the Commonwealth is absolutely immune from liability for "any claim based upon the exercise or performance or the failure to exercise or perform a *discretionary function* or duty on the part of a public employer or public employee, acting within the scope of his office or employment, *whether or not the discretion involved is abused.*" G.L. c. 258 §10(b) (emphasis added). As outlined below, courts in the Commonwealth and elsewhere have recognized that decisions by prison officials concerning the classification and housing of prisoners falls squarely within the discretionary function exception.

The decision of where to house inmates is by its very nature dependent upon the facts of each individual case and the discretionary application of policy decisions to those facts. That discretionary decision necessarily involves use of the investigating correctional officer's judgment, experience, and common sense, and thus, the defendants' discretion. Without discretion in each case, the defendants would be unable to make appropriate decisions depending upon how facts presented themselves or evolved. Indeed, the applicable regulations take into account the factual intensity of prisoner classification and residential placements, stating: "The primary goal of the Massachusetts Department of Correction classification process is to provide a systematic means by which the security requirements and programmatic needs of the inmates are assessed in

---

the same manner and to the same extent as a private individual under like circumstances."

relation to Department rules and regulations, statutory requirements and available resources."  103 C.M.R. 420.07.

Several courts have held that prison officials' decisions regarding where and how to house or classify inmates are discretionary and thus subject to immunity, either with respect to negligence or civil rights claims.  *See e.g. Jackson v. Commissioner of Correction*, 388 Mass. 700, 703, 448 N.E.2d 60 (1983) (commissioner has broad discretion to transfer and to place inmates confined within the correctional system); *Tavarez v. Essex County,* 735 N.E.2d 1269, 49 Mass.App.Ct. 1113 (2000) (Rule 1:28 decision) ("A decision whether to equip bunk beds in a correctional facility with ladders necessarily involves the balancing of the safety of the prisoners against the safety and security of correction officers.  Such a decision is characterized by a high degree of discretion and the weighing of alternatives and, therefore, warrants immunity."); *Matthews v. Rakiey,* 649 N.E.2d 770, 38 Mass.App.Ct. 490 (1995) (prison superintendent was immune from civil rights claims because he had broad discretion to determine when someone is a security  risk for purposes of assigning them to noncontact visitation); *Lyman v. Weld,* 1996 WL 1185055, *8 (Mass.Super. 1996) (decision regarding whether to transfer inmate from medium to minimum security is discretionary).

Garvin was at the time of the assault, and currently remains, in the custody of the Commonwealth of Massachusetts, and therefore, may not assert a claim for negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.* (providing a limited waiver of the federal government's sovereign immunity

as to negligent acts of government employees acting within the scope of the their

employment). Nevertheless, because Massachusetts and federal law are quite

similar with respect to the discretion afforded to prison officials for classification

and housing decisions, a brief summary of federal case law is instructive.

The United States Supreme Court has consistently held that courts should

defer to the discretion of prison officials in matters of institutional safety.  In

*Whitely v. Albers*, 475 U.S. 313, 321-22 (1986), the United States Supreme Court

stated:

> [T]he admonition that 'a prison's internal security is
> peculiarly a matter normally left to the discretion of
> prison administrators' . . . carries special weight.
> 'Prison administrators . . . should be accorded wide
> ranging deference in the adoption and execution of
> policies and practices that in their judgment are
> needed to preserve internal order and discipline and
> to maintain institutional security' . . . . That
> deference extends to prison security measures taken
> in response to an actual confrontation with riotous
> inmates, just as it does to prophylactic or
> preventative measures intended to reduce the
> incidence of these or any other breaches of prison
> discipline.  *It does no insulate from review actions
> taken in bad faith and for no legitimate purpose, but
> it requires that neither judge nor jury freely
> substitute their judgment for that of officials who
> have made a considered choice.*

(emphasis added).  Clearly, the establishment of prison security policy is a matter

within the discretion of prison authorities. *See Rhodes v. Chapman*, 452 U.S. 337,

349 n. 14 (1981) ("A prison's internal security is peculiarly a matter normally left

to the discretion of prison administrators."); *Bell v. Wolfish*, 441 U.S. 520, 547

(1979) (prison officials must be accorded wide-ranging deference in the adoption

of policies and practices that in their judgment are necessary to preserve

institutional order and discipline).

In *Santana Rosa v. United States*, 335 F.3d 39 (1st Cir. 2003) (Ponsor, J.,
sitting by designation), the First Circuit held that the federal discretionary
function exemption barred negligence claims arising out of an assault by one
prisoner on another.  *Id.* at 43-45.  Like Garvin, the plaintiff in *Santana Rosa*
claimed that prison officials negligently classified him with other prisoners,
placed him in a dangerous position, and failed to protect him from harm.  The
court held that decisions regarding where and with whom to house prisoners are
discretionary decisions that are immune from attack, regardless of whether the
decisions were made negligently.  *Id.* at 44.  On behalf of the court, Judge Ponsor
wrote:

> The management of large numbers of potentially dangerous
> individuals within a penal facility inevitably requires not only the
> exercise of discretion but decision-making within the context of
> various difficult policy choices.  In many, if not most, instances
> where an inmate is unfortunately injured by another inmate, it will
> be possible to argue that a different exercise of discretion or a
> different policy choice might well have forestalled the injury.
> Nevertheless decisions with regard to classification of prisoners,
> assignment to particular institutions or units, and allocation of
> guards and other correctional staff must be viewed as falling within
> the discretionary function exception to the [tort claims act], if
> penal institutions are to have the flexibility to operate.

*Id.* at 44; *see also Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998)
(rejecting plaintiff's argument that, "anytime a prisoner is injured by another
prisoner, he can bring an action claiming that the BOP was negligent in
classifying prisoner who committed the assault and placing him in the institution
at which the attack occurred, or in not removing that prisoner based on some prior
incident, or in not restricting his movement, or in not providing more guards, or
so forth" because such cases "exemplif[y] the type of case Congress must have

had in mind when it enacted the discretionary function exception"); *Calderon v. United States*, 123 F.3d 947, 949-50 (7th Cir. 1997) (holding that the discretionary function exception to FTCA barred recovery for plaintiff whose ear was severed during an attack by his cell mate even after plaintiff had reported cell mate's threats to prison officials on several occasions).

Accordingly, Garvin cannot base a negligence claim upon the defendants' decisions regarding classification and housing.

The discretion involved in this case is exactly the type for which the Tort Claims Act provides immunity to the defendants. As such, Garvin's claim that the defendants, because their classification and housing decisions, are somehow liable for the injuries he sustained at the hands of a third party must fail.

3.    Plaintiff's claim that Defendants are liable for negligently failing to prevent an assault on him by a fellow inmate is barred by the public duty and escape exclusions of the Mass. Tort Claims Act.

Mass. General Laws, chapter 258, §10, as amended by St. 1993, c.495, s.57, provides in relevant part that

the provisions of sections 1 through 8, inclusive, shall not apply to …

(i) any claim based upon the release, parole, furlough or escape of any person, including but not limited to a prisoner, inmate, detainee, juvenile, patient or client from the custody of a public employee or employer or their agents, unless gross negligence is shown in allowing such release, parole, furlough or escape.

(j) any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including

the violent or tortuous conduct                of a third person, which is not
originally caused by the public employer or any                other person
acting on behalf of the public employer.

Here, the physical assault on the plaintiff was committed by Mr. Zanetti, a fellow

inmate who escaped from his cell into the area where Plaintiff was having

recreation.  (App. p. 35)  There is no evidence that the Commonwealth or any of

the individual defendants did anything to cause Mr. Zanetti to attack the Plaintiff.

The suggestion is that he did so for personal reasons relating to the fact that

Plaintiff was charged with (and later convicted of) murdering a certain gang

member.  For purposes of the statutory public duty rule, clause (j) of section 10 of

chapter 258, there is immunity in respect to all consequences except where the

condition or situation resulting in Plaintiff's injury was originally caused by the

public employer.  It must have committed the affirmative act that lead to the

injury.  Here, Plaintiff's claim is that the defendant's negligently failed to prevent

his injury by a third party, not that the Commonwealth or one of its employees

affirmatively caused his injury.  See, <u>Bonnie W. v. Com</u>., 419 Mass. 122, 125-126

(1994) and <u>Audette v Com</u>., 63 Mass.App.Ct.727, 829 N.E.2d 248 (2005).


        To the extent, plaintiff bases his claim on negligence in allowing Mr.

Zanetti to escape from his cell, the Plaintiff must show gross negligence on the

part of the Defendants.   The definition of "gross negligence" is well-settled in

Massachusetts law.

        Gross negligence is substantially and appreciably higher in magnitude
than ordinary negligence.  It is materially more want of care than constitutes
simple inadvertence. It is     an act or omission respecting legal duty of an

aggravated character as distinguished from  a mere  failure  to exercise  ordinary care.  It is very great negligence, or the absence of   slight diligence, or the  want of even scant care.  It amounts to indifference to present      legal duty and to utter forgetfulness of legal obligations so far as other persons may be      affected.   It is a heedless and palpable violation of legal duty respecting the rights of       others. The  element  of  culpability  which  characterizes  all  negligence  is  in  gross      negligence magnified to a high degree as compared with that present in ordinary       negligence.  Gross negligence is a manifestly smaller amount of watchfulness and       circumspection than the circumstances require of a person of ordinary prudence.... It falls       short  of  being  such  reckless  disregard  of probable consequences as is equivalent to a  willful    and   intentional   wrong. Ordinary and gross negligence differ in degree of    inattention,  while  both  differ in kind from wilful and intentional conduct which is or       ought  to  be  known  to have a tendency to injure.

Altman v Aronson, 231 Mass. 588, 591-593 (1919).  See also, First American

Title  Ins.  Co.  v.  Lippman,  67  Mass.App.Ct.  1102,  851  N.E.2d  1133,

(Mass.App.Ct. 2006).  The evidence in this case does not warrant a finding of

gross negligence with respect to Mr. Zanetti's escape from his cell.  The evidence

indicates that this event occurred suddenly when the door to the cell was opened

while  Mr.  Zanetti's  cellmate  was  being  returned  to  their  cell.    At  the  time,

Plaintiff was in the sub-day room, separated by a corridor from Zanetti's cell.

(App. p. 35-36)  There is no evidence to suggest that the officers had any reason

to expect Zanetti to run out of his cell based on prior "escapes" or any particular

sign that Zanetti desired to harm the Plaintiff.  To the extent that Defendants may

have  failed  to  observe  regular  procedures  for  transferring  prisoners  to  and  from

their  cells,  such  evidence  would  not  amount  to  anything  more  than  ordinary

negligence.  Accordingly, any claim based on negligence with respect to Zanetti's

escape from his cell must be dismissed on the basis of the escape exclusion of the

Tort Claims Act, clause (i), section 10 of chapter 258 of the General Laws.

## II. PLAINTIFF CANNOT RECOVER ON HIS CLAIMS RELATING TO THE TESTIMONY GIVEN BY ANOTHER INMATE AT PLAINTIFF'S CRIMINAL TRIAL.

In Count II of the Complaint, Garvin sets forth the novel claim that the defendants violated his civil rights because his former cell mate, Mr. Marrero, testified against him at criminal trial. The defendants are unaware of any law, state or federal, where prison officials have been found liable for the outcome after one inmate decides to testify against another. Although Garvin alleges that the defendants "conspired and acted in conjuction [sic] with a government agent and unlawfully seized information from the plaintiff's legal documents," his own sworn deposition testimony undermines his claim. *See* App. 7 (Complaint ¶ 58). In fact, Garvin specifically admitted that he has no evidence that the defendants were aware of any deal between Marrero and the District Attorney's office:

> Q:    And is it your claim that one of the named– one or more of the named defendants in this case was aware of that deal before Mr. Marrero was put in as your cell mate?
>
> A:    Well, either they were aware of the deal or there were aware that there was a possibility that he was a snitch.
>
> They knew that for sure because he told them.
>
> Q:    . . . As far as the deal that Mr. Marrero made with someone in the DA's office–
>
> A:    I can't say that they knew about that.

*See* App. 53 (Garvin Depo 90:14 to 91:5).

20

Insofar as Garvin attempts to set forth a claim for civil conspiracy, he falls woefully short. "Civil conspiracy is recognized as a 'very limited cause of action in Massachusetts.'" *Brown v. Armstrong*, 957 F.Supp. 1293, 1305 (D.Mass. 1997) (*quoting Aetna Cas. Ins. Co. v. P&B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994)). A valid civil conspiracy claim requires (1) a combination of two or more persons to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means, and (2) some peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in like relation to the plaintiff would not have had, and (3) damage. *See DesLauries v. Shea*, 300 Mass. 30, 33, 13 N.E.2d 932 (1938).

As stated in the answers to interrogatories of each defendant, the defendants were not aware of any "deal" between Marrero and the District Attorney's office before Marrero was assigned as Garvin's cell mate. *See* App. 64 et seq. (Answers to Interrogatories by Defendants). Garvin simply cannot provide any evidence to show that the defendants acted in concert to violate his civil rights; to the contrary, he concedes that the defendants were unaware of any "deal" between Marrero and the District Attorney's office. Garvin's allegation, which is unsupported by any evidence, is an insufficient foundation upon which to base a civil conspiracy claim. *See*, *e.g.*, *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118 (1st Cir. 2006) (plaintiffs make no factual allegations supporting conclusion that defendants engaged in common design to do a wrongful act); *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 772 N.E.2d 522 (2002) (affirming summary judgment in favor of defendants because evidence was

insufficient to establish an agreement among the defendants to injury the plaintiff); *Saxonis v. City of Lynn*, 62 Mass. App. Ct. 916, 817 N.E.2d 793 (2004) (plaintiff's "bare and conclusory allegations of a grandiose plot" fail to support a civil conspiracy claim). Accordingly, the defendants are entitled to summary judgment on Count II.

## CONCLUSION

For the forgoing reasons, the Court should enter summary judgment against Garvin and in favor of the defendants with respect to all claims.

For the Defendants by their Attorneys

_____s\Kevin D.Withers_____
Kevin D. Withers, BBO# 531660
Katherine A. Day, BBO# 657765
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

Certificate of Service
_s\Kevin D. Withers\___ certifies that copies of the foregoing document were served on all parties by fax/mail on July 31, 2007.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 05-30102-MAP
_____

ANTHONY GARVIN,
PLAINTIFF
v.

HAMPDEN COUNTY SHERIFF'S DEPARTMENT, ET AL.,
DEFENDANTS
_____

**APPENDIX TO DEFENDANTS' MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT.**

| | | |
|---|---|---|
| Ex. A | Two Count Civil Rights Complaint | pp. 1-19 |
| Ex. B | Answer of Defendants | pp. 20-30 |
| Ex. C | Deposition of Anthony Garvin [Part 1] | pp. 31-46 |
| Ex. D | Deposition of Anthony Garvin [Part 2] | pp. 47-58 |
| Ex. E | Medical Records | pp. 59-59D |
| Ex. F | Plaintiff's Answers to Interrogatories | pp. 60-63 |
| Ex. G | Defendant Victor Kelly's Answers to Interrogatories | pp. 64-68 |
| Ex. H | Defendant William Muldrow's Answers to Interrogatories | pp. 69-73 |
| Ex. I | Defendant Thomas Korman's Answers to Interrogatories | pp. 74-78 |
| Ex. J | Defendant John Cadigan's Answers to Interrogatories | pp. 79-83 |
| Ex. K | Defendant Juan Ramos' Answers to Interrogatories | pp. 84-88 |
| Ex. L | Defendant Edward Weldon's Answers to Interrogatories | pp. 89-93 |
| Ex. M | Defendant John Kenney's Answers to Interrogatories | pp. 94-98 |
| Ex. N | Defendant Basil Tsgaris' Answers to Interrogatories | pp. 99-103 |
| Ex. O | Defendant Michael J. Ashe, Jr.'s Answers to Interrogatories | pp. 104-108 |
| Ex. P | Defendant Commonwealth's Answers to Interrogatories | pp. 109-114 |

For the Defendants by their Attorneys

___\Kevin D. Withers _____
Edward J. McDonough, Jr., BBO# 331590
Kevin D. Withers, BBO# 531660
Katherine A. Day, BBO# 657765
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

The above swears under the pains and penalties of perjury that the attached are
true and accurate copies.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 05-30102-MAP
_____

ANTHONY GARVIN,
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT,
SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS,
COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS,
DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON,
LT. (FIRST NAME UNKNOWN) KORMAN,
LT. JUAN RAMOS,
LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW,
OFFICER VICTOR KELLY, AND
THE UNKNOWN OFFICER IN THE TOWER,
DEFENDANTS
_____

DEFENDANTS' STATEMENT OF MATERIAL FACTS
_____

1. Plaintiff Anthony Garvin filed the instant action against the defendants on April 27, 2005. *See* App. 1.

2. HCCC is owned and operated by the Commonwealth of Massachusetts. *See* App. 20 (Answer par. 2).

3. Defendant Michael J. Ashe, Jr. is the Sheriff of Hampden County and a public employee of the Commonwealth of Massachusetts. *See* App. 20 (Answer ¶ 2).

4. Defendants Basil Tsagaris, John Kenney, Edward Weldon, Thomas Korman, Juan Ramos, John Cadigan, William Muldrow, and Victor Kelly are public

employees of the Commonwealth of Massachusetts. *See* App. 20 (Answer ¶ 2).

5. On May 27, 2003, the plaintiff Garvin was housed as a pretrial detainee at the Hampden County Correctional Center (HCCC) in Ludlow, Massachusetts. *See* App. 2 (Complaint ¶ 17) and App. 33 (Garvin Depo. 11:9-12).

6. Garvin was classified as Administrative Protective Custody status and assigned to Pod C-2 in the Special Management unit based upon a concern that other inmates who were gang members may attempt to retaliate against Garvin for the murder one of their fellow gang members. *See* App. 11. (Complaint Ex. B - incident report).

7. Garvin did not object to his classification as Protective Custody status. *See* App. 34 (Garvin Depo, 14:5-7).

8. On the morning of June 2, 2003, defendant Muldrow escorted Garvin from his cell to a subday room for recreational time. *See* App. 35 (Garvin Depo. 19:2-8).

9. Shortly thereafter, while Muldrow was escorting inmate R. S. to the showers, inmate Timothy Zanetti, R.S.'s cellmate, ran out of the cell and into the subday room, where he began to punch Garvin. *See* App. 13 (Complaint Ex. D - Muldrow incident report).

10. Defendants Muldrow and Kelly restrained inmate Zanetti and returned him to his cell. *See* App. 13 (Complaint Ex. D).

11. Garvin was examined by medical personnel at approximately 10:55 a.m. for injuries sustained during the altercation. *See* App. 59 (Medical Record).

Garvin was treated for a lump over his eye, a bleeding lip, and dizziness. *See id*.

12. As a result of the assault by Zanetti, Garvin suffered a laceration to his lip and some bruises to the back of his head, and complained of a throbbing of his eye. *See* App. 39 (Garvin Depo. 33:10-17).

13. Garvin claims that defendant Weldon violated his civil rights by denying Garvin's request to be moved to another facility. *See* App. 6 (Complaint ¶ 51).

14. At his deposition, Garvin acknowledged that "[o]ther than the fact that [defendant Kelly] was in the unit that day," he was not responsible for the assault by Zanetti. *See* App. 43 (Garvin Depo. 50:1-5).

15. At his deposition, Garvin conceded that defendants Tsagaris, Kenney, Weldon, Korman, Ramos, Cadigan, and Ashe were not present at the time of the assault. *See* App. 43 (Garvin Depo. 50:6-10).

16. At his deposition, Garvin stated that defendant Cadigan denied his request to be transferred to another facility and instructed Garvin that "if [he] wanted to move that [he] would have to contact the jail [to which he wished to be transferred] and get permission from them." *See* App. 42 (Garvin Depo. 47:13-16).

17. At his deposition, Garvin stated that, with respect to defendants Tsagaris, Kenney, Weldon, Ramos, and Ashe, responsibility for the assault is based upon the decision to house him in Pod C-2. *See* App. 44-47 (Garvin Depo. 54:2 to 68:20).

18. On or about September 1, 2003, Garvin was moved to a double bunk cell in Pod C-2 and inmate Omar Marrero was assigned as Garvin's cellmate. *See* App. 4 (Complaint ¶¶ 35 and 37).

19. Garvin claims that Marrero "unlawfully searhed [sic] through the plaintiff's legal documents to seize information about the circumstancies [sic] of the plaintiff's criminal case for the benefit of the commonwealth [sic] as well as his own." *See* App. 5 (Complaint ¶ 45).

20. None of the defendants were aware of an agreement between Marrero and the District Attorney's Office prior to Marrero being placed in Garvin's cell. See App. 67 (Defendants' Answers to Interrogatory 23).

21. At his deposition, Garvin claimed that sometime in August of 2003, and prior to being assigned to Garvin's cell, Marrero "made a deal" with someone from the Hampden County District Attorney's Office to testify against Garvin in exchange for less time. *See* App. 67 (Garvin Depo. 72:7-18).

22. At his deposition, Garvin claimed to have a written statement from a witness who informed him of Marrero's alleged deal with the District Attorney's Office. *See* App. 49 (Garvin Depo. 73:8-15).

23. At his deposition, Garvin refused to provide the defendants with either the written statement or the name of the witness. *See* App. 49 (Garvin Depo. 73:21 to 74:9).

24. Approximately two or three weeks after Marrero was assigned as Garvin's cell mate, Garvin "was removed out of the cell." See App. 51 (Garvin Depo. 82:3-8).

25. On October 21. 2003, defendant Kelly entered on the system to keep Marrero and Garvin separate, because he had heard the men "talking one cell to another." See App. 68 (Kelly's Answer to Interrogatory #27).

26. At his deposition, Garvin admitted that the defendants did not know about the alleged deal between Marrero and the District Attorney's Office. See App. 53 (Garvin Depo. 91:2-5 ("I can't say that they knew about that.")).

For the Defendants, by their Attorneys

\Kevin D. Withers\
Edward J. McDonough, Jr., BBO# 331590
Kevin D. Withers, BBO# 531660
Katherine A. Day, BBO# 657765
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

Certificate of Service

\Kevin D. Withers\ certifies that copies of the foregoing document were served on all parties by fax/mail on July 31, 2007.

UNITED STATES DISTRICT COURT

MASS,SS

FEDERAL DISTRICT COURT

C.A. _____

---

ANTHONY GARVIN, PLAINTIFF

VS.

HAMPDEN COUNTY SHERIFF'S DEPT.,

SHERIFF MICHAEL J.ASHE. JR.,

HAMPDEN COUNTY COMMISSIONERS,

COMMONWEALTH OF MASSACHUSETTS,

SUPT. BASIL TSGARIS,

DEPUTY CHIEF OF SECURITY (KNOWN AS)KENNEY,

MAJOR (FIRST NAME UNKNOWN)WELDON,

LT.(FIRST NAME UNKNOWN)KORMAN #115,

LT.JUAN RAMOS #261,

LT.(FIRST NAME UNKNOWN)CADIGAN,

OFFICER WILLIAM MULDROW #0764,

OFFICER VICTOR KELLY AND,

THE UNKOWN OFFICER IN THE TOWER,ET AL.

DEFENDANTS

05 - 30102 - MAP

---

## (TWO COUNT CIVIL RIGHTS COMPLAINT)

### JURY TRIAL REQUESTED

PARTIES:

1.)The plaintiff, Anthony garvin,now resides at Souza-Baranowski Correctional Center,P.O.Box 8000,Mass 01464.

2.)On count one,the defendants are all of the defendants in the above captioned matter and resides at 627 Randall Road,ludlow,Mass 01056-1079.

3.)The defendants,Commonwealth of Massachusetts,resides at one ashburton place, Boston Mass 02108.

4.)On count two of this complaint,all of the defendants in the above captioned matter are the same with the exception of the unknown officer of the tower.

INTRODUCTION:

5.)This is a civil rights complaint pursuant to 42 U.S.C.,section 1983,G.L.C.258 Tort claim and M.G.L.A.12 section 11-H and I under State and Federal Laws.

**EXHIBIT A**



6.)On count one, this is a civil rights complaint against all
   defendants who acted under color of law and failed to protect
   the plaintiff under the 8th and 14th Amendments of the U.S.
   Constitution, for the indifference and negligence towards the
   plaintiff's safety while the plaintiff was in the defendants
   custody in an isolated protective custody unit of the Hampden
   county Sheriff's department.

7.)On count two, this is a complaint pursuant to 42 U.S.C.section
   1983, G.L.C.258 Tort claim and M.G.L.A. 12 section 11-H and I, as
   well as the 1st,4th,5th and 14th Amendments of the U.S.Const.

8.)The plaintiff also moves pursuant to M.G.L.A.127, section 32,
   his rights to privacy and State and Federal Laws for the unlawful
   intrusion of his property and privacy.

9.)The defendants also failed their duties under intitutional
   regulations 103 C.M.R. 400.07 to protect the plaintiff's property
   and legal documents.

JURISDICTION:

10.)On both counts, this court has jurisdiction to apply the law
    under 42 U.S.C.A. section 1983 for the deprivation of rights
    secured under the 1st,4th,5th,8th and 14th Amendments of the
    United States Constitution, as well as the plaintiff's rights to
    Due process as guaranteed by the Massachusetts Declaration of
    rights.

11.)The plaintiff further involves 42 U.S.C. section 1997 E and M.G.L.c.
    127 section 38 F, for the exhaustion of administrative remedies.

12.)This court has the jurisdiction to appoint counsel for the indigent
    plaintiff in according to both state and federal Laws and Rules
    under the 6th and 14th Amendments of the U.S. Constitution,
    Equal Protection Clause.

### STATEMENT OF FACTS ON COUNT ONE

13.)On May 27,2003, the defendant Hampden County Sheriff's Department,
    placed the plaintiff, Anthony Garvin, in a protective custody unit
    due to known plots of retaliation.See(Exibit"A") and due to threats
    made by another inmate to a Hampden County Sheriff employee on May
    28,2003.See(Exibit"B")

14.)On May 29,2003, the plaintiff was placed on administrative protective
    custody bythe Classification board members of the Hampden county
    house of correction.

15.) On May 30,2003, the plaintiff requested to be moved to another jail for his safety.

16.) The request was made to defendant, Major Weldon, who gave a negative response to the plaintiff on June 3,2003. See(Exibit"C")

17.) Prior to the response of the defenedant Major Weldon, on June 2,2003, while the plaintiff was on his recreation time in a subday room, while handcuffed and shackled, another inmate, Timothy Zanetti, who was not in restraints and was not suppose to be out his cell brutally attacked the plaintiff in the unlocked subday room.

18.) The inmate, Timothy Zanetti, who was housed in cell 15, or 14 with another inmate, William Torres, who was being escorted by defendant, William Muldrow, from the shower area.

19.) The defendant William Muldrow, while escorting inmate Torres from the shower, radioed to the defendant, unknown officer, in the control tower and ordered the officer to open cell 14,or 15 before he could secure the front of the cell door and by doing so, allowed inmate Zanetti to run out and attack the plaintiff. See(Exibit"D")

20.) The defendant, Victor Kelly, placed inmate Torres into his cell, while defendant Muldrow restrained inmate Zanetti.

21.) The defendant, Muldrow ordered the plaintiff to return to his cell, which the plaintiff did.

22.) The plaintiff suffered injuries of a deep cut on his lower lip, which left a perminate scar, two bumps to the back of his head and trauma to his eye, which he went for several days without medical treatment.

23.) The plaintiff continuously requested medical treatment which was repeatedly denied to him by unit staff.

24.) Inmate Zanetti is a known gang member of one of the gangs mentioned in defendant, Lt. Juan Ramos' report. See(Exibit"A")

25.) The defendant, Lt.Korman, was the unit supervisor on the day of the incident.

26.) The defendant, Lt. Korman, had full knowledge of the plaintiff Mr. Garvin's status in protective custody and the likelihood of danger the plaintiff faced.

27. The defendant, Lt.Cadigan, is a supervisor of the same unit C-2 who also had full knowledge of the plaintiff's status of protective custody and the likelihood of danger the plaintiff faced. He also played a roll in the plaintiff being placed on said status at the classification board hearing, which he is a part of.

3

28.)The defendant Lt. Juan Ramos, is the head supervisor of the unit
the incident took place in, is a member of the same classification
board and is on a gang task force, who had full and direct
knowledge and involvement in the classification of the plaintiff
placing him on a protective custody status and in fact was the
on who brought the likelihood of danger to the classification
board's attention.

29.)The defendant, <u>Deputy chief of security Kenney</u>, is a member of
the same classification board, who also had full knowledge of
the plaintiff's status and had full and direct involvement in
the decision to place the plaintiff on a protective custody
status and knew of the likelyhood of danger the plaintiff faced.

30.)The defendant, <u>the unknown officer in the tower</u>, had full control
of all locking mechanisims and should have known of the plaintiff's
status as well as the likelihood of danger.

31.)The defendant, <u>Sheriff Michael J. Ashe Jr.</u>, is the one in charge
of the orderly running of the Hampden Copnty house of correction.

32.)The defendant, <u>Supt. Basil Tsgaris</u>, is responsible for the training
and supervision of the officers and Lt.s and the actions to be
taken once a violation has been discovered.

33.)The defendant, <u>Hampden county commissioner(s)</u>, oversees the
orderly running of the employees of the Hampden county Sheriff's
department.

34.)The defendant, <u>Commonwealth of Massachusetts,Et Al.</u>, had full
knowledge of the plaintiff's status in the protective custody
unit and the likelihood of danger the plaintiff faced and was
made aware of the assault commited on the plaintiff by way of
a motion for transfer filed by his trial attorney, which was
denied as well as by the plaintiff's demand letter on August 3
2004. See(Exibit"E"and"F") and nothing was done.

## STATEMENT OF FACTS ON COUNT TWO

35.)On, or about september1,2033, the defendant, <u>Hampden county sheriff
Dept., Et Al.</u>, placed the plaintiff, <u>Anthony Garvin</u> into a double
bunk cell in C-2, a gang/segregation/protective custody unit.

36.)Prior to this time, the plaintiff was housed in a single man cell,
due to his protective custody status.

37.)Shortly after, defendant, <u>William muldrow</u>, placed inmate Omar
Marrero into the cell with the plaintiff.

4

38.) All of the defendants knew, or should have known, that the plaintiff
was on the protective custody status due to alleged threats,
threats and the privous attack by another inmate who was a gang
member.

39.) All defendants knew, or should have known that Omar Marrero was
a La familia gang member, one of the gangs said to be interested
in harming the plaintiff, as well as the fact that Omar was a
government agent, or at least the possibility that he was a
government agent.

40.) The plaintiff was never informed of Omar Marrero's status, nor
was he asked if he were comfortable with being in the same cell,
with a member of a gang that already had one of their members
attack him.

41.) The defendants never attempted to remove the government agent
from the cell, nor the plaintiff dispite his request for such
action.

42.) The plaintiff had to deliberately get into trouble, so that he
would be removed from that cell with the government agent in it.

43.) The defendants, Lt. juan Ramos and the Commonwealth of Massachusetts
Et. Al., had previously used an excop who was an inmate to fabricate
a statement against the plaintiff, to further the commonwealths
criminal case against the plaintiff.

44.) Defendant, Lt.Juan Ramos, throughout the plaintiff's being housed
at the Hampden county house of correction, played a major roll
in the commonwealth obtaining witnesses against the plaintiff,
by placing inmates who were working for the commonwealth, into
the same unit and cell area as the defendant to obtain information,
then he would contact the D.A.'s office to set up a meeting,
which was held in his office in one instance.

45.) During Omar's being housed in the cell with the plaintiff, he
unlawfully searhed through the plaintiff's legal documents to
seize information about the circumstancies of the plaintiff's
criminal case for the benefit of the commonwealth as well as his
own.

46.) Omar Marrero had numerous oppertunities to do so, such as when
the plaintiff went to court,medical,visits and to use the phone
and shower.

5

47.) The defendant, the commonwealth of Massachusetts in turn did use inmate Marrero's testimony in the plaintiff's criminal case, which was founded on unlawfully obtained information, which inmate Marrero used to fabricate an alleged admission by the plaintiff, which played a major roll in the obtaining of a conviction on the plaintiff.

48.) Defendant Lt. Juan Ramos gave testimony to create an adverse inference to cooborate Marrero's testimony, whereas Marrero's own testimony rebutted Lt.Juan Ramos' testimony that,"legal documemts are held in a property room". Marrero stated that the plaintiff always took his legal documents with him whenever he left the cell.

49.) The defendants, Victor Kelly, Lt.korman, Lt.Cadigan, Deputy chief of security Kenney, Et. Al., knew inmate Marrero's status as well as the plaintiff's status, disregarded the plaintiff's rights, requests for removal from the facility and his safety, by deliberately placing a government agent in the plaintiff's cell, in conspiracy and in conjunction with the government agent to obtain unlawful incriminating information.

## CLAIMS FOR RELIEF ON COUNT ONE

50.) The defendant, Hampden County Sheriff's Department, failed to provide adequate protection to the plaintiff while he was in a protective custody unit thereby entitling the plaintiff to a claim for relief under 42 U.S.C. section. 1983, for deprivation of the plaintiff's 8th Amendment rights of the U.S.constitution. They are being sued individually, collectively, in official capacity and in personal capacity.

51.) The defendant, Major Weldon, acted under color of law and violated the plaintiff's civil rights to safety with much deliberate indifference under 42 U.S.C. section.1983 and M.G.L.A. section 12, section 11-H and I, when the plaintiff grieved to be moved to another jail for better protection, thereby entitling the plaintiff compensatory relief for the violation of his 8th and 14th Amendment rights of the U.S.Const. He is being sued individually, collectively, in official capacity and personal capacity.

6

52.) The defendants, <u>William Muldrow, Victor Kelly, Lt.Korman, Lt.</u>
<u>Cadigan, Lt.Juan Ramos, Deputy Chief of security Kenney, the</u>
<u>unknown officer in the tower, Et Al.,</u> all acted under color of
law and failed to provide adequate protection to the plaintiff
through their collective negligence and individual indifference
to the plaintiff's safety entitling the plaintiff to compensatory
relief for his injuries, physical trauma, mental anguish, cruel
and unusual punishment under the 8th and 14th Amendments to the
Constitution of the United States, 42 U.S.C. section. 1983 and
M.G.L.A. 12. section 11-H and I. They are all being sued
collectively, individually, in official capacity and in personal
capacity.

53.) The defendant, <u>Sheriff Ashe Jr.,</u> failed to inforce,properly
train and supervise the officers employed in the protective custody
unit, regarding the policies and procedures on the running of
such a unit. He is being sued individually, collectively, in
official capacity and personally.

54.) The defendant, <u>Supt. Tsgaris,</u> failed to properly inforce, train,
supervise and sufficiently oversee his subordinates on the policies
and procedures at the Hampden county house of correction. He is
being sued individually, collectively, in official capcity and
personally.

55.) The defendant, <u>Hampden county Commissioner(s),</u> oversees all the
defendants. They are being sued collectively.

56.) The defendant, <u>Commonwealth of Massachusetts Et. Al.,</u> failed to
insure the protection of the plaintiff and was aware of the
plaintiff's safety issues and took no steps to assure the plaintiff
safety. They are being sued collectively and individually with
all of the defendants.

57.) The plaintiff, <u>Anthony Garvin,</u> reserves his rights to amend his
claims for relief and complaint with the assistance of counsel
pursuant to civil rule 15a under state and federal rules.

### CLAIMS FOR RELIEF ON COUNT TWO

58.) All of the defendants, while under the color of law and scope of
their duties, conspired and acted in conjuction with a government
agent and unlawfully seized information from the plaintiff's
legal documents, entitling him to compensatory and punitive damages
for the violation of his 1st, 4th, 5th, 8th and 14th Amendment
rights under the U.S.CONST., under 42 U.S.C. section. 1983, M.G.L.A. 7

127, section 32, G.L.C 258, M.G.L.A. section 12 and 11-H and I. All of the defendants are being sued individually, collectively, in official capacity and in personal capacity.

59.) The defendants conspired to and in conjunction with a government agent, committed slander, humiliation, defamation, fabricated lies and violated the plaintiff's rights under the 1st, 4th, 5th, 8th and 14th Amendment rights under the U.S.CONST., entitling the plaintiff to declaratory claim for relief under 42 U.S.C.A., section 1983.

60.) The plaintiff, Anthony Garvin, reserves his rights to amend this complaint with the assistance of counsel, pursuant to civil rule 15a of state and federal rules of civil procedure.

*Signed under the pains and penalties of perjury*

*Anthony Garvin*
*Pro se*
*Anthony Garvin*

8

RELIEF    REQUESTED *on Count One*

**WHEREFORE**, the plaintiff, Anthony Garvin, requests the following relief:

A.)Declaratory Judgment stating the defendants,et al., did fail to protect the plaintiff in violation of his Constitutional Rights.

B.)Punitive damages Ordering the defendants,et al.,to make a substantial donation to the Boys And Girls Club of Sprigfield,Mass.,in an amount that this Honorable Court Deems Just.

C.)Compensatory damages in the amount of $500,000,Five Hundred Thousand Dollars for the injuries,physical trauma,mental anguish,cruel punishment the plaintiff suffered as a result of the defendants,et al.,failure to protect him with deliberate indifference, and negligence.

    1.]Compensatory damages in the amount of $500,000, Five Hundred Thousand Dollars for the defendants failure to provide medical treatment to the plaintiff.

    2.]Compensatory damages in the amount of $100,000, One Hundred Thousand Dollars for the defendants ,Officer Muldrow, Officer Kelly,Major Weldon, deliberate indifference to the plaintiff's safety in protective custody.

D.)The Court grant relief that the Court Deems Justice.

E.)Order the defendants, et al., to pay filing fees,and costs, and all attorney fees that this Court Deems Just ,and proper.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

Dated: _4-15-5_                    _Anthony Garvin_ .
ANTHONY GARVIN#W83481
PLAINTIFF-PRO-SE
P.O.BOX 8000
SHIRLEY, MASS 01464

*Exhibit A*

THE COMMONWEALTH OF MASSACHUSETTS

HAMPDEN COUNTY SHERIFF'S DEPARTMENT

AND CORRECTIONAL CENTER

627 RANDALL ROAD

LUDLOW, MASSACHUSETTS 01056-1079



MICHAEL J. ASHE, JR.
SHERIFF

(413) 547-8000

To:     Deputy Chief of Security, AS. Kenney    *cc: SPFLD P.D. DET. PIOGGI*
From:   Lieutenant Juan Ramos
Date:   23 SEP 02
RE:     Felipe Santiago Homicide 22 SEP 02 – Springfield, MA

On 23 SEP 02 I received an outside telephone call at approximately 0800 in my office from a confidential informant (CI) in regards to the above mentioned homicide in Springfield. CI was with Santiago just minutes before shooting. CI states the following.

Santiago demanded from shooter that he not sell drugs on the "block". Shooter ignored Santiago's orders and continued selling. Santiago makes a call on a cell phone in front of the shooter asking that a couple of "brothers" come to his area with guns. As Santiago is making the call, the shooter pulls out his gun and shoots Santiago in the back of the head.

CI also indicates the following information.

There was a meeting last night at Morgan Park in Springfield. They used the darkest area of the park. The La Familia with the assistance of the Latin Kings will retaliate against the family of the shooter at Canon Circle in Springfield. No date has been set. There is another meeting planned for tonight to discuss retaliation – time and location unknown. CI feels it will be Morgan Park again at approximately 2100. CI will advise me on exact time and location later today. CI states that Rene Ortiz AKA Rene (5/13/74), living on Oakland Street, Springfield and Luis Rodriguez AKA Lindo Madness (7/27/72) living at a housing project in Chicopee are running the meetings and making the plans. There are La Familia members from Worcester, Lawrence, New York and Connecticut scheduled to be at this meeting. According to CI, more than likely they will use "outside" help for retaliation. They will have two roaming vehicles and two-way radios for communication while meeting is taking place. They will also have a car parked at the McDonald's (North End-Springfield) parking lot looking for any type of police presence or activity. CI indicated that vehicles have already been rented and they are planning on stealing other vehicles for future missions. CI will advise on plate numbers and make and model of vehicles as soon as possible. CI states that they are rushing to retaliate and are not thinking rationally. Prior to last nights meeting and for all future meetings a metal detector will be used on everyone attending the meetings.

End of report.

Respectfully submitted,

*[signature]*

Lieutenant Juan Ramos #261

171

I turned myself in 5-27-0?

*Exhibit B*

### Hampden County Jail and House of Correction

# INCIDENT REPORT FORM

(1) Information Only ✓

(2) Inmate's Name Nelson Aponte / Anthony Garvin

(3) Person Number 123383 / 133065

(4) Inmate's Housing Assignment at Time of Occurrence A1-35 / Q-004

(5) Date of Occurrence 5/28/03    Time of Occurrence 1:00 p

(6) Date Report is Completed 5/28/03    Time Report is Completed 2:00 p

(7) Incident Description (include staff and inmates involved, what occurred, where it occurred, when it occurred, how it occurred, and if known, why it occurred).

On above date & time inmate Aponte came into my office inquiring the whereabouts of inmate Garvin, when I asked why Aponte said "because he shot & killed my boy & I better not see him in here." Inmate Aponte has the victims names tattooed on his left forearm.

(8) Immediate Action Taken:

ATTN: A11 Supps:
Review status on both inmates

Copies to Intake/Orientation unit
Seg unit / Transportation / Central Class

Sworn To Under The Pains and Penalties of Perjury.

(9) Reporting Employees Signature Andrew VanZay    Date 5/28/03

Employees Identification Number 2276    Time 2:00 p

The following section is to be completed by the Supervisor.

(10) Is disciplinary action requested?    Yes_____    No_____

(11) Miranda Warning    Yes_____    No_____

(12) Supervisor's Signature _____    Date 5/31/03

Supervisor's Identification Number 277    Time 3C~

Central Records- White    Department Director- Green    Special Operations- Yellow
Reporting Employee- Pink    Copy to_____ -Goldenrod

HCHOC-0037 (5Part)    — 141

Hampden County    Incident Report    3.1.23.0

11

**HAMPDEN COUNTY SHERIFF'S DEPARTMENT
AND CORRECTIONAL CENTER**

<u>INMATE REQUEST</u>

To: _____

From: _Anthony_____    Person # _____
          Inmate Name

Date _5-30-03_  POD _C-2_    Cell _4_

Request _I Really Need to be transfer
ed to another jail My Case involved
a gang member + Myself am Not
Please help me get to Northampto
I can Live like this "Threats $ PC"

Inmates Signature: _Anthony Darin_____

Received by: _____

_____

STAFF RESPONSE _Weldon  5/30/03_

Approved ☐   Denied ☐   (state reason)

_You are in no danger where you
are now. If you want to go somewhere
else, write to them and if they take
you I will transport you there_

Employee Name/Title _ADS  Weldon_       Date _6/3/03_

WHITE - Unit File       YELLOW - Inmate       PINK - Kept by inmate

HCHOC-0021 (3-Part) (9-4-92) (7-96) (167)

12

Hampden County Jail and House of Correction

# INCIDENT REPORT FORM

Cell #15                    Cell #4                    (1) Information Only

(2) Inmate's Name  Timothy Zanetti , Anthony Garvin

(3) Person Number  130587                    133065

(4) Inmate's Housing Assignment at Time of Occurrence  O2

(5) Date of Occurrence  6-2-03                    Time of Occurrence  9:30 AM

(6) Date Report is Completed  6-2-03                    Time Report is Completed  10:3 PM

(7) Incident Description (include staff and inmates involved, what occurred, where it occurred, when it occurred, how it occurred, and if known, why it occurred).

On 6-2-03 at about 9:30 am inmate Timothy Zanetti was out of cell #15 behind his roommate inmate Robert Santiago while doing the showers. Then he attack inmate Anthony Garvin in the sunday room 1 while inmate Garvin was on Rec time. Zanetti was throwing punches at Garvin, when Garvin was trying to move away from the punches. Myself and officer Victor Kelly restrained inmate Zanetti, beside him on the ground and cuffed and shackled him. We put him back on cell #15 Pod secure supervisor arriving.

(8) Immediate Action Taken:
Both inmates were seen by medical
Inmate Zanetti moves to C-1 #9 by SPEC OPS
Remaining no privs.

Sworn To Under The Pains and Penalties of Perjury.

(9) Reporting Employees Signature  William Meldon                    Date  6-2-03
Employees Identification Number  0764                    Time  10:38 m

The following section is to be completed by the Supervisor.

(10) Is disciplinary action requested?    Yes  ✓    No

(11) Miranda Warning    Yes ___    No ___

(12) Supervisor's Signature  [signature]                    Date  6-2-03
Supervisor's Identification Number  115                    Time  10:41 P

Central Records- White         Department Director- Green         Special Operations- Yellow
    Reporting Employee- Pink         Copy to _____         -Goldenrod

HCHOC-0037 (5Part)

Hampden County                    Incident Report

142

http://www.ma-trialcourts.org - AOTC Information Center

Page 2 of 6

*Exhibit E*

**Involved:**

| | | | |
|---|---|---|---|
| **Last Name:** | Orenstein | **Firm Name:** | HAMP02 |
| **Address:** | 50 State Street | **First Name:** | James C |
| **City:** | Springfield | **Address:** | Hall of Justice |
| **Zip Code:** | 01103 | **State:** | MA |
| **Telephone:** | 413-747-1014 | **Zip Ext:** | |
| **Fascimile:** | 413-781-4745 | **Tel Ext:** | |
| | | **Representing:** | Commonwealth, (Plaintiff) |

**Attorney Involved:**

| | | | |
|---|---|---|---|
| **Last Name:** | Frank | **Firm Name:** | FRAN02 |
| **Address:** | 95 State Street | **First Name:** | Donald W |
| **City:** | Springfield | **Address:** | 9th Floor Suite 918 |
| **Zip Code:** | 01103 | **State:** | MA |
| **Telephone:** | 413-733-2899 | **Zip Ext:** | |
| **Fascimile:** | 413-731-6641 | **Tel Ext:** | |
| | | **Representing:** | Garvin, Anthony (Defendant) |

**Attorney Involved:**

| | | | |
|---|---|---|---|
| **Last Name:** | Schubert | **Firm Name:** | |
| **Address:** | 1365 Main Street | **First Name:** | Greg T |
| **City:** | Springfield | **Address:** | |
| **Zip Code:** | 01103 | **State:** | MA |
| **Telephone:** | 413-746-1313 | **Zip Ext:** | |
| **Fascimile:** | 413-746-3102 | **Tel Ext:** | |
| | | **Representing:** | Garvin, Anthony (Defendant) |

**Attorney Involved:**

| | | | |
|---|---|---|---|
| **Last Name:** | Rubin | **Firm Name:** | |
| **Address:** | 1365 Main Street | **First Name:** | Richard J |
| **City:** | Springfield | **Address:** | |
| **Zip Code:** | 01103 | **State:** | MA |
| **Telephone:** | 413-732-5100 | **Zip Ext:** | |
| **Fascimile:** | 413-746-3102 | **Tel Ext:** | |
| | | **Representing:** | Garvin, Anthony (Defendant) |

## Calendar Events

18 Calendar Events for Docket: HDCR2002-00896

| No. | Event Date: | Event Time: | Calendar Event: | SES: | Event Status: |
|---|---|---|---|---|---|

http://www.ma-trialcourts.org - AOTC Information Center

Page 4 of 6

| 05/27/2003 | 7 | Motion by Deft: to preserve evidence |
| 05/27/2003 | | Motion (P#7) allowed (Tina S. Page, Justice) |
| 05/27/2003 | 8 | Motion by Deft: for fees for an investigator and motion to impound |
| 05/27/2003 | | Motion (P#8) allowed (Tina S. Page, Justice) |
| 06/06/2003 | 9 | Notice of assignment of counsel filed. |
| 06/10/2003 | 10 | Motion by Deft: for remand to another facility |
| 06/10/2003 | 10 | Deft files affidavit in support of request to transfer to another facility |
| 06/16/2003 | 11 | Pre-trial conference report filed |
| 06/19/2003 | | Motion (P#10) denied (Judd J. Carhart, Justice). |
| 07/18/2003 | 12 | Ex parte Motion by Deft: for fees forensic pathologist and motion to impound. |
| 07/18/2003 | 13 | Motion by Deft: for criminal records of Commonwealth witness and list of proposed Commonwealth witnesses. |
| 07/18/2003 | 14 | Motion by Deft: for witness reports - House of Corrections. |
| 07/18/2003 | 15 | Motion by Deft: for production of statements of the defendant. |
| 07/18/2003 | 16 | Motion by Deft: for statements of witnesses. |
| 07/18/2003 | 17 | Motion by Deft: for disclosure of deviation of witness statements. |
| 07/18/2003 | 18 | Motion by Deft: for disclosure of prior bad acts. |
| 07/18/2003 | 19 | Motion by Deft: for list of all people interviewed by the police or other Commonwealth agent regarding these crimes. |
| 07/18/2003 | 20 | Motion by Deft: for disclosure of defendants conduct that government intends to introduce at trial as implied admissions. |
| 07/18/2003 | 21 | Motion by Deft: for copies of daily activity/progress reports & special reports. |
| 07/18/2003 | 22 | Motion by Deft: to sequester the Commonwealth's witnesses. |
| 07/18/2003 | 23 | Motion by Deft: for autopsy report & medical records/notes/reports. |
| 07/18/2003 | 24 | Motion by Deft: disclosure of identification procedures. |
| 07/18/2003 | 25 | Motion by Deft: for examination of physical evidence. |
| 07/18/2003 | 26 | Motion by Deft: for exculpatory evidence - promises, rewards & inducements & other witness impeachment material. |
| 07/18/2003 | 27 | Motion by Deft: for photographs and videotapes/audio. |
| 07/18/2003 | 28 | Motion by Deft: for payment records. |
| 07/18/2003 | 29 | Motion by Deft: for incident report. |
| 07/18/2003 | 30 | Motion by Deft: to preserve police notes. |
| 07/18/2003 | 31 | Motion by Deft: for production of reports of scientific tests. |
| 07/18/2003 | 32 | Motion by Deft: for copies of property tags. |
| 07/18/2003 | 33 | Motion by Deft: for 911/turret tapes. |
| 07/21/2003 | 34 | Pleading list/ Agreement on Discovery motions |
| 07/21/2003 | 35 | Motion by Deft: to dismiss appointed attorney and for appointment of new attorney. N. 7/22/03 |
| 07/21/2003 | | Motion (P#12) allowed (please see pleading) (Velis, J.) |

*[handwritten annotations: "Motion for Transfer"; "Transfer Denied"]*

http://www.ma-trialcourts.org/tclc/fc/?app_ctx=print_docket

4/5/2004

15

*Exhibit F*

Commonwealth of Massachusetts

Complaint (Demand letter)

Pursuant to M.G.L.c.258



Attorney Generals Office
One Ashburton Place
Boston Ma 02108

Anthony Garvin
S.B.C.C
P.O. Box 8000
Shirley Ma 01464

Dear Mr Reilly

While at Hampden County House of Correction in protective custody, in a gang block, I was attacked by another inmate, who should have been locked in his cell. I should have been secure in the sub-day room while on recreation, in handcuffs and shackles.

Due to the negligence of prison officials despite my status I was not protected, as I was previously told by officials that I would be. I suffered two lumps on the back of my head and a split lip, which left a scar.

I am demanding compensation for the negligence that caused my injuries, resulting in me having a permanent scar and the violation of my 8th amendment rights.

I am requesting compensation in the amount of One Million Dollars. $1,000,000.00

Signed under the pains and penalties of perjury.

Respectfully Yours

Anthony Garvin

Date: 8-3-4

16

Exhibit F(A)

Commonwealth of Massachusetts

Complaint (Demand Letter)

Pursuant to M.G.L.c.258

Attorney Generals Office
One Ashburton Place
Boston Ma 02108

Anthony Garvin
S.B.C.C
P.O. Box 8000
Shirley Ma 01464

Dear Mr Reilly

   I was at Hampden County House of Correction in
a gang unit, for reasons surrounding my case and La
Familia Gang members and alleged threats of "Retaliation".

   The county prison officials put a known gang (La-
Familia) / commonwealth agent in my cell without telling
me of his status. That is known to these prison officials.

   This commonwealth Agent/informant, a La Familia
gang member took this opportunity to read my legal
documents and other mail, to fabricate a statement
that I made a confession to him. He testified at trial
and his testimony helped influence the Jury to obtain
a guilty verdict.

   Had these officials for the second time not been
negligent in their duties, I would not have been un-
protected under my 8th amendment rights and M.G.L.c.258
rights. I am demanding compensation in the amount
of two hundred million dollars. $200,000,000.oo

                                    Respectfully Yours

                                    Anthony Garvin
                                    Date; 8-3-4

17

*Exhibit F (8)*



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

August 19, 2004

Michael J. Ashe, Jr., Sheriff
**Hampden County Sheriff's Department**
627 Randall Road
Ludlow, Massachusetts  01056

Re:    **Claim of:**                          Anthony Garvin
       **Presentment Letter Dated:**          August 3, 2004
       **Date Of Incident:**                  August 3, 2004

Dear Sheriff Ashe:

    I am enclosing the presentment letter referenced above which we received in this Office on August 10, 2004.

    Would you please investigate this claim and notice this Office of the results in accordance with the Attorney General's Presentment Procedures for Agencies of the Commonwealth. (June 30, 2001).  Thank you for your cooperation in this matter.

                                    Sincerely,

                                    Susan Gaeta

                                    Susan Gaeta
                                    Presentment Coordinator
                                    (617) 727-2200 x 3343

Enclosures
cc:    Anthony Garvin

18

ADDENDUM #2

42 U.S.C.A. S 1983

UNITED STATES CODE ANNOTATED
TITLE 42. THE PUBLIC HEALTH AND WELFARE
CHAPTER 21--CIVIL RIGHTS
SUBCHAPTER I—GENERALLY
Copr. C West Group 2000. No claim to orig. U.S. Govt. Works

Current through P.L. 106-274, approved 9-22-2000

§ 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-30102-MAP

———————————————

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT,
SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS,
COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS,
DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON,
LT. (FIRST NAME UNKNOWN) KORMAN,
LT. JUAN RAMOS,
LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW,
OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

———————————————

**ANSWER OF DEFENDANTS AND DEMAND FOR JURY TRIAL.**

Now come the defendants in the above-captioned matter except for "The

Unknown Officer in the Tower" and by way of response to the numbered paragraphs

of the Complaint state:

1.      There is insufficient information to form a belief of the truth of the allega-

tions of this numbered paragraph of the complaint.

2.      Defendants admit that the defendants, Tsgaris, Kenney, Weldon, Korman,

Ramos, Cadigan, Muldrow, and Kelly are public employees of the Common-

wealth of Massachusetts, and that Michael Ashe, Jr. is the sheriff of

Hampden County and an employee, official and officer of the Common-

wealth, and that the Hampden County Correctional Center is located at 627

**EXHIBIT B**

20

Randall Road and denies the remaining allegations of this numbered paragraph of the Complaint.

3.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

4.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

5.    Paragraph 5 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

6.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

7.    Paragraph 7 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

8.    Paragraph 8 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

9.    The allegations of this numbered paragraph of the complaint are denied.

10.    Paragraph 10 of plaintiff's complaint contains conclusion of law rather than

2

allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

11. Paragraph 11 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

12. Paragraph 12 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

13. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

14. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

15. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

16. Defendants admit that the defendant Weldon is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

17. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

3

18.   Defendants admit that the defendant Muldrow is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

19.   Defendants admit that the defendant Muldrow is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

20.   Defendants admit that the defendant Kelly is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

21.   Defendants admit that the defendant Muldrow is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

22.   The allegations of this numbered paragraph of the complaint are denied.

23.   There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

24.   Defendants admit that the defendant Ramos is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the

4

23

complaint.

25.    Defendants admit that the defendant Korman is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

26.    Defendants admit that the defendant Korman is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

27.    Defendants admit that the defendant Cadigan is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

28.    Defendants admit that the defendant Ramos is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

29.    Defendants admit that the defendant Kenney is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

30.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

31.    Defendant admits only that Michael Ashe, Jr. is the sheriff of Hampden County and an employee, official and officer of the Commonwealth, and that the Hampden County Correctional Center is located at 627 Randall Road and

5

24

deny the remaining allegations of this numbered paragraph of the Complaint.

32.    Defendants admit that the defendant Tsgaris is a public employee of the Commonwealth of Massachusetts, but deny the remaining allegations contained in this numbered paragraph of the Complaint.

33.    The allegations of this numbered paragraph of the complaint are denied.

34.    The allegations of this numbered paragraph of the complaint are denied.

35.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

36.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

37.    Defendants admit that the defendant Muldrow is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

38.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

39.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

40.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

41.    There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

42. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

43. Defendants admit that the defendant Ramos is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

44. Defendants admit that the defendant Ramos is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

45. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

46. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

47. There is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

48. Defendants admit that the defendant Ramos is a public employee of the Commonwealth of Massachusetts, but state there is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

49. Defendants admit that the defendants Velly, Korman, Cadigan and Kenney are public employees of the Commonwealth of Massachusetts, but state there

7

26

is insufficient information to form a belief of the truth of the allegations of this numbered paragraph of the complaint.

50.    The allegations of this numbered paragraph of the complaint are denied.

51.    The allegations of this numbered paragraph of the complaint are denied.

52.    The allegations of this numbered paragraph of the complaint are denied.

53.    The allegations of this numbered paragraph of the complaint are denied.

54.    The allegations of this numbered paragraph of the complaint are denied.

55.    The allegations of this numbered paragraph of the complaint are denied.

56.    The allegations of this numbered paragraph of the complaint are denied.

57.    Paragraph 57 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

58.    The allegations of this numbered paragraph of the complaint are denied.

59.    The allegations of this numbered paragraph of the complaint are denied.

60.    Paragraph 60 of plaintiff's complaint contains conclusion of law rather than allegations of fact and therefore no answer is required, but to the extent that an answer is indicated, the defendants deny the allegations contained in this paragraph the complaint.

### AFFIRMATIVE DEFENSES

1.    Plaintiff's complaint fails to state any claim upon which relief can be granted.

2.    Plaintiff's claim is barred because the damages allegedly suffered by the

27

Plaintiff resulted from or were caused by the contributory negligence of the Plaintiff.

3. Plaintiff's claim is barred because the damages allegedly suffered by the Plaintiff resulted from or were caused or contributed to by the negligence of the Plaintiff, which negligence was equal to or greater than any alleged negligence of the Defendants.

4. Plaintiff's claim is barred because the damages allegedly suffered by the Plaintiff were caused by the intervening and/or superseding negligence or other acts or omissions of third persons or entities for whose conduct the Defendants are not legally responsible.

5. Plaintiff is not entitled to recover in the amounts prayed for in the Complaint because Plaintiff's negligence has diminished whatever right, if any, Plaintiff might ever have had to such recovery.

6. At the time of the alleged accident the Plaintiff was in violation of the laws of this Commonwealth, and said violation was the cause of Plaintiff's alleged injuries.

7. The Plaintiff's action is barred due to lack of service of process and due to insufficient service of process.

8. The Plaintiff's claim is barred due to the Plaintiff's failure to provide sufficient and timely notice of Plaintiff's claim and injury as required by law, including but not limited to the provisions of G.L. ch. 258.

9. The Plaintiff's claims should be diminished in accordance with M.G.L. c.

9

28

231, §85, because the damages allegedly suffered by the Plaintiff resulted from or were caused by or contributed to by the negligence of the Plaintiff.

10. The defendants deny that this action arises under the Constitution of the United States and deny that there has been any deprivation under color of any statute of the Commonwealth of Massachusetts of any rights, privileges or immunities secured to the plaintiff by the Constitution of the United States.

11. The defendants state that all of their actions as they may relate in any way to this action were taken in good faith without the knowledge that said actions would result in a violation of the named plaintiff's, or anyone else's, constitutional rights, nor were said actions taken with any reckless disregard of the constitutional rights of the named plaintiff, or of anyone else, and thus, the defendants are immune from liability for any damages as alleged in plaintiff's complaint under the doctrine of qualified immunity.

12. The defendants state that all actions taken by them which in any way related to plaintiff were taken in good faith, without knowledge that any such actions would violate any person's constitutional rights, and without reckless disregard for any person's constitutional rights, and therefore they are immune from suit.

13. The defendants say that all of their actions which in any way related to the plaintiff were taken pursuant to their public obligations and duties, that their said actions were taken in their lawful capacity pursuant to their obligations under state law, and as such, were privileged.

10

29

14. The defendants say that they are immune from liability in this action under the provisions of G.L. c. 258, as amended.

15. The defendants say that the plaintiff has failed to comply with the notice provisions of G.L. c. 258, as amended.

16. The plaintiff's claims are barred by the Eleventh Amendment of the United States Constitution and the doctrines of sovereign and qualified immunity.

WHEREFORE, the Defendants demand that plaintiff's complaint be dismissed, that judgment be entered on defendants' behalf, and that they be awarded reasonable attorneys' fees and costs in defending this action.

THE DEFENDANTS DEMAND A TRIAL BY JURY.

FOR THE DEFENDANTS,
By Their Attorney

Edward J. McDonough, Jr., Esq.
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121
BBO# 331590

CERTIFICATE OF SERVICE

_____, hereby certify that on this 19th day of July, 2005, I have caused the aforementioned document to be served on all parties to this action by mailing a copy of same first-class mail, postage prepaid to Anthony Garvin (pro se) SBCC L-2/12, P. O. Box 8000, Shirley, MA 01464.

0056-040873\94382.wpd

11

30

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY GARVIN,           )
        Plaintiffs        )
VS.                       )  Civil Action
                          )  05-30102-MAP
HAMPDEN COUNTY SHERIFF'S  )
DEPARTMENT, SHERIFF       )
MICHAEL J. ASHE, JR.,     )
HAMPDEN COUNTY COMMISSIONERS, )
COMMONWEALTH OF MASSACHUSETTS,)
SUPT. BASIL TSGARIS, DEPUTY   )
CHIEF OF SECURITY KENNEY,     )
MAJOR(First Name Unknown)     )
WELDON, LT.(First Name Unknown)
KORMAN, LT. JUAN RAMOS, LT.   )
(First Name Unknown) CADIGAN, )
OFFICER WILLIAM MULDROW,      )
OFFICER VICTOR KELLY and THE  )
UNKNOWN OFFICER IN THE TOWER, )
        Defendants           )

        THE DEPOSITION OF: ANTHONY GARVIN,
taken before Julia A. McLeod, Shorthand
Reporter and Notary Public, pursuant to the
Federal Rules of Civil Procedure at the
Souza-Baranowski Correctional Center, Harvard
Road, Shirley, Massachusetts at 2:00 p.m. on
Thursday, March 8, 2007.

APPEARANCES:

(Please, see page two.)

        Julia A. McLeod
    PHILBIN & ASSOCIATES, INC.
    Certified Shorthand Reporters
    Certificate of Proficiency
        Certificate of Merit

**Page 2**

APPEARANCES:

PRO SE:
ANTHONY GARVIN, Souza-Baranowski Correctional
Center, Harvard Road, P.O. Box 8000, Shirley,
Massachusetts 01464, representing himself.
BY: ANTHONY GARVIN.

EGAN, FLANAGAN AND COHEN, P.C., 67 Market
Street, P.O. Box 9035, Springfield,
Massachusetts 01102-9035, representing the
Defendants, Hampden County Sheriff's
Department, Sheriff Michael J. Ashe, Jr.,
Hampden County Commissioners, Commonwealth of
Massachusetts, Supt. Basil Tsgaris, Deputy
Chief of Security Kenney, Major (First Name
Unknown) Weldon, Lt. (First Name Unknown)
Korman, Lt. Juan Ramos, Lt. (First Name
Unknown) Cadigan, Officer William Muldrow,
Officer Victor Kelly and The Unknown Officer
in the Tower,
BY: KEVIN D. WITHERS, ESQUIRE.

        *****

**Page 3**

I N D E X

-------------------------------------------
WITNESS    DIRECT CROSS REDIRECT RECROSS
-------------------------------------------

Anthony
Garvin    5
    (Withers)


-------------------------------------------
EXHIBITS:      DESCRIPTION        PAGE


Defendant 1  Copy of Notice of
        Taking Deposition        5


        *****

**Page 4**

S T I P U L A T I O N S

    It is agreed by and between the parties

that all objections, except objections as to

the form of the question, are reserved to be

raised at the time of trial for the first

time.

    It is further agreed by and between

the parties that all motions to strike

unresponsive answers are also reserved to be

raised at the time of trial for the first

time.

    It is further agreed that the deponent

will waive the reading, signing and sealing of

the deposition.

    It is further agreed by and between the

parties that notification to all parties of

the original deposition

transcript is also hereby waived.

        *****

EXHIBIT C

5

1    ANTHONY GARVIN, Deponent, having been
2  first duly sworn, deposes and says as follows:
3
4    <u>DIRECT EXAMINATION BY MR. WITHERS</u>
5    (Defendant's Deposition
     Exhibit 1 offered and
6    <u>marked.</u>)
7    Q.    Would you just state your name for
8  the record?
9    A.    My name is Anthony Garvin.
10    Q.    Mr. Garvin, before we start, have you
11  ever had your deposition taken in a civil case
12  before?
13    A.    Never.
14       MR. WITHERS:  Okay. Let me just
15  tell you, as you can see the stenographer is
16  taking down what we say. She is going to
17  eventually create a transcript.  And the
18  transcript will be available at trial, and so
19  forth, if necessary.
20       Usually there are a number of
21  formalities that the rules say are done as
22  part of a deposition, things like getting the
23  transcript notarized and signing it and filing

6

1  it with the court, and so forth, which the
2  court doesn't really want anybody to do
3  because they don't have the room to store all
4  those things.
5       What typically happens then is that
6  the parties enter into what are called usual
7  stipulations, which are basically waiving the
8  formalities of notarizing and filing the
9  transcript, and so forth.
10       On many occasions people will waive
11  the right to review and sign the transcript,
12  which you have a right to do.
13       It also usually applies to
14  formalities like objections.
15       What typically happens is in the
16  deposition any question that is related to the
17  case will get asked, but the parties reserve
18  the right to object later on.
19       For instance, if the question was
20  improper and it can't be used at trial, then
21  you raise that when somebody goes to use the
22  deposition.
23       All of that is, obviously, for

7

1  convenience purposes so that you don't have to
2  keep interrupting the deposition and get a
3  judge rule on it, come back, resume the
4  deposition.
5       You get the whole deposition done and
6  then you can argue about whether the questions
7  were proper later on.
8       So that's also part of the usual
9  stipulations.
10       And the final thing is the one
11  question that people do object to is, if it's
12  a question of form, meaning generally that the
13  question is confusing or something like that.
14       Now, in your case you don't have an
15  attorney, so you don't have an attorney to
16  object to matters of form.  So I don't know
17  that that part of the usual objections is
18  really going to apply here.
19       If you don't understand the question
20  I'm asking you, just let me know.
21       THE WITNESS:  Right. How can I
22  object?
23       MR. WITHERS:  Just tell me you

8

1  don't understand it, and I'll repeat it or
2  rephrase it.
3       THE WITNESS:  Okay.
4       MR. WITHERS:  That's what we
5  mean by the usual stipulations.  And you can
6  agree to the usual stipulations or not agree
7  to the usual stipulations.  That's up to you.
8       But that's the first thing I have to
9  ask you, is whether you'll agree to the usual
10  stipulations or not.
11       THE WITNESS:  I mean, it's no
12  problem.  I mean, it doesn't have to be made
13  complicated.
14       MR. WITHERS:  Okay.
15       THE WITNESS:  The questions, I
16  was ordered to answer them, you know, over my
17  objection.
18       For the record, you know, I object to
19  this proceeding because it's late, you know.
20       MR. WITHERS:  Yes. But we just
21  have to cover that for the record so that it's
22  on there.
23       So, if you don't object, we will

9

1  proceed by way of the usual stipulations.  And
2  if you get an attorney later and your attorney
3  goes through the deposition and I try to use
4  it or someone, you know, representing the
5  Defendants tries to use it and you think the
6  questions are improper for some reason other
7  than form, you will be able to object then.
8        THE WITNESS:  All right.
9        MR. WITHERS:  Let's proceed
10  then. We are here in connection with a case
11  that you filed in the United States District
12  Court against Sheriff Michael Ashe, the
13  Commonwealth of Massachusetts, and a number of
14  other parties.
15        As I understand it, there are really
16  two incidents, if we can call them that, that
17  this lawsuit is about. The first is an assault
18  that took place in May of 2003 when you were
19  attacked by another inmate, Anthony Zanetti;
20  correct.
21        THE WITNESS:  Timothy.
22        MR. WITHERS:  Timothy Zanetti.
23        THE WITNESS:  Yes. Yes, I was.

10

1  That was in June.
2      Q.   Was it June?
3      A.   Beginning of June here.
4      Q.   June 2nd?
5      A.   Yes, sir.
6      Q.   '03. And then the other event
7  concerns the facts relating to a man named
8  Omar Marrero being placed as your cell mate
9  later on in 2003, in September--
10     A.   It was August, off the top of my
11  head. Yes.
12     Q.   Those are the two incidents described
13  in your Complaint; correct?
14        The two basic incidents that we are
15  talking about?
16     A.   Yes.
17     Q.   What I would like to do is sort of
18  take them one by one.  And we'll go through
19  them and proceed in that fashion.
20        Initially at least, what I would like
21  to ask you about is the incident involving
22  Mr. Zanetti.  Okay?
23     A.   Okay.

11

1      Q.   As we just discussed, that incident
2  occurred June 2nd, 2003?
3      A.   Yes, sir.
4      Q.   As best you remember?
5      A.   Yes, sir.
6      Q.   Where did the incident take place?
7      A.   It took place in a sub-day room
8  inside of C2 unit at Ludlow county jail.
9      Q.   You were incarcerated there at the
10  time; correct?
11     A.   I was being held pre-trial.
12     Q.   Pre-trial, okay.
13        Do you know what Mr. Zanetti's status
14  was at the time? Whether he was pre-trial--
15     A.   I believe he was sentenced.
16     Q.   That particular pod that you were
17  assigned to, what was its designation?
18     A.   As far as like what kind of inmates?
19     Q.   No.
20        The number?
21     A.   Oh, C2.
22     Q.   C2. That was going to be my next
23  question?

12

1      A.   Okay.
2      Q.   Were the inmates in that pod held in
3  some kind of special status?
4      A.   Well, they called them the special
5  management unit for several purposes.  They
6  use it for detention, for people got tickets,
7  whatever.
8        They used it for gang members and
9  they used it for protective custody.  And
10  they, also, used it for medical, for some
11  inmates for medical purposes.
12     Q.   Is it true you were being held there
13  in a protective custody status?
14     A.   Yes, sir.
15     Q.   When did you first go into the
16  Hampden County House of Correction?
17     A.   May 27th.
18     Q.   Of 2003?
19     A.   2003.
20     Q.   So you had been there about a week,
21  little less than a week, actually, when this
22  event happened?
23     A.   Less than a week.

13

1    Q.    You had been arrested before you went
2    in there; correct?
3    A.    Yes, I had.
4    Q.    That was in connection with the
5    shooting of somebody in Springfield?
6    A.    Yes, sir.
7    Q.    What was that person's name?
8    A.    Philippe Santiago, a/k/a Poopie.
9    Q.    And you were charged with shooting
10   him?
11   A.    Yes, sir.
12   Q.    He was at least rumored to be a
13   member of a gang, is that correct,
14   Mr. Santiago?
15   A.    You can say rumor.  It was known that
16   he was.
17   Q.    Do you know what gang he was said to
18   be a member of?
19   A.    La Familia.
20   Q.    There was some concern when you went
21   in that there might be retaliation against you
22   by the other gang members?
23   A.    There was a lot of concern.

14

1    Q.    Was that the reason you were in
2    protective custody?
3    A.    As soon as I walked in the door, they
4    place me in that unit.
5    Q.    Did you object to going into
6    protective custody status?
7    A.    No, I did not.
8          Even--
9          Well, you know, not at that time.
10   Later on I did.
11   Q.    We are just talking now from the time
12   you got up until--
13   A.    In the beginning, no, I did not.
14   Q.    Okay. Just to make it a little easier
15   for the stenographer, it's better if only one
16   of us talks at a time.  She will try to get it
17   all down, but it's not easy.
18          Could you describe the layout of the
19   C2 pod?
20   A.    The officer's station is not an
21   enclosed station. It's more of a counter like.
22          It's at the beginning of the unit,
23   next to the door.

15

1          It's the unit is shaped in a triangle
2    manner. There's two tiers.
3    Q.    Are there cells on both tiers?
4    A.    Yes, cells on both tiers and on both
5    sides of the unit.
6          The officer station would be at the
7    base of the triangle.
8          As you walk in the unit, to the left
9    there are two sub-day rooms.
10   Q.    Okay.
11   A.    Basically, it's a room with big
12   windows, got phones in it.  And within the
13   sub-day room there are cells where inmates
14   are, living quarters are.
15   Q.    Inside the sub-day room?
16   A.    Inside the sub-day room.
17          The doors are controlled by, I guess,
18   computer or switchboard which is located in a
19   tower, which is not in the unit but overlooks
20   the unit.
21   Q.    You can look out from the tower into
22   the unit?
23   A.    Yes, sir.

16

1    Q.    And are the doors controlled
2    electronically?
3    A.    I believe so.
4    Q.    I mean, you never saw a guard have to
5    use a key or something to open it?
6    A.    No.
7    Q.    They would give you a beep or--
8    A.    They would radio into the tower, and
9    the tower would open the door.
10   Q.    And that was true of the sub-day
11   room?
12   A.    The sub-day room is controlled by the
13   locking mechanism which is controlled by the
14   officer in the tower, as well.
15   Q.    That's the same thing for the cells;
16   correct?
17   A.    Yes, sir.
18   Q.    The incident occurred while you were
19   in one of the sub-day rooms; correct?
20   A.    Yes, sir.
21   Q.    The incident with Mr. Zanetti?
22   A.    Yes, sir.
23   Q.    Were the sub-day rooms numbered?

17

1    A.    Yes, they were.
2    Q.    Do you remember the number of the one
3    you were in at the time of the event?
4    A.    I believe I was in number one.
5    Q.    You described how there were some
6    cells inside the sub-day room.
7          Was there anybody in any of those
8    cells at the time of the events?
9    A.    Yes, there was.
10    Q.    Do you know who else--
11    A.    Inside the sub-day room?
12    Q.    Yes, the cells in the sub-day room.
13    A.    Yes.
14    Q.    Do you know who was in those cells?
15    A.    Names, no.  I know there was an
16    Hispanic male that was in the first, I
17    believe.
18          That's who I was talking to before
19    Zanetti came in there.
20    Q.    Your cell wasn't located in that
21    area; correct?
22    A.    My cell was in the second level.
23    Q.    So you had been brought from your

18

1    cell into that sub-day room before the
2    incident with Mr. Zanetti occurred?
3    A.    Yes, sir.
4    Q.    About how long had you been in there
5    before the incident occurred?
6    A.    I had been in there for about five
7    minutes.
8    Q.    And you were not in one of the cells;
9    you were in the open area?
10    A.    I was in the open area outside of the
11    cells.
12    Q.    Were you restrained in any way in the
13    open area?
14    A.    I was in handcuffs and shackles in
15    the sub-day room.
16    Q.    While you were in the sub-day room--
17    strike that.
18          When you first went in the sub-day
19    room, was Mr. Zanetti in there?
20    A.    No, he was not.
21    Q.    Was there anybody else in the open
22    area of the sub-day room when you first went
23    in?

19

1    A.    No.
2    Q.    Do you remember which correctional
3    officer brought you down to the sub-day room?
4    A.    Officer Muldrow brought me from my
5    cell on the same level.
6    Q.    Do you remember why you were in the
7    sub-day room that day?
8    A.    For recreation.
9    Q.    Had you been in that sub-day room
10    previously for recreation purposes?
11    A.    A number of times.
12    Q.    And at any of the previous times when
13    you were in the sub-day room had anybody else
14    been with you in the open area while you were
15    using that room?
16    A.    If there's somebody out, they would
17    be in the other sub-day room.
18    Q.    The practice was just to have one
19    person at a time using the sub-day room--
20    A.    Yes.
21    Q.    --the open area of the sub-day room?
22    A.    Yes.
23    Q.    Do you remember where Mr. Zanetti's

20

1    cell was located in the pod?
2    A.    His cell was across from the sub-day
3    rooms.
4          It's been so long, I'm kind of foggy
5    exactly which number it was.  Fourteen,
6    fifteen, around there.
7    Q.    Whatever the number was--
8    A.    Yes, he was across from the sub-day
9    room.
10    Q.    Okay. And--
11    A.    Which it's about, I would have to
12    say, at least thirty, thirty feet, maybe.
13    Q.    I think I sidetracked you when you
14    were describing the layout.
15          You were describing it as a triangle
16    with the guard's desk at the base and the
17    cells on the other two sides.
18    A.    Correct.
19    Q.    Two tiers; correct?
20    A.    Yes.
21    Q.    On which wall was the sub-day room
22    located?  The base or one of the sides?
23    A.    It would be on one of the sides.

21

1  Pursuant to where the officer sits, if he's
2  facing the point of the triangle, it would be
3  to his left.
4      Q.   To his left, okay.
5           And Mr. Zanetti's cell would have
6  been to his right?
7      A.   To the right.
8      Q.   On the opposite tier?
9      A.   Yes, sir.
10     Q.   But the same level, the bottom level?
11     A.   Yes, sir.
12     Q.   Now, you described the sub-day room
13  as having windows; correct?
14     A.   Yes.
15     Q.   And did the windows look outside or
16  did they look back into the unit?
17     A.   Well, the cells would be on one side
18  and windows would look into the unit.
19     Q.   Okay.
20     A.   There's no house out.
21     Q.   No windows looking outside?
22     A.   Outside.
23     Q.   So the windows are open or look out

22

1  into the unit itself; correct?
2      A.   Yes, sir.
3      Q.   Could you see the guard desk from
4  where you were in the sub-day room?
5      A.   Partially. It's kind-- this first day
6  room is kind of set back from the guard's
7  desk.
8      Q.   Okay.
9      A.   It's like a little-- maybe a little
10  wall about five feet, maybe, six feet.
11          From memory it's set back a little
12  bit.
13     Q.   If you went up to the windows in the
14  sub-day room, could you see the guard's desk?
15     A.   Yes. You should be able to. I
16  believe so.
17     Q.   When you were in the sub-day room,
18  somewhere around the middle of the sub-day
19  room say looking out the windows, could you
20  see Mr. Zanetti's cell?
21     A.   If I'm standing in the middle?
22     Q.   Yes.
23     A.   Yes, I would be able to see it.

23

1      Q.   Okay. Do you remember where
2  Mr. Zanetti was when you first saw him before
3  the assault occurred?
4      A.   Do you mean that same day just before
5  the incident?
6      Q.   Yes, from the time you got into the
7  sub-day room until the assault occurred.
8      A.   Well, I know he was in his cell.
9      Q.   Okay.
10     A.   They were doing showers that day.
11  And after I was let in, I was talking to the
12  guy in cell one.
13     Q.   Yes.
14     A.   And he informed me-- he was like,
15  "Look out."
16          I turned around. I seen Mr. Zanetti
17  running in my direction.
18          There was nowhere for me to go, you
19  know, so I just tried to defend myself as best
20  I could when he came in.
21     Q.   Now, the sub-day room has a door;
22  correct?
23     A.   Yes, sir.

24

1      Q.   And the door is on the wall that
2  looks out into the unit?
3      A.   Yes, sir.
4      Q.   Is there a window in the door, also?
5      A.   Yes, sir.
6      Q.   The first notice you had of any
7  problem was the fellow in this cell telling
8  you to watch out?
9      A.   Yeah.
10     Q.   So you had your back turned to the
11  window and the door at that point; is that
12  correct?
13     A.   Yes, sir.
14     Q.   And you turned around and you then
15  saw Mr. Zanetti?
16     A.   Yes, sir.
17     Q.   And he was where at that point?
18     A.   At that time he was about-- there's
19  tables outside of the bubble.
20     Q.   Yes.
21     A.   And he was like maybe a couple of
22  feet before the table.
23          He came. He jumped over the table and

25

1  ran into the day room.
2    Q.   When you say the bubble, are you
3  talking about the sub-day--
4    A.   The sub-day room.
5    Q.   Had he already jumped over the table
6  or not when you first saw him?
7    A.   Just before the table when I first
8  saw him.
9    Q.   When you had been in this sub-day
10 room on previous occasions, do you know
11 whether they locked the door behind you or
12 not?
13   A.   Always.
14   Q.   On this particular day do you know
15 whether they locked the door behind you or
16 not?
17   A.   It was not locked.
18   Q.   Had there been any conversation about
19 that before you saw Mr. Zanetti coming at you?
20   A.   Conversation about what?
21   Q.   The door being unlocked.
22   A.   No.
23   Q.   When you first saw him coming toward

26

1  you, did you realize the door was unlocked?
2    A.   No. It may look closed. It's an
3  electronic lock just because the door is like
4  this.
5      But just because the door is like
6  that, the lock could be not out.
7    Q.   May not be engaged?
8    A.   Right.
9      It's the officer's job to radio to
10 the tower to say, "Open the door so I can let
11 the inmate in from rec," or whatever.
12     They open it, then close it, secure
13 the door.
14     And he secures the door, and the lock
15 will go in.
16   Q.   And the door was unlocked when this
17 incident with Mr. Zanetti occurred?
18   A.   Yes, sir.
19   Q.   Or at least the lock wasn't engaged?
20   A.   It was unlocked.
21   Q.   Did Mr. Zanetti come into the sub-day
22 room or did you go out of the sub-day room?
23   A.   He came into the sub-day room.

27

1    Q.   And then what happened?
2    A.   He attacked me. I mean, I was trying
3  to stay away from his blows as much as I
4  could. He hit me.
5    Q.   So he was trying to punch you?
6    A.   Yes. He was punching at me.
7    Q.   Was he restrained in any way? Did he
8  have handcuffs or manacles on?
9    A.   Nothing. Nothing.
10   Q.   Do you know how he got out of his
11 cell?
12   A.   Officer Muldrow radioed to the tower
13 to open his cell.
14   Q.   Do you know what was going on at the
15 time that radio call was made?
16   A.   From my memory, his cell mate was
17 being led to the shower.
18     But from, you know, over time, it's
19 questionable between after, you know-- there's
20 a question of whether he was being led to the
21 shower--
22   Q.   Or brought back?
23   A.   --or back from the shower. Back from

28

1  the shower.
2      I'm not sure. All I know is that
3  Officer Muldrow radioed to have his cell open.
4    Q.   Did you hear him radio to do that?
5    A.   No, I did not.
6    Q.   That's just something you assume.
7    A.   I know it's practice. That's how you
8  get the cell open, is to radio to the tower.
9  I know that for sure because I've seen it done
10 previously.
11     That's how they open my cell when
12 they take me out for rec. They open the cell
13 and they take me out to rec or to shower.
14     Close cell four. Close the rec room
15 door.
16     That's the practice.
17   Q.   Had you actually seen Officer Muldrow
18 when he first went up to Zanetti's cell or
19 were you still talking to the inmate in the
20 bubble?
21   A.   I believe I did see him walking back
22 with the inmate. I believe he was putting the
23 inmate in the cell.

29

```
1        Someone else was saying he was taking
2   somebody to the shower.
3        Q.  Let's just stick with what you saw
4   and you remember.  Okay?
5        A.  It's kind of fuzzy.  You know, I'm
6   not sure whether he was going--
7             I believe he was taking him and
8   putting him in there.
9        Q.  Do you remember what Mr. Zanetti's
10  cell mate's name was?
11       A.  I thought it was William Torres.
12       Q.  Okay?
13       A.  I believe it was William Torres.
14  From my memory, it was William Torres.
15       Q.  I thought I saw a suggestion
16  somewhere that it might have been a
17  Robert Santiago.
18            Does that name ring any bells for
19  you?
20            No?
21       A.  No.
22       Q.  Okay. You think the cell mate's name
23  was Torres?
```

30

```
1        A.  I thought it was Torres.
2        Q.  So did Mr. Zanetti open the door to
3   the bubble before he assaulted you?
4        A.  Yes, he did.
5        Q.  Then he came in and he was trying to
6   punch you, at least.
7             Was he doing--
8        A.  He did punch me.
9        Q.  What happened as that was going on?
10  Did somebody come and intervene?
11       A.  Yes; Muldrow did.
12       Q.  How many punches did Zanetti get off
13  before Muldrow came in?
14       A.  Numerous.  It had to be at least
15  five, six times that he hit me.
16       Q.  Where did he hit you?
17       A.  In my face, back of my head, my eye,
18  my lip.
19       Q.  Mostly about the head?
20       A.  Yes, mostly head.
21       Q.  At some point did Officer Muldrow or
22  somebody else restrain Zan--
23       A.  Officer Muldrow restrained him by
```

31

```
1   himself.
2        Q.  And he was taken out eventually?
3        A.  Yes.
4        Q.  And led away somewhere?
5        A.  Correct.
6        Q.  What happened to you after the
7   assault?
8        A.  I was placed back in my cell.
9        Q.  At some point were you seen by any of
10  the medical personnel?
11       A.  Not that day.
12       Q.  When were you first seen by someone
13  from the medical unit?
14       A.  I had to tell them how my eye was
15  hurt because my eye was hurting.
16            And I asked Michael, who was the pod
17  nurse or whatever, to give me something to put
18  on my lip because it was bleeding.
19       Q.  And you also complained about your
20  eye, did you say?
21       A.  Yes, sir.
22       Q.  Did they provide any treatment or
23  give you anything for your cut?
```

32

```
1        A.  They said they didn't--
2             Oh, or for my cut?
3        Q.  Yes.
4        A.  I was given Bacitracin ointment a day
5   or two later because it wouldn't stop bleeding
6   and it started really coagulating and scabbing
7   up.  So.
8        Q.  Then what about your eye?
9             Did they give you any treatment for
10  that?
11       A.  No.  They just had me see the eye
12  doctor.
13            They gave me Motrin, I believe.  Just
14  temporary.
15            But, I don't know.
16       Q.  At some point you did see an eye
17  doctor?
18       A.  Yes.
19       Q.  That was at the hospital?
20       A.  No.  That was--
21       Q.  I'm sorry.  That--
22       A.  --within the facility.
23       Q.  Within the correctional center?
```

33

1  A. Yes.
2  Q. Did you see that doctor once or more
3  than once?
4  A. I believe it was once.
5  Oh, twice. I believe she set up an
6  appointment for me to get a certain test, I
7  believe.
8  Q. An eye test of some kind?
9  A. Yeah.
10  Q. Other than the problem with your eyes
11  and the problem with your split lip, what
12  other physical injuries did you have from the
13  assault?
14  A. I had some lumps on the back of my
15  head.
16  Q. Anything else?
17  A. No. That was about it.
18  Q. Did the laceration on your lip
19  eventually close up?
20  A. Yes. But now I have a scar.
21  Q. Where is the scar?
22  A. Yes.
23  Q. Can you just point to it?

34

1  So right below the red part of your
2  lip?
3  A. Yeah.
4  Q. Can I just look one more time?
5  So when it healed, you were left with
6  that sort of a lighter-colored line?
7  A. Yes, sir.
8  Q. It goes from about the middle of your
9  lip over to the right corner of your mouth?
10  A. Yes.
11  Q. Okay.
12  A. Yes.
13  Q. You would have to look in a mirror to
14  see?
15  A. I can't say exactly how long it's
16  there. I know it's there.
17  Q. Other than knowing that you have it
18  there, does it affect you in any way?
19  A. My daughter sees it. My wife sees it.
20  My ex-wife sees it.
21  Q. Okay.
22  A. She speaks about it.
23  Q. But other than it's appearance, do

35

1  you feel does it-- do you have pain from the
2  scar?
3  A. There's no pain; but I can feel it
4  sometimes.
5  Like, if I touch it, turn it, there's
6  a little bump there.
7  Q. Does it affect your speech in any
8  way?
9  A. No, sir.
10  Q. I think you said your daughter, your
11  wife, and your ex-wife have all noticed it.
12  A. Well, my wife is my ex-wife.
13  Q. That was going to be my next
14  question.
15  So it's your daughter and your
16  ex-wife?
17  A. Yes.
18  Q. You also said you had some bumps or
19  bruises on the back of your head; correct?
20  A. Some lumps.
21  Q. Do you still have those or did they
22  go away?
23  A. They are gone.

36

1  Q. About how long did it take for them
2  to go away?
3  A. I can't recall.
4  Q. Other than being able to feel them
5  back there, did they affect you in any way
6  while they were there?
7  A. Well, you know, headaches from that
8  and my eye.
9  More so my eye was throbbing and I
10  was getting headaches.
11  That's why I went in to see the lady
12  about my eye. I didn't know what was wrong
13  with it.
14  Q. I think you said your eye was
15  throbbing for a while at least?
16  A. Actually, I actually had a little
17  lump over my eye, as well.
18  Q. Okay. How long did you have that
19  problem?
20  A. The throbbing part?
21  Q. Yes.
22  A. I still go through it sometimes.
23  Q. Okay.

37

1    A.    Every now and then it goes and comes.
2  It will throb.
3    Q.    It's not something you have all the
4  time; it comes and goes?
5    A.    Yeah.
6    Q.    About how often do you get it?
7    A.    I would have to say it depends on
8  what I'm doing. If I'm doing a lot of reading
9  or if I'm thinking about things constantly or
10  if I'm stressed, that's when the throbbing
11  really comes from reading mostly or doing
12  legal work or whatever.
13    Q.    That's when you notice it?
14    A.    Yes. Or, if I'm sitting at a
15  computer too long, it will start to throb.
16    Q.    I noticed you have what appears to be
17  a little scar in your eyebrow of your right
18  eye.
19    A.    Yes.
20    Q.    Is that correct?
21    A.    Yes.
22    Q.    Is that from some other incident?
23    A.    No. Yeah. That's from when I was a

38

1  kid. I mean, I'm talking over twenty years
2  ago.
3    Q.    Okay.
4    A.    I was--
5    Q.    I don't really need to know what it's
6  from.
7          That's not from this incident with
8  Mr. Zanetti?
9    A.    No, sir.
10    Q.    And it looks like you also have a
11  couple of lines under that right eye on the
12  upper part of your cheek.
13    A.    The left eye?
14    Q.    No. Your right.
15    A.    My right eye?
16    Q.    Yes.
17    A.    I know I've gotten basketball injury.
18    Q.    Are you aware of that?
19    A.    Yeah, I'm aware of one of them,
20  basketball injury.
21    Q.    That's from something other than from
22  this event with Mr. Zanetti?
23    A.    Yes, sir.

39

1    Q.    You saw the eye doctor?
2    A.    Yes.
3    Q.    Two times at Ludlow; correct?
4    A.    That I can recall, correct.
5    Q.    Other than examining you, did they do
6  anything else for you while you were at Ludlow
7  in connection with your eye?
8    A.    No.
9    Q.    And I guess--
10    A.    Other than Motrin.
11    Q.    They gave you some Motrin?
12    A.    Every now and then, yeah.
13    Q.    Okay.
14    A.    That's something I could just request
15  from the medical nurse.
16    Q.    Since you've left Ludlow, has any
17  other medical person examined your eyes?
18    A.    Yes.
19    Q.    Who has that been?
20    A.    I don't know his name off the top,
21  but the hired physician here at SBCC.
22    Q.    Has that been on one occasion or more
23  than one occasion?

40

1    A.    More than one.
2    Q.    I think you said at one time you were
3  sent for some eye test; correct?
4    A.    No.
5    Q.    Or had an eye test?
6    A.    Here.
7    Q.    Here at SBCC?
8    A.    He did some tests, not all tests. It
9  wasn't an exhaustive test. He just did some
10  tests.
11    Q.    Did the doctor tell you anything
12  about the condition of your eye?
13    A.    First he said he can't tell anything
14  wrong with my eye.
15          All right?
16          I came back. Still having the same
17  problems.
18          Then he said I may need glasses. He
19  ordered me some glasses.
20          He said to give it some time to set
21  in.
22          Waited a while. Glasses still a
23  problem.

40

**Page 37 to Page 40**

**41**

1    Then he said, "Well, let me do
2  another test."
3    Then he said I have a problem with
4  converging, my eyes converging on an object.
5    He did a test to see if my eyes could
6  come in without a problem and converge as it
7  came closer.
8    He said that I have a problem with
9  that.
10    Before he said it was a stigmatism or
11  something, you know.
12    But, as far as I know, he was only
13  able to do certain tests on me.
14    So I just got frustrated with it and,
15  you know, I just stopped going.
16    So I just take Motrin when I have a
17  problem or whatever.
18    I have a prescription.  I refill it
19  every now and then and use it as needed.
20    Q.    Do you use the glasses now when you
21  read or do paperwork?
22    A.    Yes, sir.
23    Q.    Do you have to use them for anything

**42**

1  else?
2    A.    No.  Not all the time.  I use them--
3  I use them when I read mostly.
4    Q.    Had you ever used glasses before you
5  were given them here?
6    A.    I've always had perfect vision.
7    Q.    Do you remember when you last had an
8  eye test before the incident with Mr. Zanetti?
9    A.    No.  I can't recall offhand.
10    Q.    Do you know who would have done the
11  eye test or where you would have had it, if
12  you had one before the incident?
13    A.    I can't recall offhand.
14    Q.    Do you remember, if you had one even?
15    A.    I'm pretty sure I've had them before,
16  you know.  And I know from that I've always
17  had perfect vision, anywhere from
18  twenty/twenty, around twenty/twenty.
19    So I've never had a problem with my
20  eyes.
21    Q.    Did you ever have an eye test in
22  connection with getting a driver's license?
23    A.    I believe so.

**43**

1    Q.    Do you remember where that was done?
2    A.    Connecticut.
3    Q.    And you didn't have to wear glasses
4  to get your license?
5    A.    No, sir.
6    Q.    Other than the problems that you've
7  described with your eye, are there any other
8  problems that you are still having now that
9  you think are related to this assault by
10  Mr. Zanetti?
11    A.    Other than emotional?
12    Q.    Right.
13    A.    No.
14    Q.    Are you having some emotional
15  problems in connection with Mr. Zanetti's
16  assault?
17    A.    Yeah. Some because I think about it
18  and I think they did it on purpose.
19    I really believe they did it on
20  purpose.
21    I had a rough time at the facility
22  while I was there.
23    I know you've seen some of the

**44**

1  D-board tickets that I got, problems I was
2  having with officers and stuff, you know.
3    Q.    You had only been there about a week
4  when this incident happened; right?
5    A.    Yes.
6    Q.    What can you tell me about that week
7  that made you think that this event happened
8  on purpose?
9    A.    Well, off the top of my head, first,
10  within that week I was asking to let me out of
11  that jail.  I don't want to be here.
12    I don't want to be in the hole
13  anymore.
14    I didn't think they was going to put
15  me in the hole and I was going to be subjected
16  to certain losses of privileges, you know.
17    And I was aware that they had another
18  unit that they use for protective custody.
19    I didn't understand why I was being
20  placed amongst gang members and this very
21  individual that you are saying you are
22  protecting me from.
23    I didn't understand why I was placed

45

1   in the sub-day room one on that day when there
2   was nobody in sub-day room two where my cell
3   was.
4        It was just Cell 4.
5        I didn't understand why the day room
6   wasn't locked, you know.
7        And I don't understand why
8   Mr. Zanetti wasn't handcuffed when his cell
9   was open.
10        I had gotten tickets from officers, I
11   believe. I'm not sure if it was in that time.
12        But, you know, just the general
13   attitude towards me from the staff and, you
14   know, comments that were made about my case to
15   me from staff members and other inmates, you
16   know.
17        I see staff laugh with inmates and
18   things about me.
19   Q.   This is all before the assault by
20   Mr. Zanetti?
21   A.   From the best of my recollection,
22   I've witnessed and went through a lot of those
23   things.

46

1   Q.   Which staff members had made comments
2   to you before the assault by Mr. Zanetti?
3   A.   Off the top of my head, I can't
4   recall.
5   Q.   Okay. Do you remember what the
6   comments were?
7   A.   I've had staff tell me I wasn't
8   tough.
9        Off the top of my head, you know, not
10   that I remember whether it was before or
11   after; but I've had cops call me racial names,
12   say I wasn't so tough without a gun.
13        I mean, I've had officers just come
14   up to me and tell me that I was going to do
15   life because they knew the victim and, you
16   know, just more so things like that.
17        You know, I'm not too tough without a
18   gun.
19        I'm a PC.
20        At that time there was a lot of
21   comments about me being in protective custody.
22        I also had an officer tell me that
23   with regard to me being moved to another

47

1   facility that they are not going to do it.
2        If I would have cooperated with the
3   police, I wouldn't be in this situation.
4   Q.   Do you remember who told you that?
5   A.   Yes. That was Cadigan, John Cadigan.
6   Q.   Do you remember whether that happened
7   before or after the assault by Mr. Zanetti?
8   A.   I believe that was before because I
9   asked to be moved to Northampton.
10        I was informed that usually when they
11   have a case like mine, they move the inmates
12   to another jail.
13        And I requested that from
14   John Cadigan. He told me if I wanted to move
15   that I would have to contact the jail and get
16   permission from them, which I did.
17        Within that time period I had wrote
18   to Defendant Weldon and asked him about why I
19   was being held in that unit.
20        And before he could respond, that's
21   when the incident happened.
22        Actually, I got his response the
23   following day.

48

1   Q.   Major Weldon?
2   A.   Yes, sir.
3   Q.   And was his response that you would
4   have to write to the other facility and see if
5   they would take you?
6   A.   No. His response was that I'm being
7   protected where I am and that's why I'm being
8   held in that unit, for my own protection.
9   Q.   So he didn't tell you that you could
10   write to the other facility and ask to go
11   there?
12   A.   Not off the top of my head. I
13   believe that was Cadigan that told me to write
14   the other facility.
15   Q.   How did the emotional problems that
16   you have relating to the assault by
17   Mr. Zanetti affect you?
18   A.   Right now I pretty much have gotten
19   over it except for every now and then my
20   daughter says something about this scar.
21        But it just-- it just makes me
22   remember the incident about what happened, you
23   know.

49

1    I'm not distraught over it to where
2    it stops me from functioning; however, it is
3    something that happened to me that I remember.
4        And just I more so think about the
5    officers and, you know, just the carelessness.
6        That could have been prevented, I
7    believe, especially in a high-security unit.
8    Q.    You've named a number of individuals
9    as defendants in your suit.  And one of the
10    things I want to try to do is pin down what
11    your claims are against those various
12    individuals.
13        And you've mentioned Officer Muldrow
14    a couple times already in connection with this
15    incident with Mr. Zanetti.  Right?
16    A.    Yes.
17    Q.    And one of the other defendants you
18    named was Correctional Officer Victor Kelly.
19    A.    Yes.
20    Q.    Do you claim that Mr. Kelly played
21    some part in this assault by Mr. Zanetti?
22    A.    Well, he was working in the unit that
23    day.

50

1    Q.    Other than the fact that he was in
2    the unit that day, is there anything else that
3    he did or did not do that you think makes him
4    responsible somehow for the assault?
5    A.    No.
6    Q.    Other than Correctional Officer Kelly
7    and correctional Officer Muldrow, were there
8    any other correctional officers or supervisors
9    actually in the unit at the time--
10    A.    Not to my knowledge.
11    Q.    --of the assault?
12        One of the other people you've named
13    is Lieutenant Korman; correct?
14    A.    Yes.
15    Q.    And do you claim that
16    Lieutenant Korman played some part in this
17    assault by Mr. Zanetti?
18    A.    He's the supervisor of the unit. It's
19    his duty, I believe, to go to the units and
20    make rounds and security checks and things
21    like that.
22    Q.    Did you see him in the unit the day
23    of the assault by Mr. Zanetti?

51

1    A.    I believe so.
2    Q.    Do you remember about what time the
3    assault happened?
4    A.    It was in the morning. It was early
5    morning.  I believe it was early morning,
6    around nine thirty, ten, somewhere around
7    there.
8    Q.    I think there's a report that says it
9    was somewhere around nine thirty.
10        Do you know what time he would have
11    come on duty that day?
12    A.    No.
13    Q.    You did see him in the unit before
14    the assault sometime that day?
15    A.    I believe so, yes.
16    Q.    When you saw him in the unit earlier
17    that day, what was he doing?
18    A.    I can't recall. I mean, you know.
19    Q.    Did you have any conversation with
20    him that day?
21    A.    No.
22    Q.    Had you had any conversation with
23    Officer Kelly that day before your assault?

52

1    A.    Not that I can recall.
2    Q.    Obviously, you had some conversation
3    with Officer Muldrow.  He's the one that put
4    you in the sub-day room; correct?
5    A.    Not really. I mean, you know, they
6    are officers. I'm an inmate. It's time for
7    my rec.  He takes me into the rec room, and I
8    have my rec.
9    Q.    Other than telling you what to do in
10    order to bring you down to the rec, you didn't
11    have any conversation with him that day?
12    A.    No, sir.
13    Q.    Had you had any conversation with
14    Officer Muldrow previous to the day of the
15    assault by Mr. Zanetti?
16    A.    No.
17    Q.    Other than, you know, the ordinary
18    interactions to go here, do this, do that?
19    A.    No.
20    Q.    What about Officer Kelly, did you
21    have any interaction with him earlier?
22    A.    No.
23    Q.    What about Lieutenant Korman?

53

1   A.   No.
2   Q.   Any interaction you had had with them
3   previously was just the routine thing as part
4   of life in the pod?
5   A.   Yeah.
6   Q.   But your understanding is Korman was
7   on duty at the time of the assault?
8   A.   Yeah.
9   Q.   Did anyone ever tell you where he was
10  at the time of the assault?
11  A.   No.
12  Q.   Do you know where Officer Kelly was
13  at the time of the assault?
14  A.   At the time of the assault he was at
15  the desk.
16  Q.   Do you remember seeing him there?
17  A.   Yes.
18  Q.   About how long before the assault was
19  it that you saw Officer Kelly at the desk?
20  A.   When I was being brought into the
21  sub-day room.
22  Q.   And do you remember how long that was
23  before the assault occurred?

54

1   A.   About five minutes.
2   Q.   One of the other individuals that has
3   been named is Lieutenant Juan Ramos?
4   A.   Yes.
5   Q.   I think he's now Captain Ramos.
6   A.   Yeah.
7   Q.   Do you claim that he played some part
8   in this assault by Mr. Zanetti?
9   A.   Yes.
10  Q.   What part do you claim?
11  A.   I think he was negligent.
12  Q.   In what way?
13  A.   By having them place me in the unit
14  knowing there were gang members there when he
15  had notice that I had threats made by these
16  gang members.
17  Q.   Was Mr. Zanetti said to be a gang
18  member?
19  A.   Well, from what he said to me, I know
20  he was one of the gang brothers.
21  Q.   What did he say to you that made you
22  think that?
23  A.   When he came to my door, he said that

55

1   I killed his brother.
2   Q.   When he came to your door?
3   A.   Yeah.  When I first came into the
4   unit, the first chance that he had at rec is
5   when he came and woke me up.
6   He kicked my door and started
7   swearing at me.
8   He first tried to spit in my door,
9   told me he was going to get me, told me that I
10  killed his brother, or whatever.
11  Q.   Was this while you were in the cell
12  in sub-day room-- the other sub-day room?
13  A.   Two.
14  Q.   He was out in the open area of that
15  sub-day room?
16  A.   Yeah.
17  Q.   How long before the assault was this?
18  Do you remember?
19  A.   I came in on the 27th, and the
20  incident happened on the 2nd.  It was in
21  between then.
22  Q.   Other than that incident, had you had
23  any conversations or disputes with Zanetti

56

1   before the assault?
2   A.   No.
3   Q.   Did anyone else ever tell you that
4   Zanetti was or was not part of the La Familia
5   gang?
6   A.   No.
7   Q.   That's something you concluded from
8   the things he was saying to you?
9   A.   Yes.
10  Q.   What makes you say that
11  Lieutenant Ramos knew that threats had been
12  made against you?
13  A.   Well, previous to my being housed at
14  the facility, from a report that he generated
15  and he turned over to head of chief of
16  security, Defendant John Kenney, there was a
17  confidential informant who called him at the
18  Ludlow Jail and informed him that there had
19  been threats made of retaliation or plots of
20  retaliation to be carried out on the shooter's
21  family who lives on Cannon Circle, as put in
22  the report.
23  I was the only person they was

57

1  looking for that lived on Cannon Circle that
2  was allegedly the shooter of
3  Philippe Santiago.
4      Q.    Do you know whether or not
5  Lieutenant Ramos knew that you were the person
6  that was referred to as the shooter by the
7  confidential informant?
8      A.    Yeah, he knew.
9      Q.    How did he know that?
10     A.    Because he said his job, based on his
11  testimony from my trial, which I believe I
12  gave you a copy of the transcript, he stated
13  his job was to keep track of gang members of
14  who shot who.
15         He said that he knew that I was in
16  jail for allegedly shooting Mr. Santiago.
17         He specifically said that. So, you
18  know.
19     Q.    Any other reason why you claim
20  Lieutenant Ramos was negligent in connection
21  with this attack by Mr. Zanetti?
22     A.    Other than I believe that I should
23  not have been in that unit where they have a

58

1  protective custody unit for inmates on
2  protective custody.
3      Q.    Were you ever in that other
4  protective custody unit while you were in
5  Ludlow?
6      A.    No, sir.
7      Q.    Do you know what the pod designation
8  is for that other unit?
9      A.    Protective custody.
10     Q.    One of the other individuals that
11  you've named in your suit is Deputy Chief
12  John Kenney.
13     A.    Deputy Chief or Chief of Security.
14     Q.    Deputy Chief of Security John Kenney.
15     A.    All right.
16     Q.    You claim that he had some part in
17  this assault by Mr. Zanetti?
18     A.    Well, from my understanding now it's
19  him that runs the unit. I know he was chief of
20  security. I know he had the report. And I
21  feel that they failed to take the necessary
22  steps to prevent it from happening.
23         As far as not placing me in that

59

1  unit, I feel I should not have been placed
2  around gang members knowing there was a
3  threat.
4          And it wasn't just La Familia that
5  allegedly made threats to harm my family, you
6  know.
7      Q.    Who else had made threats?
8      A.    Well, that was in the report.
9  Pursuant to the report, also Latin Kings.
10     Q.    Anybody else that you knew or
11  believed had made threats--
12     A.    No.
13     Q.    --of retaliation?
14     A.    No, just La Familia and the Latin
15  Kings.
16     Q.    When you say Mr. Kenney had the
17  report, you are talking about the confidential
18  informant report that Mr. Ramos had generated?
19     A.    Yes.
20     Q.    Anything else that you think makes
21  Mr. Kenney responsible for the Zanetti
22  assault?
23     A.    Other than that, no.

60

1          I believe they should have directed
2  and placed me somewhere where I would have
3  been safe.
4      Q.    Another individual that you've named
5  in your suit is Major Edward Weldon; correct?
6      A.    Yes.
7      Q.    Do you claim that Major Weldon played
8  some part in the assault by Mr. Zanetti?
9      A.    Yes.
10     Q.    What part do you believe he played?
11     A.    As I told you, when I requested to be
12  removed from the facility I was denied from
13  Mr. Weldon and I was promised that I was being
14  protected.
15         This is his response to a request
16  form that I sent him.
17     Q.    This is the response you got the day
18  after the assault?
19     A.    The day after the assault.
20         You are safe where you are. We are
21  protecting you.
22         A day short and he never knew the day
23  before--

61

1    He signed it the 3rd. But on the 2nd
2 I was assaulted.
3    So, therefore, he didn't even know I
4 was assaulted the previous day and sent this
5 to me.
6    Or he did and was being sarcastic.
7    Do you know what I mean?
8    So.
9    Q.    Anything else that Major Weldon did
10 or didn't do that you think makes him
11 responsible in connection with the Zanetti
12 assault?
13    A.    I just believe that, you know, based
14 on the fact that I was placed there, based on
15 the report, based on the fact I was contacting
16 him and requesting to be removed, based on the
17 fact that I had Tim come to my cell, you know,
18 and I had tried to contact these people and
19 asked them to move me from over there, you
20 know.
21    I didn't feel safe. I didn't want to
22 be in the hole, first of all.
23    And the fact they didn't come

62

1 together and say, "This kid is contacting us;
2 let's move him."
3    You know, they had the power to move
4 me. They decided not to.
5    They decided to keep me around these
6 gang members and people that they know are
7 considered to be violent inmates in the
8 facility or people that get into trouble a
9 lot. They wanted to keep me there.
10    Q.    And you didn't think you should be in
11 with violent inmates?
12    A.    No.
13    Q.    Even though you were there being
14 accused of--
15    A.    Falsely accused. Falsely accused of
16 murder.
17    Q.    But you were accused of that; right?
18    A.    Yes, sir. But I'm not a violent
19 person.
20    Q.    Another individual that you've named
21 in your suit is Superintendent Tsgaris?
22    A.    Yes.
23    Q.    Do you claim he played some part in

63

1 the assault by Mr. Zanetti?
2    A.    Yes.
3    Q.    What part do you claim Superintendent
4 Tsgaris played?
5    A.    I believe Mr. Tsgaris is at fault
6 because the way he runs that facility.
7    I believe the training, I believe the
8 negligence in which the officers carry
9 themselves in not locking the mechanisms, I
10 believe that's all due to their training and
11 not being disciplined when they fall short of
12 their duties in such a manner.
13    Q.    Other than this incident where the
14 door to the sub-day room was unlocked and
15 Mr. Zanetti got in to assault you, what other
16 incidents are you aware of where correctional
17 officers failed to lock cells when they should
18 have?
19    A.    I hadn't been there that long. That
20 incident was enough for me.
21    Q.    That's the only incident you knew of?
22    A.    That I know of.
23    Q.    What, if anything, do you know about

64

1 the training that the correctional officers
2 have in connection with locking cells?
3    A.    Well, from my understanding they are
4 supposed to check.
5    I know they were supposed to check
6 the door, the locking mechanism, make sure the
7 door is locked.
8    Q.    Anything else?
9    A.    I mean, as far as letting Zanetti out
10 of his cell, from my understanding he should
11 have been handcuffed whether he was being
12 taken out of the cell or not and he should
13 have been ordered to go to the back of the
14 cell while his door was opened.
15    That did not happen.
16    Being a special-management,
17 high-security unit, you would imagine that--
18 anyone would imagine that the procedures that
19 you would take there would be more stringent
20 and, you know, for the safety of the inmates
21 and the staff.
22    Q.    Other than this incident with
23 Mr. Zanetti getting out of the cell, are you

46

DEPOSITION OF ANTHONY GARVIN
PART 2



65

1  aware of any other incidents where inmates got
2  out of cells when they weren't supposed to?
3      A.   As I said, I hadn't been there that
4  long; but afterwards I've heard of it and I've
5  seen inmates get out of their cells.
6      Q.   Let's take those one at a time then.
7  What incidents were there that you saw where
8  inmates got out of their cells when they
9  weren't supposed to?
10     A.   I've seen inmates get out of their
11 cells. Off the top of my head who it was and
12 when it happened, I can't recall those
13 details. But I've seen it done.
14         And I was actually taught and told
15 how to do it.
16     Q.   What were you told about how to do
17 it?
18     A.   Well, the inmates would jam their
19 door so when the tower closes the door, it
20 wouldn't lock; but it would appear to be
21 closed.
22         And you would be just able to yank
23 the door open.

66

1          However, I've never used it; but I
2  was told how to do it.
3          MR. WITHERS:  That's all I'm
4  asking.
5          THE WITNESS:  That's how they
6  would do it.
7          But at the same time, afterwards,
8  after they realized it was happening, you
9  would see the officers take the door and make
10 sure it's slammed shut.
11         And then they would find the door
12 jammed sometime and they would catch the
13 person and close the door.
14         So it became a procedure to make sure
15 the door was locked shut.
16         Or the procedure was already in place
17 and they just started to practice it.
18     Q.   When correctional officers would find
19 somebody had jammed the door like that, would
20 they give that person a ticket?
21     A.   I don't know what they would do. It
22 would be to their discretion, I guess.
23         But I believe the institution policy

67

1  is to give them a report, a D report, because
2  they are tampering with locking mechanisms in
3  the doors.
4      Q.   In addition to hearing about that or
5  seeing inmates do that and being told how to
6  do it, you said you also heard about inmates
7  who did it; correct?
8      A.   Yeah.
9      Q.   What did you hear about other
10 inmates?
11     A.   I've heard another inmate got out of
12 his cell and attacked one of the workers
13 before.
14     Q.   Before?
15     A.   Before I was at the facility, things
16 that happened in the past, I was told stories
17 about it.
18     Q.   I think you said you don't know who
19 or when, but you know you saw at least some
20 incidents?
21     A.   I've seen at least one incident, at
22 least one incident where an inmate got out of
23 his cell.

68

1          And I was seeing another one where
2  the CO caught an inmate trying to trap the
3  door with soap, smashed the door and smashed
4  the soap and locked it.
5      Q.   And the one incident is something
6  other than the incident with Mr. Zanetti?
7      A.   Other than Mr. Zanetti. His door was
8  opened by the officer in the tower.
9      Q.   The other individual you've named in
10 the complaint is Sheriff Michael Ashe;
11 correct?
12     A.   Yes.
13     Q.   Do you claim that Sheriff Ashe did
14 something that caused this assault by
15 Mr. Zanetti?
16     A.   Yes.
17     Q.   What do you claim Sheriff Ashe did or
18 didn't do?
19     A.   The same as the others.
20     Q.   Supervision and training?
21     A.   And it goes beyond that, I believe. I
22 believe that-- you know, I believe that I
23 wasn't the first incident of something like

69

1  this happening. I doubt it. And I believe
2  that incidents where inmates jump on other
3  inmates create opportunity for them to send a
4  message to the inmates that do things like
5  this by going to the DA's office and, you
6  know, implementing punishment, more stricter
7  punishment than just putting him in detention
8  in the cell, you know.
9      There was no deterrence for inmates
10  to do things like that, I believe, as in this
11  situation, when Zanetti did what he did,
12  nothing happened to him other than being
13  placed--
14      You know what I'm saying?
15      --in the hole longer. There were no
16  charges brought up against him. I requested
17  that that happen. Nothing happened.
18      You know, I was told they took care
19  of the situation.
20  Q.   You've talked about the hole a couple
21  times. By the hole you are talking about the
22  special management?
23  A.   Segregation, the hole, you know, the

70

1  box.
2  Q.   All terms for that same special
3  management unit?
4  A.   Yes, sir.
5  Q.   Just to make it clear on the record.
6      And you understand that what happened
7  to Zanetti as a result of the incident where
8  he assaulted you was that he had a hearing
9  within the facility and got punished within
10  the facility, but no criminal charge was
11  brought against him; correct?
12  A.   Yes.
13  Q.   And that's your understanding of what
14  happened to other inmates who, for instance,
15  tried to jam the door and so forth; that they
16  were just treated administratively inside the
17  facility?
18  A.   If that.
19  Q.   Anything else that you claim
20  Sheriff Ashe did or didn't do that led to the
21  assault by Mr. Zanetti?
22  A.   Without knowing their policies and
23  procedures, I would have to say that's it, you

71

1  know.
2  Q.   Okay. Let's talk about the other
3  incident then. And that's the one involving
4  Mr. Marrero.
5      And what is your claim concerning
6  Mr. Marrero as your cell mate?
7  A.   That Mr. Marrero was a government
8  agent; that he was placed in my cell; that he
9  illegally obtained information out of
10  documents, in turn using them to create,
11  fabricate, a statement against me claiming
12  that I admitted to him of this crime of
13  killing Mr. Santiago; that they did this by
14  placing him in my cell knowing that, not only
15  he was a snitch for the Commonwealth, but he
16  was also a La Familia gang member.
17      While I was still on protective
18  custody status supposedly being protected from
19  La Familia, he was placed in my cell.
20      So I feel that, you know, that they
21  violated my eighth amendment right with that
22  respect.
23  Q.   Okay. Let's take that one step at a

72

1  time then.
2  A.   Okay.
3  Q.   What is the basis that you have for
4  saying that Mr. Marrero was a government agent
5  at the time he was put in your cell?
6  A.   Well, I have come into information
7  that he had made a deal with the Commonwealth
8  prior to being placed in my cell.
9  Q.   What is the deal that you think he
10  made with the Commonwealth?
11  A.   That he was going to testify against
12  me in exchange for less time.
13  Q.   And you are claiming he made this
14  deal before he was placed in the cell?
15  A.   Before.
16  Q.   Who did he make this deal with, as
17  far as you know?
18  A.   Someone from the DA's office.
19  Q.   Do you know who it was from the DA's
20  office?
21  A.   No, sir.
22  Q.   Which DA's office are we talking
23  about?

73

1    A.    Hampden County District Attorney's
2  office.
3    Q.    Hampden County?
4    A.    Yes.
5    Q.    What is the basis for your belief
6  that he made this deal with someone in the
7  Hampden County DA's office?
8    A.    As I said, I've come into information
9  that he did make a deal with them.
10    Q.    What is the information?
11    A.    At this time I would rather not
12  disclose that; but it will be turned over in
13  discovery under Rule 26.
14        I have a witness.  I have a statement
15  from him.  And you will get that pursuant to
16  Rule 26.
17        MR. WITHERS:  All right.  That's
18  fine.  But this is discovery.  This is your
19  chance to say what the basis for your case is.
20        THE WITNESS:  I'm stating that.
21    Q.    I'm asking you:  What is the
22  information?
23    A.    Are you asking me for the source of

74

1  information?
2    Q.    Yes?
3    A.    I'm not turning that over.
4    Q.    Are you refusing to provide--
5    A.    Under Rule 26 you will get it before
6  the trial within the right amount of days.
7    Q.    Are you refusing to provide it in the
8  deposition?
9    A.    Yes, I am.
10    Q.    And as to both the name of the person
11  who gave you this information and what the
12  information is?
13    A.    I just told you what the information
14  was; that he did have a deal with them prior
15  to being placed in my cell.
16    Q.    And you know who this person is that
17  gave you this information?
18    A.    Yes, I do.
19    Q.    And do I understand you to say you
20  have a written statement or something?
21    A.    Yes, I do, sir, which I will be
22  providing to you pursuant to Rule 26.
23    Q.    But you are not providing that

75

1  information in this deposition?
2    A.    I was told during the scheduling
3  hearing that I am exempt from turning those
4  documents over.
5    Q.    I'm not asking you for the document
6  at this point.
7        I'm asking you what the statement is
8  and who made it?
9    A.    Well, I told you what the statement
10  was and I have a statement from the person.
11    Q.    Who was the person is the question?
12    A.    I will not answer that at this time
13  due to-- only due to not to be rude to you,
14  Mr. Withers, but because there has been a
15  history of intimidating my witnesses
16  throughout my criminal trial.
17        So, therefore, you know, if I can
18  keep a witness from being tampered with, I'm
19  going to do so.
20    Q.    I mean, you can choose to answer or
21  not to answer.  And it's-- you know, you make
22  that decision yourself.  I just want it clear.
23        You know who the person is and you

76

1  are refusing to tell me now?
2    A.    Yes, sir.
3    Q.    Correct?
4    A.    Yes, sir.
5    Q.    When do you claim this deal was made?
6    A.    In August of 2003, to the best of my
7  knowledge.
8    Q.    Do you remember the approximate date
9  when Mr. Marrero was placed as your cell mate?
10    A.    In August.  The date I'm not sure.
11    Q.    You are not sure when?
12    A.    No.
13    Q.    Before Mr. Marrero was placed in your
14  cell as your cell mate, did you have another
15  cell mate?
16    A.    Yes.
17    Q.    Who was that?
18    A.    Martinez. I don't know his first name
19  off the top of my head.
20    Q.    What happened to him? Why was he no
21  longer your cell mate?
22    A.    I believe he went back to population.
23    Q.    At the time of these events involving

77

1  Mr. Marrero, you were still in this special
2  management unit; correct?
3      A.   Yes.
4      Q.   Do you know what Mr. Marrero was
5  charged with when he was being held as your
6  cell mate?
7      A.   At the time I didn't.
8      Q.   Do you know now?
9      A.   Yeah; masked armed robbery,
10  possession of a sawed-off shotgun. I think
11  threatening to commit a crime.
12          He had like five counts, five
13  masked-armed-robbery charges, two
14  sawed-off-shotgun charges, assault with a
15  dangerous weapon, I believe, off the top of my
16  head.
17      Q.   Had you ever met Mr. Marrero before
18  he became your cell mate?
19      A.   I never talked to him. I seen him in
20  the unit.
21      Q.   Did you have any understanding
22  whether he was known or believed to be a gang
23  member when he first became your cell mate?

78

1      A.   No.
2      Q.   When did you first come to find out
3  that he was known or believed to be a gang
4  member?
5      A.   After he signed the statement against
6  me.
7      Q.   Do you know how long he had been in
8  the same special management unit you were in
9  before he was assigned as your cell mate?
10      A.   Off the top of my head, I can't say.
11  Maybe a month. I'm not sure.
12      Q.   Couple of weeks anyway?
13      A.   Because it had been his second time
14  in the unit. He left and went to population,
15  and came back. So I'm not sure how long it
16  was.
17      Q.   Were you in the unit the first time
18  he left?
19      A.   I had never left. I had been in
20  there.
21          The first time he left, I was there.
22      Q.   So while you were in the unit, he was
23  in the unit. Then he left. You stayed in the

79

1  unit. Then he came back to the unit--
2      A.   Yes.
3      Q.   --while you were still there.
4      A.   Yes.
5      Q.   Do you know what brought him back to
6  the unit, whether there was an incident or
7  something else that happened?
8      A.   Now I do.
9      Q.   What do you understand brought him
10  back to the unit?
11      A.   He was beaten up by La Familia gang
12  members because they said he was a snitch.
13      Q.   Did he ever talk to you about that
14  event?
15      A.   No.
16      Q.   Did anyone else ever talk to you
17  about that event before Mr. Marrero got
18  assigned as your cell mate?
19      A.   No.
20      Q.   All right. I think you said he
21  illegally obtained information from some
22  documents that you had in your cell?
23      A.   Yes.

80

1      Q.   What is the basis for saying that?
2      A.   That's the only place he could have
3  gotten the things he knew about my case from,
4  is from the documents, newspaper articles I
5  had, because I was working on my case or
6  trying to work on my case while I was there.
7      Q.   So you had documents in your cell
8  concerning the criminal charges against you?
9      A.   Police reports, newspaper articles,
10  medical examiner reports which had came while
11  he was in my cell which I ended up writing a
12  grievance about because I believe that it was
13  tampered with, my mail.
14          I had a lot of documents. I had my
15  grand jury minutes at that time.
16          And any mail that may have come while
17  I was there, they delivered to your cell. And
18  you sign for it.
19      Q.   Was there any place elsewhere you
20  were permitted to keep documents, other than
21  your cell?
22      A.   That's where you keep your documents,
23  in you cell.

50
**Page 77 to Page 80**

81

1    Q.    Did you have a lock box or anything
2  like that in your cell to keep it in?
3    A.    No.  You just sit them on-- there's a
4  shelf and a desk.  And you would just sit them
5  there.
6    Q.    Were there times that Mr. Marrero was
7  in the cell while your documents were there
8  that you weren't there?
9    A.    Yes.
10   Q.    When would those occasions occur?
11   A.    Well, at one point I had gotten my
12 visits.  I was able to go visit.  They would
13 be there.  If I went to medical, they would be
14 there.  Sometimes I went to court.  I wouldn't
15 need all those documents because I was only in
16 pretrial.  They would be there.
17   Q.    How many of these incidents were
18 there while Mr. Marrero was your cell mate?
19   A.    Numerous.  I can't even give you a
20 number, but numerous times.
21   Q.    He became your cell mate in August,
22 2003; correct?
23   A.    Yes.

82

1    Q.    And when was he taken away as being
2  your cell mate?
3    A.    Well, he wasn't taken away.  I was
4  removed out of the cell.
5    Q.    When did the two of you stop being
6  cell mates?
7    A.    I don't know.  Maybe about two or
8  three weeks later.
9    Q.    A period of a month or less that he
10 was your cell mate?
11   A.    More likely less.
12   Q.    How did you find out that he had
13 obtained information from your documents?
14   A.    By his statement.  Some of the things
15 he was saying, it matches things that are in
16 the documents, you know.
17        And he's saying I said it to him.  I
18 know I didn't say it to him.
19        So how else did you get this
20 information, other than what is generally
21 known by anybody who knows about the case
22 because the case was broadly--
23   Q.    It was in the newspapers?

83

1    A.    Yes. So a lot of people knew about
2  the case.
3        It's not like anybody can say, "Oh,
4  that's the dude that killed," such and such.
5        "How did you know?"
6        He told me he did it.
7        But anybody could have picked up a
8  newspaper and read that I was being accused
9  for killing this man.
10   Q.    You are saying Mr. Marrero had
11 information that wasn't in the media?
12   A.    He had information that wasn't in the
13 media pursuant to facts that weren't stated
14 inside of documents in my case.
15   Q.    And when you say he made statements
16 about that, was that at your trial or
17 somewhere else?
18   A.    I'm talking during his statement that
19 he wrote.
20   Q.    A written statement?
21   A.    Yes.  He ended up writing a written
22 statement.
23   Q.    And you eventually got a hold of

84

1  that?
2    A.    Yes.
3    Q.    Through your lawyer; correct?
4    A.    Yes.
5    Q.    And you got that statement after
6  Marrero-- or, after you and Marrero were no
7  longer cell mates?
8    A.    Yes.
9        Plus, the other reason I knew he did
10 it is he admitted to me he was going to do
11 that.  He told me prior to writing the
12 statement he was going to write the statement
13 against me because we had an argument and that
14 why and how he got the information.
15       And he told me that he went in the
16 stuff.
17   Q.    This is Mr. Marrero told you that he
18 had read things in your documents and he was
19 going to give a statement?
20   A.    Yes.  He, also, admitted it to
21 another individual who he was cell mates with
22 after he was cell mates with me that he wrote
23 the statement; that he didn't care; that he

51

85

1  was just trying to get out, get less time in
2  his own case, and how he got the information;
3  that he didn't even believe that I was guilty.
4      Q.    Well, let me break that up. Let's
5  talk about what Mr. Marrero told you about
6  giving the statement.
7      A.    He basically just laughed and joked
8  that he was going to get me life and I would
9  never see my family again and that he got
10  information from reading my stuff.
11     Q.    Are these statement he made orally to
12  you?
13     A.    They were oral.
14     Q.    Were they statements he made while
15  the two of you were still held in the special
16  management unit after you were no longer
17  roommates?
18     A.    Yes, sir.
19     Q.    Do you know anyone else who heard
20  Mr. Marrero make these statements telling you
21  that he was going to get you convicted?
22     A.    Yes, sir.
23     Q.    Who else heard that?

86

1      A.    At this time those are witnesses.
2  You will get copies of statements; but I will
3  not turn over their names due to intimidation
4  and tampering.
5      Q.    So you are refusing to tell me who
6  those people were today?
7      A.    Yes, sir, with all due respect.
8  Nothing personal.
9          MR. WITHERS: I take it that
10  way; I'm not taking it personally.
11         THE WITNESS: Yeah.
12     Q.    But you understand our position is we
13  have a right to get this information in this
14  deposition today; that that's one of the
15  purposes of doing this deposition?
16     A.    Under Rule 26 I have a right to
17  withhold it until thirty days before trial.
18         I was told that by the judge.
19     Q.    I don't think that's what the judge
20  told you. But we are not going to argue--
21     A.    In that exemption, he said I was
22  exempt. That's what I'm going by. So I'm
23  going by my understanding of his order.

87

1      Q.    That's a different thing. That is
2  not correct. But it doesn't matter. We are
3  not going to debate that ourselves here.
4          You are refusing to tell me the name
5  of these people; correct?
6      A.    I--
7      Q.    The people that witnessed
8  Mr. Marrero's oral statements to you about
9  having read your documents and about how he
10  would give a statement that would get you
11  convicted?
12     A.    At this time, yes, sir.
13         I'm very sorry.
14     Q.    You say he also told others this,
15  including a subsequent cell mate; correct?
16     A.    Yes.
17     Q.    Are you going to tell me who those
18  people were?
19     A.    I already gave you his name. I
20  slipped and gave you that one.
21         You are going to have to go back to
22  the transcript on that one.
23     Q.    You are not going to tell me again?

88

1      A.    It's on the transcript. I already
2  told you.
3      Q.    So what is the harm in telling me
4  again?
5      A.    His name is William Torres.
6          William Muldrow, Nelson Densy,
7  William Torres, Nelson Densy and the statement
8  that I got that told me about his deal was his
9  co-defendant, Twayne Harris.
10         So, please, do not intimidate my
11  witnesses because, if I get word-- if I get
12  word that--
13         I mean, you know, I will file a
14  complaint.
15         So, you know.
16         MR. WITHERS: I fully expect
17  that.
18         THE WITNESS: All right.
19     Q.    Let me go back.
20         Mr. Harris is the person who gave you
21  the written statement?
22     A.    Yes.
23         I have written statements from all of

89

1  those individuals--
2  Q.  Okay.
3  A.  --some of them notarized.
4  Q.  It's Mr. Harris who gave you the
5  statement about Mr. Marrero having made a deal
6  to testify against you?
7  A.  Yes.  He said that whoever admitted
8  it to him had a deal to do something else, is
9  the terms, I believe, he put it in.
10  He already had a previous deal to
11  testify against these codefendants.
12  Q.  Maybe I misunderstood, so let me be
13  clear.
14  Are you saying that Mr. Marrero also
15  made a deal that he would testify against you
16  before he became your cell mate?
17  A.  Yes.
18  Q.  But that deal has been made before he
19  became your cell mate?
20  A.  Yes.
21  Q.  And that's based upon the statement
22  that you got from Mr. Harris?
23  A.  Yes.

90

1  Q.  Now, the deal that Mr. Marrero made
2  was made with somebody at the Hampden County
3  DA's office's, as best you know; correct?
4  A.  I guess that's where he would go.
5  Q.  Is that what Mr. Harris says, that it
6  was with the Hampden County DA's office?
7  A.  He didn't say that, but it's implied.
8  My case is it out of Hampden County.  His case
9  is out of Hampden County.  I believe that's
10  where he would go to get his deal.
11  Q.  You understood Mr. Marrero's case was
12  in Hampden?
13  A.  Yes, sir.
14  Q.  And is it your claim that one of the
15  named-- one or more of the named defendants in
16  this case was aware of that deal before
17  Mr. Marrero was put in as your cell mate?
18  A.  Well, either they were aware of the
19  deal or they were aware there was a
20  possibility that he was a snitch.
21  They knew that for sure because he
22  told them.
23  Q.  Let me deal with one thing at a time.

91

1  Okay?
2  As far as the deal that Mr. Marrero
3  made with someone in the DA's office--
4  A.  I can't say that they knew about
5  that.
6  Q.  What you do say it is that they were
7  aware that at least the La Familia gang
8  members thought he was a snitch?
9  A.  Well, that's why they beat him up.
10  They were aware of that.
11  These were his own words, that they
12  said he was a snitch.
13  Q.  When you say they beat him up, you
14  are talking about La Familia gang members beat
15  up Mr. Marrero because the La Familia gang
16  thought Marrero was a snitch?
17  A.  Yes, sir.
18  Q.  And that was the reason that he got
19  brought back to the special management unit?
20  A.  Yes.  I found that out later.
21  Q.  Which of the named defendants do you
22  claim knew that the La Familia gang members
23  beat up Marrero because they thought he was a

92

1  snitch?
2  A.  Ramos knew.  I believe the lieutenants
3  knew.  Several of the lieutenants from the
4  second shift because they questioned him and
5  talked to him for a while, I believe.
6  Q.  Which lieutenants was that?
7  A.  Off the top of my head, I don't
8  remember.
9  I know there was an investigation
10  behind the whole situation and some of the La
11  Familia gang members were brought to the hole.
12  Q.  Okay.  But those are people that
13  aren't named in this suit?
14  A.  I'm not sure off the top of my head
15  who talked to him.
16  I know the staff members were aware
17  of it though.  They knew why he was back there,
18  you know.
19  They knew who he was as far as him
20  being La Familia.
21  Q.  What I'm trying to pin down is who
22  you claim knew that at least Marrero was
23  accused by La Familia people of being a

93

1  snitch?
2      A.    Well, it's in the reports which all
3  of the defendants have access to, to my
4  knowledge.
5      Q.    Leaving aside--
6      A.    The Defendants are on a
7  classification board, as well, which places
8  the inmate on protective custody status, which
9  they meet every week before.  The incident
10  would have been discussed at the
11  classification board placing him on the
12  administrative protective custody.
13          Ramos is a part of that
14  classification board.  John Cadigan is part of
15  that classification board.  To my knowledge
16  Kenney, Chief of Security Kenney, is part of
17  that classification board.
18          You have also Tsgaris, I believe, is
19  part of that classification board.
20          Defendant Basil Tsgaris spelled with
21  a T.
22      Q.    T-S-G-A-R-I-S?
23      A.    S-A. Tsgaris.

94

1      Q.    Okay. T-S-G-A-R-I-S.
2      A.    You know, they were aware of it.
3      Q.    What about Officer Muldrow?  Do you
4  think he was part of a classification board?
5      A.    No. I know they get notices of the
6  status. And there are information put inside
7  of computers.
8      Q.    Other than--
9      A.    Officers bringing people around.
10      Q.    Other than the possibility that
11  Officer Muldrow might have had access to the
12  information, do you have anything to suggest
13  that he actually knew about the deal that
14  Marrero had made or that Marrero was accused
15  of being a snitch before Marrero was placed in
16  your cell?
17          I'm talking Muldrow now.
18      A.    Not to my knowledge.
19      Q.    What about Victor Kelly, did you know
20  or have any information about that?
21      A.    He's like Muldrow.
22      Q.    He might have had access to the
23  information; but you don't know whether he

95

1  knew or didn't know?
2      A.    Right.
3          Muldrow is the officer who placed him
4  in my cell, as well.
5      Q.    What about Lieutenant Korman?
6      A.    Lieutenant Korman?
7      Q.    Yes?
8      A.    I believe he sits on the board, as
9  well--
10          I'm not sure.
11          --the classification board.
12      Q.    Other than being a possible member of
13  the classification board, is there any other
14  basis on which you think he knew that Marrero
15  was accused by La Familia people of being a
16  snitch?
17      A.    No, not to my knowledge.
18      Q.    What about Major Weldon?  Do you
19  think he was a member of the classification
20  board?
21      A.    I'm not sure.
22      Q.    Assuming that he was, other than
23  that, do you have any basis to say that he

96

1  knew La Familia people thought Marrero was a
2  snitch?
3      A.    No, not other than what is in the
4  records that they all have access to.
5      Q.    Leaving aside the fact that they
6  might have had access to that information--
7      A.    Yes.
8      Q.    We skipped somebody.  Who did we
9  skip?
10          Oh, Sheriff Ashe.
11          Same situation with Sheriff Ashe?
12      A.    The same as before, they run the
13  facility.  They set the policies on how to the
14  run the unit.
15          You know, the main thing about the
16  basis of the claim, other than, you know, he
17  has direct contact with the District
18  Attorney's office.  He goes to luncheons with
19  them.  So he had the reputation and a
20  relationship with them.
21      Q.    Other than that?
22      A.    No.  I can't say that.
23          You understand what I'm saying?

97

1    MR. WITHERS: Yes. That's what
2    I'm asking you.
3        (Discussion off the record.)
4    Q.    Other than the charges that you were
5    convicted on related to the shooting of
6    Mr. Santiago--
7        And there was a weapons offense of
8    some kind in addition to the murder charge;
9    right?
10    A.    Yes, sir.
11    Q.    Other than the offenses that all
12    relate to that same incident, have you ever
13    been convicted of any other offenses?
14    A.    Yes, I have.
15    Q.    What other offenses have you been
16    convicted of?
17    A.    I had some. I don't remember the
18    charges. I know I was convicted of one, one
19    or two charges as an adult. Then I have a
20    juvenile record.
21    Q.    Leaving aside the juvenile record,
22    for charges that you were convicted of as an
23    adult, do you think there was one or two?

98

1    A.    Yes, about one or two.
2    Q.    Do you remember approximately what
3    kind of events led to those charges?
4        I mean, was it an assault? Was it
5    robbery? Was it a breaking--
6    A.    No. It was a domestic violence case
7    where I destroyed a table and I got charged
8    for it.
9    Q.    Were both of the charges relating to
10    that?
11    A.    Yes. All those charges were related
12    to that one incident.
13    Q.    So the two incidents you had
14    convictions for were related to the shooting
15    of Mr. Santiago and then this domestic
16    violence incident?
17    A.    Yes.
18    Q.    Anything else?
19    A.    Not that I can recall. I mean, off
20    the top of my head I know it was at least two;
21    but it was all from that same incident.
22        I don't know the exact charge.
23    Q.    I understand there might be several

99

1    charges--
2    A.    It was a while ago. It was from 1998
3    or 1999, and it was out of Connecticut.
4    Q.    You were living in Connecticut at the
5    time?
6    A.    Yes, sir; New Haven, Connecticut.
7    Q.    New Haven?
8    A.    Yes.
9    Q.    Is that where the court was?
10    A.    The court that I was charged--
11    Q.    Yes?
12    A.    --do you mean? That I was convicted
13    in?
14    Q.    Yes.
15    A.    Might have more detailed discussion
16    about my criminal history in your discovery.
17        You questioned me about criminal
18    history and I gave up everything I had in my
19    possession.
20    Q.    I may be confusing this with
21    something else.
22        Was there some charge relating to a
23    car theft or something like that? No?

100

1    A.    No.
2        Conviction are you talking about?
3    No?
4        Anything like that, no.
5    Q.    Were you denied any medical treatment
6    while you were at Ludlow in connection with
7    any of these incidents that you thought you
8    should have had?
9    A.    Well, I didn't get immediate
10    attention after the first incident.
11    Q.    You told us it was the next day
12    before you saw Michael something,
13    Michael Hall?
14    A.    Yeah.
15    Q.    Is he the medical person?
16    A.    Yes. He's like the unit nurse.
17    Q.    And you did see an eye doctor while
18    you were there?
19    A.    Maybe a week or two afterwards.
20    Q.    Was there any other treatment that
21    you requested or thought you should have had
22    that you didn't get while you were at Ludlow?
23    A.    I believe that-- not really. I don't

101

1  know what else they could have done. I'm not
2  a physician, you know.
3      But, you know, the fact that I had
4  received trauma to the back of my head, had a
5  lump over my eye, and my eye was throbbing, I
6  think should have been taken more serious and
7  looked into especially because now I still
8  suffer from it, from the eye pain.
9      Q.   I think you told me Philippe Santiago
10 was supposed to be in La Familia?
11     A.   Yes, sir.
12     Q.   Okay. Did you have a motor vehicle
13 accident of some kind in 1988 or 1999 that led
14 to some injuries?
15     A.   Yes, sir.
16     Q.   What kind of injuries did you have as
17 a result of that accident?
18     A.   Back. Back and neck, I believe.
19     Q.   Any head injuries?
20     A.   No.
21     Q.   Somewhere in all of this material I
22 remember there being references to a former
23 Springfield police officer giving some kind of

102

1  evidence against you or encouraging Marrero to
2  give evidence against you.
3      Do you remember any of that?
4      A.   Police officer?
5      Q.   Michael White?
6      A.   Oh, Michael White, yes.
7      He didn't encourage Marrero. He was
8  the original person who wrote a statement
9  against me claiming I made admissions to him.
10     Q.   That you made what? Admissions to
11 him?
12     A.   Yes.
13     Q.   Did he testify at your trial?
14     A.   No, he did not.
15     Q.   When did Michael White make these
16 allegations that you had admitted things to
17 him?
18     A.   He did that while I was at the
19 facility. He was also an inmate in the
20 facility.
21     Q.   Was that before or after Mr. Marrero
22 was your cell mate?
23     A.   Before.

103

1      Q.   But he didn't testify at your trial?
2      A.   No. He did not.
3      Q.   Was he ever your cell mate?
4      A.   No, he was not.
5      Q.   Other than Mr. Marrero, did anyone
6  testify at your trial that you had admitted to
7  shooting Mr. Santiago?
8      A.   No.
9      Q.   Did anyone testify at your trial that
10 they had seen you shoot Mr. Santiago?
11     A.   Yes.
12     Q.   Who was that?
13     A.   Nelson Aponte and-- Nelson Aponte and
14 Louis Blanco Moreno.
15     Q.   Is Louis Blanco Marrero related to--
16     A.   Moreno.
17     Q.   Oh, Moreno. Okay.
18     A.   Sorry about that.
19     Q.   It's hard to hear in here with the
20 echoes.
21     Did any one of the people named as a
22 defendant in the suit testify against you in
23 trial, other than Lieutenant Ramos?

104

1      A.   No.
2      Q.   He did testify at your trial?
3      A.   Yes, he did.
4      Q.   I think I'm just about done, but give
5  me one minute.
6      You've talked about there being
7  another protective custody unit at the Ludlow
8  facility; correct?
9      A.   Yes.
10     Q.   Is it your understanding that there
11 were no gang members held in that other
12 facility?
13     A.   No, not that. I'm not saying that.
14 I just know there is another protective
15 custody unit.
16     I actually--
17     The other unit is they are not locked
18 in all day as the segregation unit.
19     It's more of a seg unit than it is a
20 protective custody unit.
21     Q.   Did anyone ever tell you why you
22 weren't placed in the other unit?
23     No?

105

1    A.   No.
2    Q.   Paragraph twenty-three of your
3  Complaint says that the Plaintiff continuously
4  requested medical treatment which was
5  repeatedly denied to him by unit staff.
6    A.   Right.
7    Q.   What are you referring to there?
8    A.   I asked them for stuff for my lip and
9  I never got it.
10        I asked for ice for my eye and never
11  got it.
12    Q.   Anything else?
13    A.   No. That's it.
14    Q.   You did eventually get some salve?
15    A.   Yes, once I seen Mike. Because Mike
16  makes rounds. When he comes on, he comes
17  around and then asks you if you need anything.
18  He'll take care of it.
19    Q.   So the denials we are talking about
20  are the day of the incident--
21    A.   Yes.
22    Q.   --up until the time you saw Mr. Hall?
23    A.   Yes. And, well, the eye examiner, I

106

1  asked him, too. I saw him a week or so later.
2    Q.   The Complaint also talks about the
3  unknown officer in the tower. Correct?
4    A.   Yes.
5    Q.   And you now know that's
6  Mr. Tim Allan?
7    A.   Yes, sir.
8    Q.   Do you claim that Mr. Allen played
9  some part in the attack by Mr. Zanetti?
10    A.   Yes, sir.
11    Q.   What part do you claim that he
12  played?
13    A.   He failed to lock the door in the
14  sub-day room that I was being held in that I
15  was on rec in, and he opened the door for
16  Zanetti, despite the fact that Zanetti wasn't
17  in handcuffs.
18    Q.   Any other role that he played in
19  connection with the Zanetti assault?
20    A.   No, not until later when he wrote his
21  false report that I'm an expert boxer.
22    Q.   He wrote a report that you are an
23  expert boxer?

107

1    A.   Not in those words, but to that
2  effect; that he was impressed with my
3  boxer-like skills as I was dodging Zanetti's
4  blows, which was never signed. Only part of
5  it was signed.
6    Q.   That was after the assault though;
7  right?
8    A.   I believe over a year after.
9    Q.   Did he play any part in the placement
10  of Mr. Marrero in your cell, as far as you
11  know?
12    A.   No. Not to my knowledge.
13        He's actually not a defendant in the
14  second count.
15        MR. WITHERS: Right.
16        THE WITNESS: I state that, I
17  believe.
18        MR. WITHERS: Just off the record
19        (Discussion off the record.)
20    Q.   Had you ever been held at the Ludlow
21  correctional facility prior to May of 2003?
22    A.   Never.
23    Q.   And other than the eye doctor that

108

1  you saw in the Ludlow facility and the eye
2  doctor that you've seen here in this facility
3  at SBCC, have you been referred out to anyone,
4  any other eye doctor?
5    A.   No.
6    Q.   Or any other doctor in connection
7  with any of your injuries?
8    A.   I've requested it, but I've not been
9  sent.
10    Q.   Have you requested it here?
11    A.   Yes, sir.
12    Q.   Who is Tracy Ann Carter?
13    A.   That's my ex-wife.
14    Q.   And is Lesley Ann Carter your
15  daughter?
16    A.   Her mother.
17    Q.   What is your daughter's name?
18    A.   Jacqueline Elise Garvin.
19    Q.   How old is she?
20    A.   Five years old.
21    Q.   Is she with your ex-wife?
22    A.   Yes, sir.
23    Q.   Who is Calem Daniels?

57

109

1    A.    Calem Daniels is an old neighbor of
2    mine.
3    Q.    You also had some treatment at the
4    Mental Health Department at the Hampden County
5    House of Corrections?
6    A.    Yes, sir.
7    Q.    What kind of treatment or counseling
8    did you have there?
9    A.    Just basically I would go talk to
10    Scott--
11          His name was Scott.
12          --whenever I was frustrated or
13    whatever.
14          I was going through a lot.  Like I
15    say, I had a lot of problems with the staff.
16    A lot of staff would torment me or whatever.
17    And I would go to see him about it and talk to
18    him.
19    Q.    Did you have counseling with him in
20    connection with either Mr. Zanetti's assault
21    or the incidents involving Mr. Marrero?
22    A.    I believe I seen him a number of
23    times.

111

1    FEDERAL DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
2
3          I, Julia A. McLeod, a Notary Public
    within and for the Commonwealth of
4    Massachusetts at large, do hereby certify that
    I took the deposition of Anthony Garvin,
5    pursuant to the Federal Rules of Civil
    Procedure on March 8, 2007, at SBCC, Harvard
6    Road, Shirley, Massachusetts.
          I further certify that the
7    above-named deponent was by me first duly
    sworn to testify to the truth the whole truth
8    and nothing but the truth concerning his
    knowledge in the matter of the case of Garvin
9    vs. Ashe, et al, now pending in the United
    States District Court for the District of
10    Massachusetts.
          I further certify that the within
11    testimony was taken by me stenographically and
    reduced to typewritten form under my direction
12    by means of COMPUTER ASSISTED TRANSCRIPTION;
    and, I further certify that said deposition is
13    a true record of the testimony given by said
    witness.
14          I further certify that I am neither
    counsel for, related to, nor employed by any
15    of the parties to the action in which this
    deposition was taken; and further, that I am
16    not a relative or employee of any attorney or
    counsel employed by the parties hereto, nor
17    financially or otherwise interested in the
    outcome of the action.
18          WITNESS my hand and seal this  13th
    day of March , 2007.
19
20          _____
          Julia A. McLeod
21          Notary Public

    My commission expires
22    April 21, 2011
23

---

110

1          I've spoken to Mr. Scott by my own
2    request though.  I didn't have like an open
3    file with him.  It was just.
4    Q.    Okay.  Have you seen somebody in the
5    mental health department here at SBCC?
6    A.    Yes, I did.
7    Q.    Have you consulted with them in
8    connection with either the Zanetti assault or
9    the incidents with Mr. Marrero?
10    A.    I think I've talked to him about
11    everything.
12    Q.    Who is William Murphy?
13    A.    William Murphy is one of the
14    individuals who heard Omar Marrero admit that
15    he was going to write a statement against me.
16    Q.    He was in Ludlow at the time the
17    statements were made?
18    A.    Yes.
19    Q.    But he's here now?
20    A.    Yes.
21          MR. WITHERS:  That's all I have.
22          (The deposition concluded.)

23          *****

=================================================================

Name: GARVIN,ANTHONY                    Booking#: 000133065
Date:  06/02/2003 Time:  1055 Seen by:  HALL,MICHAEL
Type of Encounter:  TRIAGE

SUBJECTIVE
    SENSORY SYSTEM COMPLAINT          "I GOT HIT BY THAT GUY AND GOT A LUMP
                                      AND I'M DIZZY CAN I GET MOTRIN?"


OBJECTIVE
    VISION                            DENIES ABNORMALITIES.
    GAIT                             NORMAL


ASSESSMENT
    PRESENT HEALTH                    PT EXAMINED POST ALTERCATION 1/2 "
                                      LUMP ABOVE R EYE AND SLIGHT BLEEDING
                                      FROM INNER LOWER LIP.
    NURSE ASSESSMENT EXAMINATION      PT IS ALERT AND ORIENTED TO PERSON,
                                      PLACE AND TIME
    VOMITING                          DENIES
    NAUSEA                            DENIES
    INMATE INCIDENT REPORT            REPORTS GIVEN TO LT KOREMAN.

PLAN
    PATIENT TEACHING                   TOLD PT TO GET
                                      TYLENOL FROM CART AND APPLY COLD DAMP
                                      CLOTH TO ABOVE EYE RESIGN FOR SICK
                                      CALL FOR TUES IF ANY COMPLAINTS

EXHIBIT E

==================================================================

Name: GARVIN,ANTHONY                    Booking#: 000133065
Date:  06/04/2003 Time:  1008 Seen by:  HALL,MICHAEL
Type of Encounter:  TRIAGE

SUBJECTIVE
    SENSORY SYSTEM COMPLAINT            "I HAVE BEEN GETTING HEADACHES SINCE
                                       THE FIGHT ITS BETTER THOUGH."

OBJECTIVE

ASSESSMENT
    PRESENT HEALTH                      PT IS ALERT AND ORIENTED TO PERSON,
                                       PLACE AND TIME.
    NURSE ASSESSMENT EXAMINATION        PT DENIES ANY OTHER MEDICAL PROBLEMS.
    VOMITING                            DENIES
    NAUSEA                              DENIES.
    HEADACHE                            PT IN ALETRCATION MON LUMP TO ABOVE R
                                       EYE SUBSIDED

PLAN
    IBUPROFEN                           600MG 1 PO 'AH' FREQ:BID Start:6/4/
                                       2003 Stop:6/9/2003
    PATIENT TEACHING                     TOLD PT TO REST AND
                                       AVOID STRENUOUS ACTIVITY.

S9A

```
================================================================
Name: GARVIN,ANTHONY                    Booking#: 000133065
Date:  06/04/2003 Time:  1324 Seen by:  EISNER,JILL
Type of Encounter:  NURSE PRACT VISIT
```

SUBJECTIVE

OBJECTIVE
    WEIGHT                       174
    EYES                        OTHER SCLERA CLR. EOM'S INTACT/
                              PERRLA REPORTS THROBBING BEHIND RIGHT
                              EYE. VISION CLR. NEG BLURRED VISION

    REFERRAL EYE EXAM
    DENTAL REFERRAL              LEFT UPPER TOOTH FRACTURE. NEG
                              SWELLING OR PAIN

ASSESSMENT
    PHYSICAL EXAM

PLAN

S9B

# *DEPARTMENT OF HEALTH SERVICES*

## OPTOMETRY REFERAL

DATE: _6-4-03_

NAME: _Garvin Anthony_            DOB: _10-4-77_

PERSON NUMBER: _133065_            LOCATION: _C2_

REASON FOR REFERRAL:_____

_____ _eye exam_ _____

_____ _sir altercation 6/2/03_

_R eye_

MEDICAL CONSIDERATIONS:_____HYPERTENSION

_____DIABETES

_____HIV

_____OTHER

CURRENT MEDICATIONS:_____

_____

STATUS:_____SENTENCED: RELEASE DATE:_____

_____PRETRIAL

REFERRED BY:_____ _J Ela_ _____

59c

# OPTOMETRY RECORD

Garvin, Anthony                                    DOB _10-4-77_    Sex _M_

No. _000133065_                                   Pod/Cell _C2-004_

ed by _Jill Eisner, NP_                           Date _6-10-03_

_hit in Foot in Eye_

hurts behind eye OD

**HX**

listory      ∅           ∅ flash                   LEE

ye History   ∅           ∅ vision D                 LPE

y History    ∅           ∅ floaters

y Medical Eye History

ies    ∅    ∅ glasses

| Rx | DIST. | N.R. | P.H. | C̄ Rx | DIST. | N.R. | P.H. |
|----|-------|------|------|-------|-------|------|------|
| O.D. | 21/20 | | | O.D. | | | |
| O.S. | | | | O.S. | | | |
| O.V. | 20 | | | O.V. | | | |
| t Rx | ∅ | | | Type Rx | | | |

**Screen**

- VA        ext - normal          R                    VA
                                                        OD
s          Perrinorng            L                    OS
           Euns- SAFE                                  OU

.ER  R      L                     ADD                  VA      R
                                                               L
                                                               OU
R  19
L  18        TIME  1:33pm

59D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP


ANTHONY GARVIN

PLAINTIFF

V.

HAMPDEN COUNTY SHERIFF'S DEPT ET.AL.,

DEFENDANTS


PLAINTIFF'S REVISED ANSWER TO THE
DEFENDANT'S INTERROGATORIES

Now comes the Plaintiff Anthony Garvin Pro-Se and revises
some of his answers to the defendant's Interrogatories so that he
may conform with the Rules of civil procedure regarding
objections as follows:


Numbers:

2. This request has no reasonable possibility of relevance to
   this matter and does not define or clarify any issues at hand.
   Federal.Rules.Civ.Proc.Rule 26(b) and 23(d)

3. C.O.R.I in the meaning of M.G.L.A 6 section 167.

4. C.O.R.I in the meaning of M.G.L.A 6 section 167.

7. Plaintiff states this request would constitute an unwarranted
   intrusion of privacy and there are no such physical, or mental
   situations in his history "biography" that would be reasonably
   relevant.

13.This request would constitute an unwarranted invasion of
   privacy.

14.See number (13) thirteen above.


EXHIBIT F

15. Stress, depression, mental anguish, humiliation and paranioia.

Date _2-22-06_                              _Anthony Garvin_
                                           ANTHONY GARVIN Pro-Se
                                           S.B.C.C
                                           P.O. BOX 8000
                                           Shirley, Ma 01464


     I Anthony Garvin hereby certifies that copies of the
foregoing document was served on the defendant's attorney Edward
J. McDonough Jr. at 67 Market street P.O. BOX 9035 Springfield,
Ma 01102-9035, by first class mail on _2-22-06_.

                                           _Anthony Garvin_
                                           ANTHONY GARVIN Pro-Se

_Anthony Garvin_

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO.05-30102-MAP


ANTHONY GARVIN

PLAINTIFF

V.

HAMPDEN COUNTY SHERIFF'S DEPT ET.AL.,

PLAINTIFF'S RESPONSE TO THE DEFENDANT'S

FIRST SET OF INTERROGATORIES


Now comes the plaintiff and states the following as answers
to the defendant's submitted interrogatories:

1. Anthony Garvin. S.B.C.C, P.O. BOX 8000, Shirley, Ma 01464.
D.O.B 10-4-77. The defendants are already in possession of
   my social security number.

2. What is the relevance of the question.

3. The plaintiff states this is privilaged info.

4. The plaintiff states this is privilaged info.

5. No.

6. N/A.

7. The plaintiff states this is privilaged information.

8. See original complaint.

9. See original complaint.

9(2). Attempting to obtain.

10.N/A.

11.See complaint.

12.N/A.

   a)Unsure.

   b)Will be provided under 26(3)A.

   c)N/A.

   d)Will be provided under 26(2)(A),(B) and (c).

13.Privilaged information.

14.N/A due to privilage.

15.N/A.

16.See complaint.

17. Yes, see complaint.

18. The defendants have in their possession.

19. See complaint and concerning witnesses, answer my discovery.

20. See complaint.

21. yes.

22. In 1998. or 1999, I was in a car accident. At this time, all I
    can offer is that it was in conneticut and settled to an
    amount, which I received 5,000 dollars from my attorney. All
    documents are not in my possession. And my car was stolen and
    vandalized and stolen. All relevant information not in my
    possession.

23. See complaint.

24. N/A.

25. Yes, see my complaint.

26. Attempting to obtain summary of current state.


27. At this time no experts are being used, but in the event that
one is to be used, you will be notified.

Date 1-21-06

ANTHONY GARVIN Pro-Se

S.B.C.C

P.O. BOX 8000

Shirley,Ma 01464


    I Anthony Garvin hereby certifies that copies of the
foregoing document was served on the defendant's attorney Edward
J. McDonough Jr. at 67 Market street P.O. Box 9035 springfield,
Ma 01102-9035, by first class mail on 1-22-06.

Anthony Garvin Pro-Se

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

_____

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

_____

DEFENDANT VICTOR KELLY'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection.  Defendants object to producing this documentation  because
plaintiff has requested information that could threaten the safety, health and
security of staff and other inmates.  Without waiving said objection states as
follows:

      Michael J. Ashe, Jr. is Sheriff of Hampden County
      Basil Tsagaris is Assistant Superintendent
      John Kenney is Deputy Chief of Security
      Edward Weldon is Assistant Superintendent in charge of classification
      Thomas Korman is a Lieutenant
      Juan Ramos is a Captain
      John Cadigan is a Captain
      William Muldrow is a Correctional Officer
      Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    After classification assigns a pod, the pod officers on duty assign the cell.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    I don't know.  See answers of Officer Muldrow

4.    Where was officer Muldrow when said cell was opened?



EXHIBIT G

64

A.    I don't know I was on the top tier.  See answers of Officer Muldrow.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    I don't know I was on the top tier.  See answers of Officer Muldrow.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I knew the plaintiff was on administrative protective custody.  See Officer Muldrow's answers.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I don't know.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    Yes.  According to the Incident Report and Medical Records, Health Services was called.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    Yes.  According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    I don't know.

11.    What is the defendant, the-unknown officer in the tower's name?

A.    Tim Allen.

12.    Why has the unknown officer in the tower not answered the complaint?

A.    I don't know.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27,2003 and June 2nd, 2003? If so, when?

2

65

A.    I don't know.

14.    Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know.

15.    Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    I do not know.

16.    What, if anything was done about this attack on the plaintiff? When and by whom.

A.    I do not know.

17.    Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.    I was not aware of any threats until I heard a conversation between Mr. Garvin and Mr. Zanetti.

18.    Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I was not.

19.    Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    Not to my knowledge.

20.    Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

3

A.   I do not know.  See Lt. Ramos' Answers to Interrogatories.

21.   Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A.   I do not know.  See Lt. Ramos' Answers to Interrogatories.

22.   Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.   Objection.  The information sought is protected by the phsycian-patient privilege.

23.   Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.   Not to my knowledge.

24.   How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.   Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.   When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.   Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like,

4

67

and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr. Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    Not to my knowledge.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    I entered on the system to keep Omar Marrero and Anthony Garvin separate on October 21. 2003. I did this because I had hear Mr. Marrero and Mr. Garvin talking one cell to another.

Signed under the penalties of perjury this $16$ day of May, 2006.

By:    _Victor Kelly_
        Victor Kelly

**AS TO OBJECTIONS:**

_Edward J. McDonough, Jr._
Edward J. McDonough, Jr., Esquire

Certificate of Service

_Edward J. McDonough_ certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/18/2006.

5

68

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
No.05-30102-MAP

_____

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

_____

DEFENDANT WILLIAM MULDROW'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.      Define the duties and responsibilities of each defendant.

A.      Objection. Defendants object to producing this documentation because
        plaintiff has requested information that could threaten the safety, health and
        security of staff and other inmates. Without waiving said objection states as
        follows:
                Michael J. Ashe, Jr. is Sheriff of Hampden County
                Basil Tsagaris is Assistant Superintendent
                John Kenney is Deputy Chief of Security
                Edward Weldon is Assistant Superintendent in charge of classification
                Thomas Korman is a Lieutenant
                Juan Ramos is a Captain
                John Cadigan is a Captain
                William Muldrow is a Correctional Officer
                Victor Kelly is a Correctional Officer

2.      Who is in charge of cell assignment at the C-tower?

A.      After classification assigns a pod, the pod officers on duty assign the cell.

3.      On June 2nd, 2003, did officer Muldrow radio to the control tower and order
        the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.      Yes.

4.      Where was officer Muldrow when said cell was opened?

EXHIBIT H

69

A.    I was cuffing an inmate in front of his cell.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    No.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I knew the plaintiff was on administrative protective custody.  See Officer Kelly's answers.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I don't know.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    Yes but I do not know who called for medical.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    Yes.  Medical responded to the POD and both inmates were checked. According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.   Was the attack video taped? If so who has it? If not, state why.

A.    I don't know.

11.   What is the defendant, the unknown officer in the tower's name?

A.    Tim Allen.

12.   Why has the unknown officer in the tower not answered the complaint?

A.    I do not know.

13.   Has the unknown officer in the tower ever worked in the C-2 unit between May 27, 2003 and June 2nd, 2003? If so, when?

2

70

A.    I do not know.

14.   Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know.  I did not.

15.   Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    I do not know but I believe he filed a grievance.

16.   What, if anything was done about this attack on the plaintiff?  When and by whom.

A.    Mr. Zanetti was moved to another POD.

17.   Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced?  If so, who was aware?

A.    I do not know.

18.   Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I do not know.

19.   Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    Not to my knowledge.

20.   Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A.    I do not know.  See Lt. Ramos' Answers to Interrogatories.

3

71

21.    Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A.    I do not know.  See Lt. Ramos' Answers to Interrogatories.

22.    Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection.  The information sought is protected by the phsycian-patient privilege.

23.    Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.    I was not aware.

24.    How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning,

72

probation or parole."

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    I did not know this.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    I don't know.  See Officer Kelly's Answers to Interrogatories.

Signed under the penalties of perjury this  *1k*  day of May, 2006.

By:  _Cpl William T Muldrew #764_
William Muldrow

**AS TO OBJECTIONS:**

Edward J. McDonough, Jr., Esquire

Certificate of Service

certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/17/2006.

5

73

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

---

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

---

DEFENDANT THOMAS KORMAN 'S ANSWERS TO PLAINTIFF' S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection.  Defendants object to producing this documentation  because
      plaintiff has requested information that could threaten the safety, health and
      security of staff and other inmates.  Without waiving said objection states as
      follows:
                Michael J. Ashe, Jr. is Sheriff of Hampden County
                Basil Tsagaris is Assistant Superintendent
                John Kenney is Deputy Chief of Security
                Edward Weldon is Assistant Superintendent in charge of classification
                Thomas Korman is a Lieutenant
                Juan Ramos is a Captain
                John Cadigan is a Captain
                William Muldrow is a Correctional Officer
                Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    After classification assigns a pod, the pod officers on duty assign the cell.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
      the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    I do not know see Officer Muldrow's answers to Interrogatories.

4.    Where was officer Muldrow when said cell was opened?

EXHIBIT I.                                                                    74

A.    I do not know see Officer Muldrow's answers to Interrogatories.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    I do not know.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I do not know.  See Answers of Officer Muldrow and Officer Kelly.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I do not know.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    I do not know but according to the Incident Report and Medical Records, Health Services was called.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    I do not know but according to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    I do not know.

11.    What is the defendant, the-unknown officer in the tower's name?

A.    I do not know.

12.    Why has the unknown officer in the tower not answered the complaint?

A.    I do not know.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27,2003 and June 2nd, 2003? If so, when?

A.    I do not know.

*75*

14. Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A. I do not know - I was not involved in the investigation.

15. Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A. I do not know - I was not involved in the investigation.

16. What, if anything was done about this attack on the plaintiff? When and by whom.

A. I do not know - I was not involved in the investigation.

17. Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A. I do not know.

18. Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A. I believe so but I do not know for sure.

19. Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A. Not to my knowledge.

20. Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A. See Lt. Ramos' Answers to Interrogatories.

21. Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas

3

76

Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr. Zanetti did not want to speak to anyone on April 2nd of 2004

A.      See Lt. Ramos' Answers to Interrogatories.

22.     Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.      Objection.  The information sought is protected by the phsycian-patient privilege.

23.     Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.      Not to my knowledge.

24.     How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.      Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.     When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.      Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

4

*77*

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn
       of Mr.Marrero's alleged Commonwealth witness status? If so, who and what
       did they learn?

A.     Not to my knowledge.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the
       plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on
       any date? and why?

A.     I do not know.

       Signed under the penalties of perjury this 17th day of May, 2006.


                              By:  _Thomas P Korman_    5-16-06
                                       Thomas Korman

**AS TO OBJECTIONS:**

_Edward J. McDonough_
 Edward J. McDonough, Jr., Esquire

                                       Certificate of Service

_Edward J. McDonough_ certifies that copies of the foregoing document was served
on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class
mail on 5/17/2006.

5

78

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

---

ANTHONY GARVIN
PLAINTIFF
V.

HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

---

DEFENDANT JOHN CADIGAN'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.  Define the duties and responsibilities of each defendant.

A.  Objection. Defendants object to producing this documentation because
plaintiff has requested information that could threaten the safety, health and
security of staff and other inmates. Without waiving said objection states as
follows:
    Michael J. Ashe, Jr. is Sheriff of Hampden County
    Basil Tsagaris is Assistant Superintendent
    John Kenney is Deputy Chief of Security
    Edward Weldon is Assistant Superintendent in charge of classification
    Thomas Korman is a Lieutenant
    Juan Ramos is a Captain
    John Cadigan is a Captain
    William Muldrow is a Correctional Officer
    Victor Kelly is a Correctional Officer

2.  Who is in charge of cell assignment at the C-tower?

A.  After classification assigns a pod, the pod officers on duty assign the cell.

3.  On June 2nd, 2003, did officer Muldrow radio to the control tower and order
the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.  I do not know. I was not on duty on June 2, 2003 and I was not assigned to
the investigation.

EXHIBIT J.

79

4.     Where was officer Muldrow when said cell was opened?

A.     I do not know.  I was not on duty on June 2, 2003 and I was not assigned to the investigation.

5.     Were there any other officers in front of the door when it was opened? If so, who?

A.     I do not know.  I was not on duty on June 2, 2003 and I was not assigned to the investigation.

6.     Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.     I do not know.  On June 2, 2003 on the facilities' Jail Management System, the plaintiff was listed as "protective custody at inmate's request" but not administrative protective custody.  See Answers of Officer Muldrow and Officer Kelly.

7.     Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.     I do not know.

8.     Did anyone report this attack to medical? If so, who, when; If not, why?

A.     According to the Incident Report and Medical Records, Health Services was called.

9.     Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.     According to the Medical Records, Plaintiff was seen by Michael Hall of Health Services on June 2, 2003.

10.     Was the attack video taped? If so who has it? If not, state why.

A.     I do not know.

11.     What is the defendant, the-unknown officer in the tower's name?

A.     I do not know.

12.     Why has the unknown officer in the tower not answered the complaint?

2

A.    I do not know.

13.   Has the unknown officer in the tower ever worked in the C-2 unit between May 27, 2003 and June 2nd, 2003? If so, when?

A.    I do not know.

14.   Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know. I was not on duty on June 2, 2003 and I was not assigned to the investigation.

15.   Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    I do not know.

16.   What, if anything was done about this attack on the plaintiff? When and by whom.

A.    According to the Jail Management System, plaintiff's classification was changed to "Administrative Protective Custody" on June 27, 2003 after a hearing.

17.   Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.    According to the Jail Management System, on May 28, 2003, Nelson Aponte was listed as an enemy of the plaintiff.

18.   Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I do not believe so.

19.   Was anyone at the Hampden county house of correction involved in contacting the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who, when was the call made; and from what number and extension was the call made?

3

*81*

A.    Not to my knowledge.

20.    Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A.    See Lt. Ramos' Answers to Interrogatories.

21.    Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr. Zanetti did not want to speak to anyone on April 2nd of 2004

A.    See Lt. Ramos' Answers to Interrogatories.

22.    Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection.  The information sought is protected by the phsycian-patient privilege.

23.    Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell? If so, who and what did he/she know?

A.    Not to my knowledge.

24.    How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of

82

2003, why was he placed there?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.   Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    Not to my knowledge.

27.   Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    I do not know.  According to the Jail Management System on October 21, 2003 some one entered "keep separate from Omar Marrero".

Signed under the penalties of perjury this  1st day of May, 2006.


                              By:  _John P Cadigan_____
                                        John Cadigan

AS TO OBJECTIONS,


Edward J. McDonough, Jr., Esquire

                              Certificate of Service

                                        certifies that copies of the foregoing document was served
on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class
mail on 5/1/2006.

5

83

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

---

ANTHONY GARVIN
PLAINTIFF

V.

HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSAGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

---

DEFENDANT JUAN RAMOS' ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.   Define the duties and responsibilities of each defendant.

A.   Objection.  Defendants object to producing this documentation  because
     plaintiff has requested information that could threaten the safety, health and
     security of staff and other inmates.  Without waiving said objection states as
     follows:
          Michael J. Ashe, Jr. is Sheriff of Hampden County
          Basil Tsagaris is Assistant Superintendent
          John Kenney is Deputy Chief of Security
          Edward Weldon is Assistant Superintendent in charge of classification
          Thomas Korman is a Lieutenant
          Juan Ramos is a Captain
          John Cadigan is a Captain
          William Muldrow is a Correctional Officer
          Victor Kelly is a Correctional Officer

2.   Who is in charge of cell assignment at the C-tower?

A.   After classification assigns a pod, the pod officers on duty assign the cell.

3.   On June 2nd, 2003, did officer Muldrow radio to the control tower and order
     the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.   I don't know.  See Officer Muldrow's answers to interrogatories.

4.   Where was officer Muldrow when said cell was opened?



EXHIBIT K

84

A.    I don't know.  See Officer Muldrow's answers to interrogatories.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    I don't know.  See Officer Muldrow's answers to interrogatories.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I do not know.  See answers of Officer Muldrow and Officer Kelly.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I believe the C-Tower supervisors may have known and the staff could possibly have known if they checked the computer records.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    According to the Incident Report and Medical Records, Health Services was called.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    I don't know.

11.    What is the defendant, the-unknown officer in the tower's name?

A.    I don't know.

12.    Why has the unknown officer in the tower not answered the complaint?

A.    I don't know.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27,2003 and June 2nd, 2003? If so, when?

2

*85*

A.    I don't know.

14.    Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know. I was not involved in the incident.

15.    Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    I do not know.

16.    What, if anything was done about this attack on the plaintiff? When and by whom.

A.    I do not know.

17.    Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.    I was not aware of any actual threats, but he was placed on protective custody - Administrative due to the plaintiff's high profile case.

18.    Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I was aware that in the past Omar Marrero had some affiliations to the Lafamilia gang.

19.    Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    I did not contact anyone.

20.    Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

3

86

A.    No.

21.   Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr. Zanetti did not want to speak to anyone on April 2nd of 2004

A.    No.

22.   Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection. The information sought is protected by the phsycian-patient privilege.

23.   Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell? If so, who and what did he/she know?

A.    I had no knowledge of Omar Marrero being a witness for anyone.

24.   How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection. The information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.   When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.    Objection. The information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical

4

*87*

condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    Not to my knowledge.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    I do not know.  However, someone entered on the computer to keep Omar Marrero and Anthony Garvin separate on October 21, 2003.

Signed under the penalties of perjury this 17th day of May, 2006.

By:    _____ 5/16/06
            Juan Ramos

**AS TO OBJECTIONS:**

_____
Edward J. McDonough, Jr., Esquire

Certificate of Service

_____ certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/17/2006.

88

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

———————————————

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

———————————————

DEFENDANT EDWARD WELDON'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection.  Defendants object to producing this documentation  because
      plaintiff has requested information that could threaten the safety, health and
      security of staff and other inmates.  Without waiving said objection states as
      follows:
              Michael J. Ashe, Jr. is Sheriff of Hampden County
              Basil Tsagaris is Assistant Superintendent
              John Kenney is Deputy Chief of Security
              Edward Weldon is Assistant Superintendent in charge of classification
              Thomas Korman is a Lieutenant
              Juan Ramos is a Captain
              John Cadigan is a Captain
              William Muldrow is a Correctional Officer
              Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    After classification assigns a pod, the pod officers on duty assign the cell.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
      the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    I don't know.  See Officer Muldrow's answers to interrogatories.

4.    Where was officer Muldrow when said cell was opened?



EXHIBIT L.

89

A.    I don't know.  See Officer Muldrow's answers to interrogatories.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    I don't know.  See Officer Muldrow's answers to interrogatories.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I do not know.  See Answers of Officer Muldrow and Officer Kelly.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I do not know.  This information would be available on the computer system.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    According to the Incident Report and Medical Records, Health Services was called.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    I do not know.

11.    What is the defendant, the-unknown officer in the tower's name?

A.    Tim Allen

12.    Why has the unknown officer in the tower not answered the complaint?

A.    I do not know.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27, 2003 and June 2nd, 2003? If so, when?

A.    I do not know.  See John Kenney's Answers to Interrogatories.

2

90

14. Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A. I do not know. I was not involved in any investigation.

15. Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A. I do not know. See John Kenney's Answers to Interrogatories.

16. What, if anything was done about this attack on the plaintiff? When and by whom.

A. I do not know. See John Kenney's Answers to Interrogatories.

17. Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A. I do not know.

18. Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A. I do not know. See Juan Ramos' Answers to Interrogatories.

19. Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A. Not to my knowledge.

20. Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A. See Lt. Ramos' Answers to Interrogatories.

3

91

21. Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A. See Lt. Ramos' Answers to Interrogatories.

22. Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A. Objection. The information sought is protected by the phsycian-patient privilege.

23. Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell? If so, who and what did he/she know?

A. Not to my knowledge.

24. How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A. Objection. The information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25. When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A. Objection. The information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning,

92

probation or parole."

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    Not to my knowledge.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    See Officer Kelly's Answers to Interrogatories.

Signed under the penalties of perjury this /5th day of May, 2006.

By:    *Edward Weldon*
         Edward Weldon

**AS TO OBJECTIONS:**

Edward J. McDonough, Jr., Esquire

Certificate of Service

certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/19 /06

93

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP
_____

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS
_____

DEFENDANT JOHN KENNEY'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection. Defendants object to providing this information because plaintiff
      has requested information that could threaten the safety, health and security
      of staff and other inmates. Without waiving said objection states as follows:
          Michael J. Ashe, Jr. is Sheriff of Hampden County
          Basil Tsgaris is Assistant Superintendent
          John Kenney is Deputy Chief of Security
          Edward Weldon is Assistant Superintendent in charge of classification
          Thomas Korman is a Lieutenant
          Juan Ramos is a Captain
          John Cadigan is a Captain
          William Muldrow is a Correctional Officer
          Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    After classification assigns a pod, the pod officers on duty assign the cell.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
      the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    See Officer Muldrow's Answers to Interrogatories.

4.    Where was officer Muldrow when said cell was opened?



EXHIBIT M.

94

A.    See Officer Muldrow's answers to interrogatories.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    See Officer Muldrow's answers to interrogatories.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I do not know.  See Answers of Officer Muldrow and Officer Kelly.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    Information on the plaintiff's status is available on the computer system.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    According to the Incident Report and Medical Records, Health Services was called.  I do not know who contacted Health Services.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    Yes.  However the video tape is no longer in possession of Hampden County Correctional Center due to a computer crash.

11.    What is the defendant, the-unknown officer in the tower's name?

A.    Tim Allen.

12.    Why has the unknown officer in the tower not answered the complaint?

A.    I have been advised by counsel that the complaint has not amended nor served on the officer.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27,2003 and June 2nd, 2003? If so, when?

95

A.     Yes, May 31, 2003 and June 1, 2003.

14.    Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.     There was an investigation and inmate Zanetti was questioned by a Disciplinary board panel as a result of his inmate rule violation.

15.    Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.     The plaintiff filed an Inmate Request dated June 3, 2003 requesting an appointment with an eye doctor.

16.    What, if anything was done about this attack on the plaintiff? When and by whom.

A.     Inmate Zanetti was moved to a different POD by Pod Staff and in house discipline was given.

17.    Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.     I am aware of no specific threats. Given the circumstances of the crime that the plaintiff was accused, we took precautionary measures to protect the plaintiff, other inmates and staff.

18.    Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.     Yes. On or about February 18, 2003 but not confirmed until October 20, 2003.

19.    Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.     Not that I am aware of.

20.    Did Lt. Juan Ramos notify the district attorney's office of any other potential

96

witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A.    See answers of Lt. Ramos.

21.    Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A.    See answers of Lt. Ramos.

22.    Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection.  The information sought is protected by the phsycian-patient privilege.

23.    Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.    Not to my knowledge.

24.    How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.    Objection, the information sought constitutes "evaluative information" under

4

97

the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.     Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr. Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.      Not to my knowledge.

27.     Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.      On October 21, 2003 an entry of "keep separate from Omar Marrero" was entered but I do not know by whom.

Signed under the penalties of perjury this 17th day of May, 2006.

_____
John P. Kenney
Deputy Chief of Security

AS TO OBJECTIONS:

_____
Edward J. McDonough, Jr., Esquire

_____ certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/17/2006.

5

98

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

DEFENDANT BASIL TSAGARIS' ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection.  Defendants object to producing this documentation  because
      plaintiff has requested information that could threaten the safety, health and
      security of staff and other inmates.  Without waiving said objection states as
      follows:
            Michael J. Ashe, Jr. is Sheriff of Hampden County
            Basil Tsagaris is Assistant Superintendent
            John Kenney is Deputy Chief of Security
            Edward Weldon is Assistant Superintendent in charge of classification
            Thomas Korman is a Lieutenant
            Juan Ramos is a Captain
            John Cadigan is a Captain
            William Muldrow is a Correctional Officer
            Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    The pod officers on duty assign the cells.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
      the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    I do not know.  I was not there.  See answers of Correctional Officer
      Muldrow.



EXHIBIT N.

99

4.   Where was officer Muldrow when said cell was opened?

A.   I do not know.  I was not there.  See answers of Correctional Officer
     Muldrow.

5.   Were there any other officers in front of the door when it was opened? If so,
     who?

A.   I do not know.  I was not there.  See answers of Correctional Officer
     Muldrow.

6.   Did officer Muldrow and officer Kelly know that the plaintiff was on
     administrative protective custody?

A.   I do not know.  See Answers of Officer Muldrow and Officer Kelly.

7.   Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.   I do not know.

8.   Did anyone report this attack to medical? If so, who, when; If not, why?

A.   According to the Incident Report and Medical Records, Health Services was
     contacted.

9.   Did the plaintiff receive medical treatment in regard to the attack? If yes, state
     when, where, and by whom; If hot, state why not.

A.   According to the Medical Records, Plaintiff was seen by Michael Hall of
     Health Services on June 2, 2003.

10.  Was the attack video taped? If so who has it? If not, state why.

A.   I do not know.

11.  What is the defendant, the-unknown officer in the tower's name?

A.   Tim Allen.

12.  Why has the unknown officer in the tower not answered the complaint?

A.   I do not know.

13.  Has the unknown officer in the tower ever worked in the C-2 unit between

2

May 27,2003 and June 2nd, 2003? If so, when?

A.    I do not know.

14.    Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know.

15.    Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    I do not know but Inmate Grievance of dated June 9, 2003, states "When I spoke to Lt Cadigan and ask what was being done & that I wanted to press charges due to the fact I was hand cuffed & shackled He told me 'as far as he were concerned I ingaged that inmate' which were not true I was on rec"

16.    What, if anything was done about this attack on the plaintiff? When and by whom.

A.    Plaintiff was seen by medical and an incident report was written by Correctional Officer Muldrow.

17.    Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.    I do not know.  See Capt. Ramos' Answers to Interrogatories.

18.    Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I do not know.  See Capt. Ramos' Answers to Interrogatories.

19.    Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    Not to my knowledge.

20.    Did Lt. Juan Ramos notify the district attorney's office of any other potential

/0/

witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A.    See Lt. Ramos' Answers to Interrogatories.

21.    Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A.    See Lt. Ramos' Answers to Interrogatories.

22.    Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection.  The information sought is protected by the physician-patient privilege and constitutes "evaluative information" under the C.O.R.I. statute.

23.    Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.    Not to my knowledge.

24.    How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection.  The information sought constitutes "evaluative information" under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.    Objection.  The information sought constitutes "evaluative information"

4

102

under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.  Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.  Not to my knowledge.

27.  Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.  See Correctional Officer Kelly's Answers to Interrogatories.

Signed under the penalties of perjury this 15th day of May, 2006.

By: _Basil Tsagaris_

Basil Tsagaris

**AS TO OBJECTIONS:**

_Edward J McDonough_

Edward J. McDonough, Jr., Esquire

Certificate of Service

_Edward J McDonough_ certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/15/2006.

5

103

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

ANTHONY GARVIN
PLAINTIFF
V.

HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

DEFENDANT MICHAEL J. ASHE, JR.'S ANSWERS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

1.    Define the duties and responsibilities of each defendant.

A.    Objection.  Defendants object to producing this documentation  because
      plaintiff has requested information that could threaten the safety, health and
      security of staff and other inmates.  Without waiving said objection states as
      follows:
            Michael J. Ashe, Jr. is Sheriff of Hampden County
            Basil Tsagaris is Assistant Superintendent
            John Kenney is Deputy Chief of Security
            Edward Weldon is Assistant Superintendent in charge of classification
            Thomas Korman is a Lieutenant
            Juan Ramos is a Captain
            John Cadigan is a Captain
            William Muldrow is a Correctional Officer
            Victor Kelly is a Correctional Officer

2.    Who is in charge of cell assignment at the C-tower?

A.    After classification assigns a pod, the pod officers on duty assign the cell.

3.    On June 2nd, 2003, did officer Muldrow radio to the control tower and order
      the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.    See Officer Muldrow's answers to interrogatories.

4.    Where was officer Muldrow when said cell was opened?



EXHIBIT O

A.    See Officer Muldrow's answers to interrogatories.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    See Officer Muldrow's answers to interrogatories.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    I do not know.  See Answers of Officer Muldrow and Officer Kelly.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    I do not know.  The information concerning plaintiff's status is available on the computer system.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    According to the Incident Report and Medical Records, Health Services was called.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    According to the Medical Records, Plaintiff was seen by Michael Hall on June 2, 2003.

10.   Was the attack video taped? If so who has it? If not, state why.

A.    I do not know.  See John Kenney's Answers to Interrogatories.

11.   What is the defendant, the unknown officer in the tower's name?

A.    Tim Allen.

12.   Why has the unknown officer in the tower not answered the complaint?

A.    I have been advised by counsel that the complaint has not been amended nor served on the officer.

13.   Has the unknown officer in the tower ever worked in the C-2 unit between May 27, 2003 and June 2nd, 2003? If so, when?

*105*

A.    I do not know.  See John Kenney's answers to interrogatories.

14.   Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    I do not know.  See John Kenney's Answers to Interrogatories.

15.   Did the plaintiff request any actions to be taken due to said attack?  If so what and when as well as who it was requested of?

A.    I do not know.  See John Kenney's Answers to Interrogatories.

16.   What, if anything was done about this attack on the plaintiff?  When and by whom.

A.    I do not know.  See John Kenney's Answers to Interrogatories.

17.   Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced?  If so, who was aware?

A.    I do not know.   See John Kenney's and Juan Ramos' Answers to Interrogatories.

18.   Was the institution aware of Omar Marrero's affiliation to the lafamilia gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    I do not know.  See Juan Ramos's Answers to Interrogatories.

19.   Was anyone at the Hampden county house of correction involved in contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    Not to my knowledge.

20.   Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

3

*106*

A.     See Lt. Ramos' Answers to Interrogatories.

21.    Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas
       Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county
       house of correction, and that Mr.Zanetti did not want to speak to anyone on
       April 2nd of 2004

A.     See Lt. Ramos' Answers to Interrogatories.

22.    Was Springfield police officer Michael White under mental observation and,
       or suicide watch while housed in the C-2 unit? If so, when, why and in what
       cell(s) was he housed in? And from what date was he in said cell(s)?

A.     Objection.  The information sought is protected by the phsycian-patient
       privilege.

23.    Was anyone aware of the fact that Omar Marrero was a Commonwealth
       witness prior to being placed in the plaintiff's cell?  If so, who and what did
       he/she know?

A.     Not to my knowledge.

24.    How many times was Omar Marrero in any of the segregation units? And
       why was he there each time?

A.     Objection.  The information sought constitutes "evaluative information"
       under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure,
       "evaluative information" defined as: "'Evaluative information', records, data,
       or reports concerning individuals charged with crime and compiled by
       criminal justice agencies which appraise mental condition, physical
       condition, extent of social adjustment, rehabilitative progress and the like,
       and which are primarily used in connection with bail, pre-trial or post-trial
       release proceedings, sentencing, correctional and rehabilitative planning,
       probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of
       2003, why was he placed there?

A.     Objection.  The information sought constitutes "evaluative information"
       under the C.O.R.I. statute.  M.G.L. c. 6 § 167 exempts from disclosure,
       "evaluative information" defined as: "'Evaluative information', records, data,
       or reports concerning individuals charged with crime and compiled by
       criminal justice agencies which appraise mental condition, physical

4

107

condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.     Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.      Not to my knowledge.

27.     Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.      See Officer Kelly's Answers to Interrogatories.

Signed under the penalties of perjury this 17 th day of May, 2006.

Michael J. Ashe, Jr.
Sheriff of Hampden County

**AS TO OBJECTIONS:**

Edward J. McDonough, Jr., Esquire

Certificate of Service

certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 5/17/2006.

5

108

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO.05-30102-MAP

ANTHONY GARVIN
PLAINTIFF
V.
HAMPDEN COUNTY SHERIFF'S DEPARTMENT, SHERIFF MICHAEL J. ASHE, JR.,
HAMPDEN COUNTY COMMISSIONERS, COMMONWEALTH OF MASSACHUSETTS,
SUPT. BASIL TSGARIS, DEPUTY CHIEF OF SECURITY KENNEY,
MAJOR (FIRST NAME UNKNOWN) WELDON, LT. (FIRST NAME UNKNOWN)
KORMAN, LT. JUAN RAMOS, LT. (FIRST NAME UNKNOWN) CADIGAN,
OFFICER WILLIAM MULDROW, OFFICER VICTOR KELLY AND
THE UNKNOWN OFFICER IN THE TOWER
DEFENDANTS

**DEFENDANT COMMONWEALTH OF MASSACHUSETTS' ANSWERS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

1.     Define the duties and responsibilities of each defendant.

A.     Objection. Defendants object to providing this information because plaintiff
       has requested information that could threaten the safety, health and security
       of staff and other inmates.  Without waiving said objection states as follows:
              Michael J. Ashe, Jr. is Sheriff of Hampden County
              Basil Tsagaris is Assistant Superintendent
              John Kenney is Deputy Chief of Security
              Edward Weldon is Assistant Superintendent in charge of classification
              Thomas Korman is a Lieutenant
              Juan Ramos is a Captain
              John Cadigan is a Captain
              William Muldrow is a Correctional Officer
              Victor Kelly is a Correctional Officer

2.     Who is in charge of cell assignment at the C-tower?

A.     After classification assigns a pod, the pod officers on duty assign the cell.

3.     On June 2nd, 2003, did officer Muldrow radio to the control tower and order
       the unknown officer in the tower to open the cell door of Timothy Zanetti?

A.     To the best of the Commonwealth's knowledge and based on the information
       provided by Officer Muldrow, yes he radioed he control tower.

4.     Where was officer Muldrow when said cell was opened?



EXHIBIT P.

109

A.    To the best of the Commonwealth's knowledge and based on the information provided by Officer Muldrow he was cuffing an inmate in front of his cell.

5.    Were there any other officers in front of the door when it was opened? If so, who?

A.    To the best of the Commonwealth's knowledge and based on the information provided by Officer Muldrow there were no other officers in front of the door.

6.    Did officer Muldrow and officer Kelly know that the plaintiff was on administrative protective custody?

A.    To the best of the Commonwealth's knowledge and based on the information provided by Officers Muldrow and Kelly, they knew the plaintiff was on administrative protective custody.

7.    Whoelse [sic] knew of the plaintiff's status? And how did they know?

A.    Other than Officers Muldrow and Kelly, the Commonwealth can not say who else, if any one, knew of plaintiff's status.  Information on the plaintiff's status is available on the computer system.

8.    Did anyone report this attack to medical? If so, who, when; If not, why?

A.    According to the Incident Report and Medical Records, Health Services was called.  The Commonwealth does not know who contacted Health Services.

9.    Did the plaintiff receive medical treatment in regard to the attack? If yes, state when, where, and by whom; If hot, state why not.

A.    According to the Medical Records, Plaintiff was seen at the facility by Michael Hall on June 2, 2003.

10.    Was the attack video taped? If so who has it? If not, state why.

A.    A camera photographed the incident and the images were stored digitally. However the images are no longer in possession of Hampden County Correctional Center due to a computer crash.

11.    What is the defendant, the unknown officer in the tower's name?

A.    Tim Allen.

*110*

12.    Why has the unknown officer in the tower not answered the complaint?

A.    The Commonwealth has been advised by counsel that the complaint has not been amended nor served on the officer.

13.    Has the unknown officer in the tower ever worked in the C-2 unit between May 27,2003 and June 2nd, 2003? If so, when?

A.    Yes, May 31, 2003 and June 1, 2003.

14.    Did anyone question inmate Zanetti as to his motive for the attack? If so, who, when; and what was discovered if anything?; and was it documented? If not, why not?

A.    There was an investigation and inmate Zanetti was questioned by a Disciplinary board panel as a result of his inmate rule violation.

15.    Did the plaintiff request any actions to be taken due to said attack? If so what and when as well as who it was requested of?

A.    The plaintiff filed an Inmate Request dated June 3, 2003 requesting an appointment with an eye doctor.

16.    What, if anything was done about this attack on the plaintiff? When and by whom.

A.    Inmate Zanetti was moved to a different POD by Pod Staff and in house discipline was given.

17.    Was the institution aware of any threats or the likelyhood [sic] of danger the plaintiff faced? If so, who was aware?

A.    The Commonwealth was not aware of any specific threats prior to the assault. Given the circumstances of the crime that the plaintiff was accused, we took precautionary measures to protect the plaintiff, other inmates and staff.

18.    Was the institution aware of Omar Marrero's affiliation to the lafamilia [six] gang? If so, when did they become aware; and in said circumstancies [sic], who is notified of such a status?

A.    Yes.  This affiliation was suspected on or about February 18, 2003 but not confirmed until October 20, 2003.

19.    Was anyone at the Hampden county house of correction involved in

3

*lll*

contacking the state police, or the district attorney's office, for the soul purpose of assisting Omar Marrero in becoming a commonwealth witness against the plaintiff? If so, who ,when was the call made; and from what number and extension was the call made?

A.    Not that the Commonwealth is aware of.

20.   Did Lt. Juan Ramos notify the district attorney's office of any other potential witnesses against the plaintiff, and or in any other criminal matter? If so, who were said potential witnesses, and from where did he place said call to the district attorney? What is the phone number and extention [sic] of said phone?

A.    To the best of the Commonwealth's knowledge and based on the information provided by Lt. Ramos, he did not notify the district attorney's office.

21.   Did LT. Juan Ramos tell the plaintiff's private investigator, Nicholas Cockoros, that inmate Timothy Zanetti was no longer at the Hampden county house of correction, and that Mr.Zanetti did not want to speak to anyone on April 2nd of 2004

A.    To the best of the Commonwealth's knowledge and based on the information provided by Lt. Ramos, he did not make such statements to the plaintiff's private investigator.

22.   Was Springfield police officer Michael White under mental observation and, or suicide watch while housed in the C-2 unit? If so, when, why and in what cell(s) was he housed in? And from what date was he in said cell(s)?

A.    Objection.   The information sought is protected by the phsycian-patient privilege.

23.   Was anyone aware of the fact that Omar Marrero was a Commonwealth witness prior to being placed in the plaintiff's cell?  If so, who and what did he/she know?

A.    Defendant Commonwealth of Massachusetts objects to this request in so far as it seeks information about the knowledge of individuals outside the Hampden County Correctional Center on the grounds that such information is not relevant to the issues raised in this case.  Without waiving such objection, To the best of the Commonwealth's knowledge, no information concerning Mr. Marrero's status as a witness or potential witness was known to anyone at the facility.

112

24.    How many times was Omar Marrero in any of the segregation units? And why was he there each time?

A.    Objection.   The information sought constitutes "evaluative information" under the C.O.R.I. statute.   M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

25.    When Omar Marrero returned to the C-2 unit in, or around september of 2003, why was he placed there?

A.    Objection, the information sought constitutes "evaluative information" under the C.O.R.I. statute. M.G.L. c. 6 § 167 exempts from disclosure, "evaluative information" defined as: "'Evaluative information', records, data, or reports concerning individuals charged with crime and compiled by criminal justice agencies which appraise mental condition, physical condition, extent of social adjustment, rehabilitative progress and the like, and which are primarily used in connection with bail, pre-trial or post-trial release proceedings, sentencing, correctional and rehabilitative planning, probation or parole."

26.    Upon Inmate Marrero's return to C-2 this time in question did anyone learn of Mr.Marrero's alleged Commonwealth witness status? If so, who and what did they learn?

A.    Defendant Commonwealth of Massachusetts objects to this request in so far as it seeks information about the knowledge of individuals outside the Hampden County Correctional Center on the grounds that such information is not relevant to the issues raised in this case.   Without waiving such objection, To the best of the Commonwealth's knowledge, no information concerning Mr. Marrero's status as a witness or potential witness was known to anyone at the facility.

27.    Did officer Kelly enter an enemey [sic] status between Omar Marrero and the plaintiff on october 28, 2003? If so why?; and If not this date, did he do so on any date? and why?

A.    To the best of the Commonwealth's knowledge and based on the information provided on October 21, 2003 an entry of "keep separate from Omar Marrero" was entered by Officer Kelly.

*113*

Signed under the penalties of perjury this 23rd day of June, 2006.

The Defendant,
Commonwealth of Massachusetts

By John F. Kenney
Deputy Chief of Security

**AS TO OBJECTIONS:**

Kevin D. Withers, Esquire

Certificate of Service

Kevin D. Withers certifies that copies of the foregoing document was served on Anthony Garvin to S.B.C.C. P. O. Box 8000, Shirley, MA 01464 by first class mail on 6/26/2006.

114